# EXHIBIT 2

Virgil Davila, M.D.

```
 1              UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF WEST VIRGINIA
 2                     AT CHARLESTON
 3       -------------------------------
         IN RE:  ETHICON, INC. PELVIC     MDL NO. 2327
 4       REPAIR SYSTEM PRODUCTS
         LIABILITY LITIGATION
 5                                        Master File
         ----------------------------    No. 2:12-MD-02327
 6       THIS DOCUMENT RELATES TO:
 7       Michelle A. Geery, v.            JOSEPH R. GOODWIN
         Ethicon, Inc., et al.,          U.S. DISTRICT JUDGE
 8
         Case No. 2:14-cv-09072
 9
         -------------------------------
10
11
                             - - -
12
                     Thursday, July 18, 2019
13
                             - - -
14
15            Videotaped deposition of VIRGIL DAVILA,
         M.D., held at 22 West Lake Beauty Drive,
16       Suite 314, Orlando, Florida, commencing at
         4:02 p.m., on the above date, before Susan D.
17       Wasilewski, Registered Professional Reporter,
         Certified Realtime Reporter, Certified Realtime
18       Captioner, Certified Manager of Reporting
         Services, Florida Professional Reporter, and
19       Realtime Systems Administrator
20
                             - - -
21
                  GOLKOW LITIGATION SERVICES
22           877.370.3377 ph | 917.591.5672 fax
                       deps@golkow.com
23
24
25
```

Virgil Davila, M.D.

Page 2

```
 1  APPEARANCES:
 2  AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
    BY: BOBBY J. (BRAD) BRADFORD, ESQUIRE
 3      bbradford@awkolaw.com
        17 East Main Street, Suite 200
 4      Pensacola, Florida 32502
        Phone: (850) 202-1010
 5      Representing Plaintiff
 6
 7  BUTLER SNOW, LLP
    BY: MATTHEW P. SMITH, ESQUIRE
 8      matt.smith@butlersnow.com
        The Pinnacle at Symphony Place
 9      150 3rd Avenue South, Suite 1600
        Nashville, Tennessee 37201
10      Phone: (615) 651-6700
        Representing Defendants Ethicon, Inc.,
11      and Johnson & Johnson
12
13  MATEER & HARBERT
    BY: SHARON JABLONSKI HENRY, ESQUIRE
14      shenry@mateerharbert.com
        225 East Robinson street, Suite 600
15      Orlando, Florida 32801
        Phone: (407) 425-9044
16      Representing the witness
17
18  ALSO PRESENT:
19      RON FLEMING, Videographer
20
21
22
23
24
25
```

Page 4

```
 1              E X H I B I T S
 2          (Attached to transcript)
 3  VIRGIL DAVILA, M.D. DEPOSITION EXHIBITS      PAGE
 4  Exhibit 7   Medical Record              72
                GEERYM_PASSO_MDR00003 and 4
 5
    Exhibit 8   Medical Record              72
 6              GEERYM_SOUSH_MDR00408
 7  Exhibit 9   Medical Record              72
                GEERYM_PSR_01000 and 1001
 8
    Exhibit 10  Medical Record              72
 9              GEERYM_PSR_01025 through 1027
10  Exhibit 11  Medical Record              73
                GEERYM_PSR_00545
11
    Exhibit 12  Medical Record              73
12              GEERYM_PASSO_MDR00002
13  Exhibit 13  Medical Record              73
                GEERYM_PASSO_MDR00001
14
    Exhibit 14  Medical Record              132
15              GEERYM_SOUSH_MDR00002 and 3
16  Exhibit 15  Gynemesh PS - Adverse Reactions     151
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              - - -
 2            I N D E X
 3              - - -
 4  Testimony of: VIRGIL DAVILA, M.D.         PAGE
 5    DIRECT EXAMINATION BY MR. BRADFORD...........  6
 6    CROSS-EXAMINATION BY MR. SMITH.............. 81
 7    REDIRECT EXAMINATION BY MR. BRADFORD........ 145
 8    RECROSS-EXAMINATION BY MR. SMITH........... 159
 9    REDIRECT EXAMINATION BY MR. BRADFORD........ 166
10    RECROSS-EXAMINATION BY MR. SMITH........... 167
11
12
13            E X H I B I T S
14          (Attached to transcript)
15  VIRGIL DAVILA, M.D. DEPOSITION EXHIBITS      PAGE
16  Exhibit 1   Defendants' Fact Sheet          24
                DFS-GEERY.MICHELLE-0001 through 106
17
    Exhibit 2   E-mails - Subject: Doctor in     28
18              Winterpark, FL
                ETH.MESH.17665053
19
    Exhibit 3   Gynecare Prolift Instructions for  51
20              Use
                ETH.MESH.02341522  through 2341589
21
    Exhibit 4   Gynecare TVT Instructions for Use  59
22              ETH.MEXH.02340974 through 2341046
23  Exhibit 5   TVT - Adverse Reactions          64
24  Exhibit 6   Medical Record                   72
                GEERYM_PASSO_MDR00005 and 6
25
```

Page 5

```
 1              - - -
 2      THE VIDEOGRAPHER: We are now on the record.
 3  My name is Ron Fleming. I am a videographer for
 4  Golkow Litigation Services. Today's date is
 5  July 18th, 2019, and the time is 4:02 p.m.
 6      This video deposition is being held in
 7  Orlando, Florida, in the matter of Michelle Geery
 8  vs. Ethicon, Incorporated, et al., being heard in
 9  the US District Court, Southern District of West
10  Virginia. The deponent is Dr. Virgil A. Davila.
11      Counsel, will you please identify yourselves
12  and affiliations.
13      MR. BRADFORD: I'm Brad Bradford for the
14  Plaintiff.
15      MS. HENRY: Matt Smith for Defendant
16  Ethicon.
17      THE VIDEOGRAPHER: Thank you. The court
18  reporter is Susan Wasilewski and will please
19  swear in the witness.
20      THE COURT REPORTER: Would you raise your
21  right hand?
22      Do you solemnly swear or affirm the
23  testimony you're about to give will be the truth,
24  the whole truth, and nothing but the truth?
25      THE WITNESS: I do.
```

Virgil Davila, M.D.

Page 6

1    THE COURT REPORTER:  Thank you.
2    VIRGIL DAVILA, M.D., called as a witness by
3  the Plaintiffs, having been duly sworn, testified as
4  follows:
5         DIRECT EXAMINATION
6  BY MR. BRADFORD:
7    Q.  Good afternoon, Dr. Davila.
8    A.  Good afternoon.
9    Q.  We were just introduced.  I'm going to be
10 asking you some questions about your care and
11 treatment of Michelle Geery today and your general
12 experience with some of the synthetic pelvic mesh
13 devices that you implanted in Ms. Geery.  Okay?
14   A.  Okay.
15   Q.  If you don't understand what I ask, please
16 let me know, I'll try to ask a better question.  I'm
17 sure I'm going to muddy some things up and get some
18 things wrong, so please have me ask a better
19 question if I do that.  Okay?
20   A.  Okay.
21   Q.  Is it fair that if you answer my question,
22 that you understood it?
23   A.  Yes, sir.
24   Q.  And I know you're busy, so if there comes a
25 time where you need a break for any reason, work or

Page 7

1  otherwise, just, you know -- we're here for you, so
2  just let us take a break and do what you need to do.
3  Okay?
4    A.  I appreciate it.
5    Q.  And I don't know what Counsel has told you
6  but we're tight time limited in these cases pursuant
7  to the judge's orders, so we have, like, an hour and
8  a half each side that is pretty stringent, so we're
9  not going to be here forever like some of these
10 things can go.
11        Have you, in the course of your practice,
12 given depositions in cases regarding the synthetic
13 meshes, polypropylene meshes?
14   A.  Yes.
15   Q.  About how many times have you done that?
16   A.  Four or five times.
17   Q.  All right.  And when you've done that, have
18 those -- have each of those times been as a treating
19 physician, meaning it was one of your patients who
20 was subject to the deposition?
21   A.  Not necessarily.
22   Q.  Okay.  Have you done work as an expert
23 witness in this litigation?
24   A.  No, I haven't.
25   Q.  What other circumstances would you have

Page 8

1  given depositions regarding the synthetic meshes?
2    A.  Somebody who I treated after she had a mesh
3  issue.
4    Q.  Okay.  Fair enough.  So there -- out of the
5  four or five times, there were some circumstances
6  where you would have been the doctor who implanted
7  the mesh device?
8    A.  Maybe once.
9    Q.  Okay.  And the rest of those times have been
10 where you, in the course of your practice, came to
11 treat someone who had a pelvic mesh device and then
12 had a lawsuit; is that fair?
13   A.  That's fair.
14   Q.  All right.  And do you recall which products
15 would have been involved in those depositions?
16   A.  Ethicon, Boston Scientific, AMS.
17   Q.  All right.  Do you recall which specific
18 Ethicon synthetic meshes would have been involved?
19   A.  No, I don't.
20   Q.  All right.  A general time frame for these
21 depositions?
22   A.  I think the last one that I had was four
23 years ago.
24   Q.  Okay.  So you're in the early waves?
25   A.  Yes.

Page 9

1    Q.  Okay.  All right.  Well, there's not many
2  left now, so, hopefully --
3    A.  That's what I heard.
4    Q.  Hopefully, there won't be many more of
5  these.
6         And I've provided some medical records
7  before the deposition that your counsel asked for.
8  Did you get a chance to review those records?
9    A.  I just reviewed them, yes.
10   Q.  All right.  Do you -- are you aware as to
11 whether there are any other medical records from
12 your treatment of Ms. Geery other than the ones that
13 we've provided copies of to you before the
14 deposition?
15   A.  I'm not aware of any, no.
16   Q.  All right.  Did you review, other than the
17 records you looked at before the deposition, did you
18 review any other records, medical or otherwise, in
19 preparing for your deposition today?
20   A.  No, I haven't.
21   Q.  And we have never met before, correct?
22   A.  Correct.
23   Q.  And we've never spoken before?
24   A.  No.
25   Q.  Okay.  And have you spoken with anyone from

Virgil Davila, M.D.

Page 10

1  Ethicon about your deposition today?
2     A.   No.
3     Q.   Before I get into your qualifications and
4  get to the meat of this thing, I want to ask you
5  some questions.  As part of the discovery in this
6  case Ethicon has produced millions and millions and
7  millions of pages of documents and some of those had
8  your name on them, had to do with you, and I wanted
9  to ask you about any relationship you would have had
10  with Ethicon as a preceptor or a consultant or
11  someone who spoke or taught on Ethicon's behalf.
12  Okay?
13     A.   Okay.
14     Q.   Do you recall any circumstances where you
15  spoke or taught on Ethicon's behalf and what time
16  frame that would have been?
17     A.   I am pretty sure that I did several times.
18  It was back in 2005, '04, that time frame.
19     Q.   Yeah.  They produced a grid to us that
20  shows -- and I'm not trying to trick you or, you
21  know, I'm not trying to ask you and then come back.
22     A.   Right.
23     Q.   They produced a grid that shows you did do
24  some preceptor work in the 2004, '05, '06, '07 time
25  frame.  Does that sound about right?

Page 11

1     A.   That's correct.
2     Q.   All right.  Do you recall, let's say from
3  2010 on, doing any consulting or preceptor or
4  teaching or anything like that on behalf of Ethicon?
5     A.   No.
6     Q.   Do you remember which devices you would
7  have -- and you know what I mean when I say
8  preceptor, of course?
9     A.   Sure.
10     Q.   And you're familiar with the term "key
11  opinion leader"?
12     A.   Key opinion leader?  No.
13     Q.   Okay.  Well, we'll work with preceptor for
14  now.
15     A.   Yeah.
16     Q.   Okay.  Do you recall which devices that
17  Ethicon wanted you to teach or speak on in its
18  behalf?
19     A.   Prolift and TVT and TVT-O.
20     Q.   I'm going to get into a lot of questions
21  about your training and history and all of that with
22  those in a little bit.  Any others that you
23  remember?
24     A.   Not that I remember.
25     Q.   All right.  In case this gets played instead

Page 12

1  of you having the misfortune of coming live to a
2  trial here in the Orlando area, could you introduce
3  yourself to the jury, please?
4     A.   Virgil Anthony Davila.
5     Q.   Dr. Davila, could you describe your
6  educational background and what your profession is
7  and what you do?
8     A.   I -- do you want me to start from medical
9  school?
10     Q.   Sure.
11     A.   I went to medical school at Jefferson
12  Medical College in Philadelphia from 1984 to 1988,
13  did my training at the Naval Hospital in San Diego
14  from 1988 to 1992.  I got out of the military in
15  1995 and pursued a job with Physician Associates
16  from that time on.
17     Q.   Okay.  And where do you currently practice?
18     A.   Orlando.
19     Q.   And how long have you practiced in Orlando?
20     A.   Actually, Oviedo, but Orlando.
21     Q.   Okay.  And how long -- how long have you
22  practiced in the Orlando area?
23     A.   Since 1995.
24     Q.   Do you have a specialty?
25     A.   I am board certified OB-GYN, I'm also board

Page 13

1  certified in urogynecology, I guess female pelvic
2  medicine and reconstructive surgery.
3     Q.   In the course of your practice and --
4  actually, let me strike that and ask it differently.
5         During your training that led to your
6  practice, did you treat women who suffered from
7  pelvic organ prolapse?
8     A.   Yes, I did, and I still do.
9     Q.   Okay.  And you still do.  And how about the
10  same questions for stress urinary incontinence?
11     A.   Correct.
12     Q.   All right.  Can you describe for me, I
13  guess, before the pelvic mesh -- the synthetic
14  meshes came on the market, which was -- I guess TVT
15  was the late '90s; is that correct?
16     A.   Correct.
17     Q.   Okay.  And before the TVT came on the market
18  and then those that followed for prolapse, what
19  types of treatments would you use for women you
20  treated who had pelvic organ prolapse?
21     A.   We did what we called native tissue repair
22  which involves anterior/posterior repairs.  We did
23  sacrocolpopexies in patients, open at that time, we
24  did Burch procedures for incontinence, we did MMKs
25  for incontinence.  Those are the types of surgeries

Virgil Davila, M.D.

Page 14

1  that we did back then.
2      Q.  All right.  And how did your patients
3  generally do with those treatments?
4          MR. SMITH:  Object to the form.
5      A.  They did well.
6      Q.  Now, obviously, the mesh slings came on the
7  market in the late '90s.  When did you -- I'm going
8  to ask these questions in parts.  I'm going to ask
9  about slings and then I'm going to ask about the POP
10  kits.  Okay?
11         So regarding slings, when did you first
12  become aware that there were polypropylene synthetic
13  midurethral slings?
14     A.  I believe it was in the mid 1990s or late
15  1990s.
16     Q.  Okay.  And do you recall how you became
17  aware of those?
18     A.  I had a -- I've always been, in the group
19  that I practice, I have been the one that did most
20  of the urogynecology and I'd treat those patients
21  because I had an interest in it and I had a good
22  training for it, and I also was kept up to date with
23  the training for urinary incontinence and for
24  prolapse.
25         So when it first came out, one of my

Page 15

1  colleagues actually who was also into urogynecology
2  had told me that there was a new procedure called
3  transvaginal tape for urinary incontinence.  I
4  became very curious.  I read about, you know, the
5  pathophysiology behind it and the mechanism behind
6  it and it seemed like something that would make
7  perfect sense to treat stress incontinence.
8      Q.  Okay.  I'm going to ask you the same
9  questions for pelvic organ prolapse.  When was it
10  that you first learned that there were polypropylene
11  or other synthetic meshes being used to attempt to
12  treat pelvic organ prolapse?
13     A.  It was shortly after that, maybe a few years
14  after that.  It had to do with the fact that there
15  was a lot of reports coming out at that point about
16  the fact that native tissue repair had a high
17  failure rate and we felt that there had to be a
18  better way to treat these patients, and I believe
19  that the initial -- bless you -- initial studies
20  that came out were from Europe and they were having
21  some good data in Europe as far as prolapse and mesh
22  repair and treatment with those, so I believe it was
23  shortly after that.
24     Q.  All right.  Regarding pelvic organ prolapse,
25  did you start using the synthetic meshes in your

Page 16

1  practice?
2      A.  Yes, I did.
3      Q.  Okay.  And when did you start using them in
4  your practice and which products did you use?
5      A.  If I recall correctly, the first product
6  that came out was not from Ethicon, it was actually
7  from AMS, and I believe it was Apogee and Perigee,
8  and I don't remember the name of the rep.  The rep
9  back then, because, you know, I did a lot of pelvic
10  organ prolapse, he contacted me about this product
11  and that's how I used this product.
12     Q.  And that would have been an AMS sales
13  representative?
14     A.  Correct.
15     Q.  Did you also have sales representatives from
16  Ethicon call on you?
17     A.  That happened afterwards.
18     Q.  Okay.  How long did you use the AMS -- let
19  me strike that and back up.
20         So when you mentioned the AMS products,
21  those are true POP kits, meaning it's not, you know,
22  a self-tailored piece of mesh, it's an actual kit
23  with trocars and all to be implanted transvaginally?
24     A.  Correct.
25     Q.  Okay.  And how long did you use the AMS POP

Page 17

1  kits?
2      A.  I think I used it for a couple of years when
3  they came out.
4      Q.  All right.  And at some point did you start
5  using the Ethicon Prolift?
6      A.  Yes.
7      Q.  Do you recall when that would have been?
8      A.  I don't recall exactly when it was but I do
9  remember that it was a few years after that.
10     Q.  And how did you learn about the -- first
11  learn about the Prolift?
12     A.  I believe I was approached by the rep.
13     Q.  And that would have been the sales
14  representative for Ethicon?
15     A.  Correct.
16     Q.  Do you remember who that would have been at
17  the time?
18     A.  There have been so many of them.  I want to
19  say Adam Brimwall.  Does that sound right?  Adam
20  Brimwall.
21     Q.  I've seen that name in the file, yes, sir.
22     A.  Yeah, yeah, yeah.
23     Q.  Okay.  Did you train on the Prolift?
24     A.  Yes, I did.
25     Q.  Okay.  Can you tell me about your Prolift

Virgil Davila, M.D.

Page 18

1 training?
2   A. I actually did a couple of trainings. I
3 went down to Miami to see a doctor there who did a
4 lot of mesh repair.
5   Q. Dr. Sepulveda?
6   A. Yes. And I also trained -- there was a
7 major training, and I forgot exactly where it was
8 but it was a training where it involved multiple
9 physicians. I particularly remember Dr. Lucente at
10 that point, and I think Dr. Sepulveda was also
11 there, so there were a couple of places where we --
12 that did the training. I went to a couple of those
13 training programs.
14   Q. Do you recall where you would have undergone
15 training on the Prolift where Dr. Lucente was one of
16 the teachers?
17   A. That was the second training program but I
18 can't recall where it was. I think it was in
19 Atlanta but I'm not -- I don't remember exactly
20 where it was.
21   Q. Give me one second. I've got a list here of
22 what Ethicon -- where Ethicon said you trained.
23 Let's take a look and see if that helps.
24       How about Savannah, Georgia, does that --
25   A. Savannah, Georgia, that's correct.

Page 19

1   Q. Is that it? Okay. All right. And at that
2 training session it was Dr. Sepulveda and
3 Dr. Lucente?
4   A. Well, they were there. Dr. Lucente was
5 definitely one of the -- one of the main speakers,
6 and I don't know if Dr. Sepulveda was one of the
7 main speakers at that lecture, to be honest, but he
8 was there, I do remember he was there.
9   Q. All right. Was there a presentation portion
10 of that training?
11   A. Correct, yeah.
12   Q. And then was there also a hands-on training
13 portion of that training?
14   A. Yes.
15   Q. All right. I'm going to ask some questions
16 about the presentation portion of that training. Do
17 you recall whether there were written materials
18 provided?
19   A. I think there were. Honestly, I don't
20 remember specifically but I think -- I think there
21 were.
22   Q. Was this like -- was this one of those
23 situations where you are there and other doctors who
24 treat pelvic organ prolapse were there also?
25   A. Correct.

Page 20

1   Q. Okay. So would part of it have been in,
2 like, a conference room or a classroom and there
3 were maybe a PowerPoint presentation and a board and
4 they went through the product and things like that?
5   A. That is correct.
6   Q. Okay. And then another part of it would
7 have been actually hands-on, you working with
8 cadavers to practice implanting the Prolift?
9   A. Correct.
10   Q. Okay. Regarding what I'll call the
11 classroom portion of that -- and if you have a
12 better term or you don't like that term, tell me and
13 I'm happy to change it.
14       For the classroom portion, what, if
15 anything, do you remember from that?
16   A. Aside from the actual mechanism, how to do
17 the procedure, or -- in particular, or about the
18 physiology specifically?
19   Q. Yeah. Let me ask a better question.
20       We've, in the course of the discovery in
21 this case, we've been produced and came across,
22 like, for example, PowerPoint presentations that
23 Dr. Sepulveda used when he trained physicians like
24 yourself to implant the Prolift, for example, and I
25 just want to get an understanding as to whether or

Page 21

1 not you have any memory as to Dr. Sepulveda using a
2 PowerPoint presentation as part of -- or an
3 audiovisual presentation as part of teaching on the
4 Prolift?
5   A. Yes, but I'm not sure that it was at the
6 Savannah conference. It might have been at the
7 Miami.
8   Q. Sure. And the same question for
9 Dr. Lucente. When Dr. Lucente presented, did he
10 have a PowerPoint or some type of audiovisual
11 presentation on the Prolift?
12   A. Yes.
13   Q. Did, at some point, did you -- were you
14 provided a copy of the -- are you -- well, strike
15 that.
16       Are you familiar with what an IFU is,
17 instructions for use?
18   A. No.
19   Q. Okay. It's what -- it's the package insert
20 that comes with medical devices.
21   A. Okay.
22   Q. Okay. Do you recall during that training
23 session it being -- the package insert being gone
24 over as part of that?
25   A. I don't recall, really.

Virgil Davila, M.D.

1  Q.  Okay.  Do you recall, in the course of your
2  practice, reviewing with the sales rep or on your
3  own or otherwise reviewing the package insert for
4  the Prolift?
5  A.  I'm sure that I did at some point.
6  Q.  That's an -- it's an important document,
7  isn't it?
8  A.  Right.  Right.
9      MR. SMITH:  Object to form.
10  Q.  Do you -- do you agree -- do you have an
11  opinion whether or not the package insert or IFU is
12  an important document for medical devices?
13      MR. SMITH:  Object to form.
14  A.  Yes.
15  Q.  Okay.  And part of that package insert or
16  IFU, there are instructions on how to implant the
17  device; is that fair?
18  A.  That is fair, yes.
19  Q.  And also a part of the -- that is warnings
20  or contraindications; is that fair also?
21  A.  Correct.
22  Q.  Okay.  And that's something you would have
23  reviewed before you decided to use the Prolift; is
24  that fair?
25  A.  Correct.

1  Q.  Okay.  And the same questions for the TVT-O,
2  that's something you also would have reviewed before
3  using the TVT-O device as well?
4  A.  Correct.
5  Q.  Okay.  Would you have relied upon the
6  information provided in the package insert or IFU
7  regarding the Prolift in, in part, in your learning
8  and your technique in implanting the devices?
9      MR. SMITH:  Object to form.
10  A.  Would I rely strictly on that --
11  Q.  No, no.  Relied on it in part amongst other
12  training as part of what -- as part of the
13  information that you would have used in learning how
14  to and the technique you would have used.
15      MR. SMITH:  Object to form.
16  A.  Yes.
17  Q.  Okay.  And likewise, would you have relied
18  upon the warnings and contraindications in the
19  package insert or IFU in -- at least in part in the
20  risk/benefit analysis you would undergo with your
21  patients?
22      MR. SMITH:  Object to form.
23  A.  Yes.
24  Q.  Bear with me one second, Doctor.  I lost my
25  place where it talked about your training.  I wanted

1  to get those dates.
2      I won't -- I'm going to mark -- this is the
3  defendant's fact sheet.  I'll just mark it as
4  Exhibit 1.
5      MR. BRADFORD:  Do you need a copy of it?
6      MR. SMITH:  Sure.
7      (Davila Exhibit 1 was marked for
8  identification.)
9      MR. BRADFORD:  Okay.  Let me dig those out.
10  Of course, I've lost my place again.
11 BY MR. BRADFORD:
12  Q.  They combine these.  There are other doctors
13  that treated her, so it's everybody's in here, not
14  just yours.
15  A.  Right.
16      MR. BRADFORD:  Actually, so I don't waste my
17  time looking for that, I'm just going to ask him
18  about the dates as to when he trained.
19      MR. SMITH:  Okay.
20 BY MR. BRADFORD:
21  Q.  Doctor, if you look at -- on the bottom of
22  these documents there is a number at the bottom, so
23  Bates number 0064.  It looks like there is a
24  Gynemesh PS -- I don't have it in front of me.  It's
25  either a preceptorship or a proctorship.

1  A.  Okay.
2  Q.  From February of 2006.
3  A.  Right.
4  Q.  Do you recall having been trained on the
5  Prolift before then?
6  A.  Yes, I'm pretty sure I was trained before
7  that, yeah.
8  Q.  Okay.  Thank you.  Let me --
9  A.  I was also trained on the Apogee and Perigee
10  as well, so --
11  Q.  Sure.  That would have been through AMS?
12  A.  Correct.
13  Q.  And it looks like you were trained on the
14  TVT-O in September of 2004?
15  A.  TVT and TVT-O, correct.
16  Q.  Do you recall whether, specific to the
17  TVT-O, whether you would have been trained on the
18  TVT-O by Ethicon before September of 2004?
19  A.  You know, I might have, to be honest with
20  you, because I think the TVT-O came out much later
21  than the TVT.  The TVT came out first and the TVT-O
22  came out much later.
23  Q.  Yeah.  I understand.
24  A.  Yeah.
25  Q.  The Prolift was first marketed in the United

Virgil Davila, M.D.

Page 26

1  States in March of 2005.  Do you remember -- and I'm
2  not trying to marry you to the week, but do you
3  remember how long Prolift had been out when you
4  adopted it and started -- you trained on it and
5  adopted it and started using it?
6  A.  Honestly, I don't remember.  It must have
7  been pretty soon after that.
8  Q.  Is it fair to say you were an early user of
9  Prolift?
10  A.  Yes.  Yeah.
11  Q.  Did you know at the time that the Prolift
12  had not been cleared by the FDA?
13  A.  I don't recall, to be honest.  I don't think
14  I know that.
15  Q.  Did anyone from Ethicon ever tell you that
16  the Prolift was not cleared by the FDA until May of
17  2008 to be used as a medical device?
18     MR. SMITH:  Object to the form.
19  A.  No, I haven't -- I didn't know that.
20  Q.  Is that something you would have liked to
21  have known for people like Ms. Geery, who was
22  implanted in 2006, that the device had never been
23  cleared by the FDA?
24     MR. SMITH:  Object to the form.
25  A.  It would have been nice to know, yeah.

Page 27

1  Q.  I'm going to get to the specifics of
2  Ms. Geery in a little bit but she was implanted in
3  May of 2006.  Is that consistent with your review of
4  her records?
5  A.  Yes.
6  Q.  Okay.  At that point Prolift had been on the
7  market 14 months or so.  Do you recall how many,
8  roughly, how many Prolifts you would have implanted
9  from when it hit the market until you put this one
10  in, the one in Ms. Geery?
11  A.  I would say at least 20 of them at that
12  point, just because I had a large referral basis.
13  Q.  Were you still using the AMS device or did
14  you, once you started using Prolift, did you, at
15  least for a period of time, use the Prolift
16  exclusively?
17  A.  Once I -- the Prolift came out, I started
18  using the Prolift exclusively.
19  Q.  All right.  At some point did you get away
20  from the Prolift and start using another synthetic
21  mesh device for pelvic organ prolapse?
22  A.  Not vaginally.
23  Q.  Okay.  Did you ever use a Pinnacle?
24  A.  I might have tried it once maybe.
25  Q.  Yeah.

Page 28

1  A.  Once or twice I might have tried it, but it
2  wasn't something that I used on a regular basis.
3  Q.  Yeah.  And the reason I'm asking is as part
4  of the millions of millions of documents that were
5  produced to us, some of those had information with
6  your -- that had your name on it.  There is -- I'll
7  mark as Plaintiff's Exhibit 2 --
8  A.  Who produces the Pinnacle?
9  Q.  The Pinnacle?
10  A.  Who is the -- who is the manufacturer?
11  Q.  That's Boston Scientific, I think.  Let me
12  look and I'll tell you.
13  A.  Okay.  It might have been, yeah, because I
14  think Boston Scientific approached me after --
15  Q.  Yes.  I'll show you in a second.
16  A.  Okay.
17  Q.  And I'll look.  Whatever you remember, you
18  remember.
19  A.  Okay.
20  Q.  I'm not trying to put words.  I just want to
21  let you know why I'm asking the question.
22  A.  Okay.
23  Q.  Boston Scientific.
24  A.  Okay.  Makes sense, yeah.
25     (Davila Exhibit 2 was marked for

Page 29

1  identification.)
2  BY MR. BRADFORD:
3  Q.  All right.  I'll show you what we've -- what
4  I've marked as --
5     MR. BRADFORD:  I'm sorry, I've only got a
6  copy for counsel.
7     MS. HENRY:  That's okay.
8     MR. BRADFORD:  You're welcome to look at it
9  before the doctor sees it.  Here you go.
10  BY MR. BRADFORD:
11  Q.  I'll show you what I've marked as
12  Plaintiff's Exhibit 2, and that's an e-mail string
13  from a Selena Lessa to Adam Remoll.  I think that's
14  the representative you mentioned earlier; is that
15  correct?
16  A.  Yes.
17  Q.  So he's the rep that called on you for
18  Ethicon, at least during a certain time frame?
19  A.  Right.
20  Q.  Okay.  It looks like -- and I don't know who
21  Selena Lessa is but --
22  A.  She was one of the managers.
23  Q.  Okay.
24  A.  I remember her now.
25  Q.  So it looks like she was looking for someone

Virgil Davila, M.D.

Page 30

1  to recommend for her aunt's mom.  Do you see that at
2  the bottom of the e-mail?
3      A.  Yes.  Yes.
4      Q.  All right.  And then you were recommended as
5  one of the doctors but -- and the date on this is
6  December 2nd, 2008, and it says that you've done
7  over 100 Prolifts as of that time but,
8  unfortunately, you're using the Pinnacle a lot
9  lately.
10      A.  Hm-hmm.
11      Q.  And I'm -- I assume it's unfortunate for the
12  Ethicon rep to say that because you were not using
13  the Prolift.
14      A.  Right.  Right.  Right.  Yeah.  I don't
15  remember that but I do remember doing some of the
16  other procedures.
17          MS. HENRY:  Wait for a question.
18          THE WITNESS:  Sorry.
19          MR. SMITH:  Object to form.
20      Q.  Yeah, that was -- you anticipated my
21  question, is does that jog your memory or does that
22  help you recall that you used the Pinnacle?
23      A.  Yes, I do remember the Boston Scientific rep
24  coming and I started using it.  I didn't realize
25  that I was using -- doing so many Pinnacles.

Page 31

1      Q.  Okay.  And --
2      A.  I did a few but I don't remember doing a lot
3  of them.
4      Q.  Sure.  Do you remember why you would have
5  started using the Pinnacle as opposed to the
6  Prolift?
7      A.  Not specifically, other than the fact that
8  just looking for a different approach, a different
9  way of doing things.  You know, I've also -- I've
10  always been interested in learning new procedures,
11  so when this procedure came out, there was always a
12  spin to one as opposed to the other, and I wanted to
13  see whether I was -- I would be getting the same
14  results from one as compared to the other.  That
15  would have been the main reason why I had done it,
16  just comparison purposes.
17      Q.  Dr. Davila, did you, when you implanted the
18  Prolift, did you implant that as you were trained by
19  Ethicon?
20          MR. SMITH:  Object to form.
21      A.  You mean the way that I was trained?
22      Q.  Yes, sir.
23      A.  Yes.
24      Q.  You followed Ethicon's training when you
25  implanted the device?

Page 32

1      A.  I did.
2          MR. SMITH:  Object to form.
3      Q.  Okay.  And you wouldn't deviate from how you
4  were taught by Ethicon to put the device in; is that
5  fair?
6      A.  That is correct.
7      Q.  Okay.  Same for the TVT-O, when you
8  implanted the TVT-O devices, did you do that as
9  Ethicon trained you?
10          MR. SMITH:  Object to form.
11      A.  Correct.
12      Q.  And you would not deviate when implanting
13  the TVT-O from what Ethicon would have told you to
14  do?
15      A.  No.
16      Q.  And I will tell you, there is no allegations
17  in this case.  Ms. Geery -- there is no criticism of
18  your care or the implantation or anything to do with
19  that, so that's -- you probably know that already,
20  but we haven't talked, so I haven't had the
21  opportunity to tell you that.  So there is no
22  allegation or criticism from her behalf that you did
23  anything wrong in the implantation.  Okay?
24      A.  Thank you.
25      Q.  I just wanted you to know that.

Page 33

1          When is the last time you implanted or used
2  Prolift in your practice?
3      A.  It would have to be 2007.
4      Q.  Okay.  And what happened in 2007 to cause
5  you to stop using the Prolift in your practice?
6      A.  I started looking at other ways to repair
7  bladder prolapse.
8      Q.  Okay.  And what other ways were you looking
9  at?
10      A.  Robotic surgery started coming around for
11  GYN, so I kind of jumped into that technology
12  thinking that would be a better way to do things.  I
13  had done sacrocolpopexy way as -- you know, open
14  sacrocolpopexy in the past, so I felt that this
15  would be a better way to repair the bladder, and
16  since it had the best results.  So I started looking
17  into sacrocolpopexy as opposed to a lot of these
18  vaginal mesh repairs.
19      Q.  Right.  And you would do that through the
20  robotic surgical devices abdominally?
21      A.  Correct.
22      Q.  Okay.  And how did your -- once you made
23  that transition, how did your patients do?
24      A.  They did very well.
25      Q.  Do you have an opinion whether or not the

Virgil Davila, M.D.

Page 34

1  patients that you treated did better with the
2  robotic abdominal approach for prolapse repair
3  compared to the tradition -- well, I don't want to
4  say traditional -- compared to the mesh kits such as
5  Prolift?
6     MR. SMITH: Object to form.
7     A. I believe that I had patients that did well
8  on both.
9     Q. Understanding you had patients who did well
10  in both, is it fair that you continued to use the
11  robotic surgery going forward and stopped using the
12  Prolift?
13     A. Yes.
14     Q. And is that because you thought that was in
15  the best interest of your patients?
16     A. Yes.
17     Q. Did you have any -- as of that time frame,
18  were you seeing any mesh-related complications from
19  the Prolift?
20     A. The main thing that I was seeing was some
21  mesh extrusion through the vagina.
22     Q. And would some of that that you were seeing
23  be from your own patients?
24     A. Yes.
25     Q. And also, I suspect, based upon the nature

Page 35

1  of your practice, you might have also seen that from
2  patients that you did not implant but came to see
3  you for their complications?
4     A. That is correct.
5     Q. And it seems like, from your body language,
6  and I don't want to put words in your mouth, but it
7  seems like you -- you're experienced in treating
8  mesh complications; is that fair?
9     A. That's correct.
10     Q. I don't know if there is an easy way to
11  answer this, by time frame or percentage of practice
12  or what, but how much of that -- what's the best way
13  you can answer that question for me?
14     A. I'm sorry. Can you repeat that again?
15     Q. Sure. In treating mesh complications from
16  women who had synthetic polypropylene meshes
17  implanted, I don't know whether it would be best for
18  you to talk about a percentage of your practice or
19  it may be more in a certain time frame or less than
20  others, or how much -- I'm just trying to get a feel
21  for how much experience and how much time you spent
22  in your practice doing that.
23     MR. SMITH: Object to form.
24     A. I would say maybe about five percent of my
25  practice is involving patients that had other issues

Page 36

1  with the mesh usually.
2     Q. All right. And so as of 2007, you were
3  seeing some erosions or extrusions. Are those terms
4  interchangable to you, or do you have different
5  definitions?
6     A. I call it erosion if it goes into a viscous,
7  like, for example, bladder or rectum.
8     Q. Sure.
9     A. I call it extrusion if it's extruded to the
10  vagina.
11     Q. I'm happy to use that same vernacular, so
12  that's fine. As of 2007, were you seeing any other
13  complications from Prolift that was giving you
14  concern?
15     MR. SMITH: Object to form.
16     A. Not really. The main complication I was
17  seeing is the extrusion.
18     Q. In your practice moving forward from --
19  strike that.
20     Is the robotic surgery, the abdominal
21  robotic approach, is that the exclusive surgical
22  approach you use for prolapse now?
23     A. No.
24     Q. What else do you do?
25     A. I still use vaginal -- I do vaginal surgery.

Page 37

1  I have used, until the FDA recently came out with
2  their -- the last advisory, I've been using
3  transvaginal mesh in selected patients.
4     Q. And when you say selected patients, what do
5  you mean?
6     A. These are -- well, these are patients that
7  have multiple medical problems, patients that
8  have -- may have a severe prolapse that I don't want
9  to do a big surgery on them, patients that I want
10  to -- that I want to minimize my time in the OR and
11  yet I want to repair their prolapse in an efficient
12  manner.
13     Q. When you were trained on the Prolift, did
14  anyone from Ethicon ever tell you that the original
15  study on Prolift failed its primary endpoint because
16  the recurrence rate was higher than the rate that
17  was targeted?
18     MR. SMITH: Object to form.
19     A. I don't recall that.
20     Q. You don't recall that coming from
21  Dr. Sepulveda or Lucente?
22     A. No.
23     MR. SMITH: Object to form.
24     Q. Is that something that you would have liked
25  to have known, that the original study on Prolift

Virgil Davila, M.D.

Page 38

1  failed its primary endpoint before you chose to use
2  that in your patients?
3      MR. SMITH: Object to form.
4      A. Yes.
5      Q. Is that something had you known, would you
6  have let your patients know when it came
7  risk/benefit analysis time?
8      MR. SMITH: Object to form.
9      A. I would have probably mentioned it to them,
10  yes.
11     Q. When you were trained on the Prolift, or any
12  time thereafter, did anyone from Ethicon ever tell
13  you that Ethicon's chief medical officer, that it
14  was his belief that a reasonable argument could be
15  made that the risks outweighed the benefits at the
16  time the Prolift was launched and it never should
17  have been sold?
18     MR. SMITH: Object to form.
19     A. I was never told that.
20     Q. Is that something you would have liked to
21  have known as a physician who was being asked to
22  implant the Prolift device in women?
23     MR. SMITH: Object to form.
24     A. Yes.
25     Q. And had you known that, is that something

Page 39

1  that could have affected your decision as what -- as
2  to whether or not to use the Prolift in your
3  patients?
4      MR. SMITH: Object to form.
5      A. Yes.
6      Q. And had you known that, is that something
7  you would have shared with your patients when it
8  came risk/benefit analysis and informed consent
9  time?
10     A. Yes.
11     Q. When you did your initial training on the
12  Prolift or any time thereafter, did anyone from
13  Ethicon ever let you know that Ethicon never
14  investigated mesh contraction before putting Prolift
15  on the market?
16     MR. SMITH: Object to form.
17     A. I wasn't told that, no.
18     Q. Is that something you would have liked to
19  have known?
20     A. Yes.
21     MR. SMITH: Object to form.
22     Q. And is that something, had you known, that
23  would have played a role in whether or not you used
24  the Prolift in your practice?
25     MR. SMITH: Object to form.

Page 40

1      A. Yes.
2      Q. And is that something, had you known, you
3  would have shared with your patients in their
4  informed -- in your informed consent?
5      MR. SMITH: Object to form.
6      A. Yes.
7      Q. Did anyone from Ethicon ever tell you that
8  the contraction rate for the Prolift is 20 to 40
9  percent?
10     MR. SMITH: Object to form.
11     A. No.
12     Q. Is that something you would have liked to
13  have known as a physician to whom -- or who was
14  being asked to use the Prolift?
15     MR. SMITH: Object to form.
16     A. Yes.
17     Q. Is that something that would have played a
18  role whether or not you chose to use the Prolift in
19  your patients?
20     A. Yes.
21     Q. And is that something that you would have
22  shared with your patients when it came risk/benefit
23  time?
24     A. Yes.
25     Q. Did anyone from Ethicon at any point, from

Page 41

1  training through the time you stopped using the
2  Prolift, ever advise you that Ethicon never
3  investigated the risk of chronic pain with the
4  Prolift?
5      MR. SMITH: Object to the form.
6      A. No.
7      Q. Is that something you would have liked to
8  have known?
9      A. Yes.
10     MR. SMITH: Object to form.
11     Q. Is that something, had you known, that would
12  have played a role in your decision in using the
13  Prolift for your patients?
14     A. Yes.
15     Q. Is that something, had you known, you would
16  have shared with your patients when it came time for
17  the risk/benefit analysis in determining whether or
18  not to have a Prolift?
19     MR. SMITH: Object to form.
20     A. Yes.
21     Q. Are you ever -- are you familiar with
22  Professors Cosson or Jacquetin, are those names you
23  ever heard?
24     A. Cosson sounds familiar, yeah. West coast?

Virgil Davila, M.D.

Page 42

1   Q.  Actually, they are European.
2   A.  Oh, no.  Okay.
3   Q.  They were -- they have been referred to as
4  the godfathers of the Prolift.  Have you --
5   A.  Okay.  No.
6   Q.  Are you familiar with them?
7   A.  No, that's somebody else.
8      MR. SMITH:  Object to form.
9   Q.  Thank you.  Did anyone from Ethicon ever
10  tell you that Professors Cosson and Jacquetin, their
11  main concern with the Prolift was contraction and
12  they wanted to create a new material before the
13  Prolift was ever launched, did you know that?
14      MR. SMITH:  Object to form.
15   A.  No, I didn't know that.
16   Q.  Is that something you would have liked to
17  have known?
18   A.  Yes.
19   Q.  Is that something that would have played a
20  role in whether or not you would have chosen to use
21  the Prolift in patients such as Mr. Geery?
22   A.  Yes.
23   Q.  Is that something you would have let
24  patients like Ms. Geery know when it came
25  risk/benefit analysis time?

Page 43

1   A.  Yes.
2   Q.  Did anyone from Ethicon ever make you aware
3  that one of its medical directors, Dr. Axel Arnaud,
4  it was his opinion that if exposure and shrinkage
5  were due to the mesh, that the material should have
6  been changed and never put in the Prolift or ever
7  marketed, did anyone from Ethicon ever tell you
8  that?
9      MR. SMITH:  Object to form.
10   A.  No.
11   Q.  Is that something you would have liked to
12  have known?
13   A.  Yes.
14      MR. SMITH:  Object to form.
15   Q.  And had you known that, is that something
16  that would have played a role in whether or not you
17  would have used the Prolift with patients such as
18  Ms. Geery?
19      MR. SMITH:  Object to form.
20   A.  Yes.
21   Q.  Is that something you would have shared with
22  patients like Ms. Geery in their risk/benefit
23  analysis that you did?
24   A.  Yes.
25   Q.  Did anyone from Ethicon ever let you know

Page 44

1  that Ethicon never studied or did any investigation
2  at all into whether the Prolift mesh could be
3  removed if complications or problems arose with the
4  mesh before launching the product?
5      MR. SMITH:  Object to form.
6   A.  No.
7   Q.  Is that something you would have liked to
8  have known?
9   A.  Yes.
10   Q.  Is that something you would have shared with
11  patients like Mrs. Geery in the risk/benefit
12  analysis had you known that?
13      MR. SMITH:  Object to form.
14   A.  Yes.
15   Q.  In the course of your practice treating mesh
16  complications, have you seen on your own that a
17  Prolift is difficult to remove?
18      MR. SMITH:  Object to form.
19   A.  Yes.
20   Q.  Based upon your experience, how difficult is
21  it to remove a Prolift when patients have
22  complications?
23   A.  It depends on the patient.  It depends on
24  how sensitive it is.
25   Q.  It can be difficult; is that fair?

Page 45

1      MR. SMITH:  Object to form.
2   A.  Yes.
3   Q.  Have you ever been able to remove the
4  entirety of a Prolift device from a patient who
5  needed a removal?
6   A.  No, I haven't.
7   Q.  Why is that?
8   A.  Because it could be very difficult to get.
9   Q.  You just can't get all of it; is that fair?
10   A.  Yes.
11   Q.  And did Ethicon ever tell you that there was
12  no plan or investigation in place as to getting this
13  device out before it launched the Prolift?
14      MR. SMITH:  Object to form.
15   A.  No.
16   Q.  And had you known that, would you have used
17  the Prolift with your patients or would you have
18  found other -- continued to use the other treatment
19  options that you were using?
20      MR. SMITH:  Object to form.
21   A.  At the time it seemed like the -- that it
22  was one of the best options for a patient that had
23  prolapse just because, again, statistics was coming
24  out saying that the rate of failure was high and we
25  felt this would be a better option for the patients,

Virgil Davila, M.D.

Page 46

1  so, you know, I think I, in selected patients, like
2  I said, with the proper training, I think the
3  Prolift did help a lot of patients, so I was
4  comfortable using it on my patients.
5      Q.   Sure.  Is it -- is it fair to say that your
6  knowledge of the risks and complications of the
7  Prolift grew and you learned a lot over time having
8  used it with your patients and treating other women
9  into whom it was implanted?
10      MR. SMITH:  Object to form.
11      A.   Absolutely, yes.
12      Q.   So when you mentioned at the time, you know,
13  you thought this was a good -- a good option, have
14  you learned information since then that might cause
15  you to think there were better options?
16      MR. SMITH:  Object to form.
17      A.   I think at the time it was the right choice
18  and I think at the time for many patients it was the
19  right choice, and I believed that because I was
20  trained well and I was comfortable doing it, I think
21  my patients did well, but I can see how if somebody
22  is not trained well or somebody who doesn't have any
23  experience, it may not be the right choice.
24      Q.   Right.  You haven't treated Ms. Geery since,
25  according to the records, August of 2006, which was

Page 47

1  three months or so after you implanted her; is that
2  fair?
3      A.   That's fair, yes.
4      Q.   And you haven't seen her since then?
5      A.   I have not.
6      Q.   You haven't talked to her independently
7  outside of a medical practice or anything like that,
8  have you?
9      A.   No.
10      Q.   You have no idea how she's doing today?
11      A.   No.
12      Q.   If, as it turns out, Ms. Geery has had three
13  mesh removal surgeries, including one as recently as
14  2017, and currently undergoes pelvic floor therapy
15  and pain management, looking back with what you know
16  now, unfortunately in hindsight, was the Prolift the
17  best device for her for her prolapse?
18      MR. SMITH:  Object to form; calls for
19  speculation.
20      A.   Looking back, she had issues, you know, but,
21  you know, any type of surgery you can have issues,
22  unfortunately, we have no way of predicting that,
23  but I think at the time it seemed like a viable
24  option for her.
25      Q.   Sure.  Yeah, at the time, based upon what

Page 48

1  you knew, it was the option that you recommended to
2  her; is that fair?
3      MR. SMITH:  Object to form.
4      A.   Correct.  Yeah.
5      Q.   Okay.  And that's based upon what you knew
6  about the risk profile at the time; is that fair?
7      A.   That's fair, yeah.
8      Q.   And if Ms. Geery would have came into your
9  practice in -- after 2007, she would have most
10  likely received a robotic surgery with an abdominal
11  approach; is that fair?
12      MR. SMITH:  Object to form.
13      MS. HENRY:  Just one second.  Counsel, I'm
14  just going to caution you that I think we're
15  going outside the scope of Dr. Davila's
16  deposition today.  His role is just treating
17  physician, so his lane, so to speak, is from the
18  first time he saw her to the last, so any
19  questions beyond that -
20      MR. BRADFORD:  Right.
21      MS. HENRY:  -- are getting more into expert
22  testimony --
23      MR. BRADFORD:  Sure.
24      MS. HENRY:  -- which is improper under
25  Florida law.

Page 49

1      MR. BRADFORD:  Well, the issue we have with
2  this case is we have a failure to warn claim and
3  that claim hinges upon Dr. Davila's -- or
4  Dr. Davila's -- I'm sorry, I'm -- I apologize if
5  I'm mispronouncing your name.
6      MS. HENRY:  Me, too.
7      MR. BRADFORD:  That claim hinges upon not
8  necessarily what's told to the plaintiff but what
9  risks he's told of, so the reason I'm asking
10  these risk profile questions is because the
11  failure to warn -- the elements of the failure to
12  warn claim require these questions about his
13  understanding of the risks and what he would have
14  done or how he would have reacted differently,
15  would he have warned her differently or whatever.
16  That's why I'm asking these questions.
17      MS. HENRY:  Which is why I've permitted the
18  questions so far.
19      MR. BRADFORD:  Sure.
20      MS. HENRY:  Because they've been during his
21  care and treatment, what he understood at the
22  time that he was, you know -- leading up to his
23  care and treatment and during that time, but that
24  last question went after the last time he saw
25  her, what would he have done in the future, and

Virgil Davila, M.D.

Page 50

1   that's not why he's here.
2        MR. BRADFORD:  I'll withdraw the question.
3        MS. HENRY:  Okay.  Thank you.
4        MR. BRADFORD:  I think his previous
5   testimony speaks for itself as to that.
6   BY MR. BRADFORD:
7        Q.  Were you aware that Ethicon Medical Director
8   Dr. Arnaud wanted to change the IFU or the package
9   insert regarding the Prolift before the product was
10  launched, did anyone from Ethicon ever tell you
11  that?
12       MR. SMITH:  Object to form.
13       A.  No.
14       Q.  Were you aware that Dr. Arnaud wanted to
15  change the IFU to read:  Use of mesh can lead to
16  complications such as vaginal erosion and
17  retraction.  This can interfere with sexual
18  intercourse and the risk is increased when done with
19  hysterectomy.  This must be taken into consideration
20  with sexually active women.
21       Were you aware that Dr. Arnaud wanted to
22  make that change?
23       MR. SMITH:  Objection.
24       A.  No, I was not.
25       Q.  Did anyone from Ethicon ever tell you that

Page 51

1   change wasn't made because they had already sent the
2   document to print?
3        MR. SMITH:  Object to form.
4        A.  No.
5        Q.  Did anyone from Ethicon ever tell you
6   despite the excuse that they had already sent it to
7   print, that that change never was made to the
8   Prolift IFU ever, did you ever know that?
9        A.  No.
10       MR. SMITH:  Object to form.
11       Q.  Is that something you would have liked to
12  have known?
13       A.  Yes.
14       Q.  Is that something, had you known, that could
15  have played a role in your decision to use the
16  Prolift in your practice?
17       MR. SMITH:  Object to form.
18       A.  Yes.
19       Q.  Is that something you would have shared with
20  patients such as Ms. Geery when giving the
21  risk/benefit analysis for the Prolift?
22       MR. SMITH:  Object to form.
23       A.  Yes.
24       (Davila Exhibit 3 was marked for
25  identification.)

Page 52

1        MR. BRADFORD:  I'm going to mark the Prolift
2   IFU as Exhibit 3.
3        MS. HENRY:  Thank you.
4        MR. SMITH:  Thanks.
5   BY MR. BRADFORD:
6        Q.  While your counsel is looking at that, did
7   the sales reps that called on you bring brochures
8   for the Prolift and the TVT-O devices?
9        A.  I don't remember, to be honest with you.
10       Q.  Yeah.  In the course of your practice was it
11  common for there to be brochures that sales
12  representatives have for different drugs or medical
13  devices?
14       A.  Usually there are, yes.
15       Q.  Do you have any independent memory today
16  whether or not the -- you had brochures for the
17  Prolift in your office?
18       A.  I don't remember.
19       MR. SMITH:  Object to form.
20       Q.  So you could have, you just don't remember
21  one way or the other?
22       A.  Correct.
23       Q.  I want to -- feel free to look through that.
24  I'm going to direct you to page 5.  If you will
25  look, the page numbers are --

Page 53

1        A.  Yes.
2        Q.  Yeah.  Okay.  Do you see under the -- at the
3   bottom of the page, under Performance, do you see
4   that section?
5        A.  Yes.
6        Q.  Do you see it reads that:  "Animal studies
7   show that implantation of Gynecare Gynemesh PS..."
8        And let me stop there.  Were you aware that
9   the Prolift was made -- the body of the Prolift was
10  made of what Ethicon called Gynemesh PS, were you
11  ever aware of that?
12       A.  No.
13       Q.  Okay.  Well, I'll represent to you that is
14  so, that's why it says Gynemesh PS as opposed to
15  Prolift.
16       A.  Okay.  Gotcha.  Okay.  I understand.  Yes.
17       Q.  Yeah.  Okay.  And it reads:  "Animal studies
18  show that implantation of Gynecare Gynemesh PS
19  elicits a minimum to slight inflammatory reaction,
20  which is transient and is followed by a deposition
21  of a thin fibrous layer of tissue which can grow
22  through the interstices of the mesh, thus
23  incorporating the mesh into adjacent tissue."
24       Do you see that?
25       A.  Yes.

Virgil Davila, M.D.

Page 54

1    Q.   All right.  And then reading further: "The
2   mesh remains soft and pliable, and normal wound
3   healing is not noticeably impaired.  The material is
4   not absorbed, nor is it subject to degradation or
5   weakening by the action of tissue enzymes."
6        Do you see that?
7    A.   Yes.
8    Q.   Is that consistent with what Ethicon taught
9   you about the Prolift?
10    A.   As I recall, yes.
11    Q.   All right.  What is your understanding of
12   the word transient?
13    A.   That it's short-lived.
14    Q.   That it's short-lived or temporary?
15    A.   Temporary, right.
16    Q.   Not permanent?
17    A.   Correct.
18    Q.   Not lifelong?
19    A.   Correct.
20    Q.   So is it fair that at the time you were
21   using the Prolift, it was your understanding that
22   the body's reaction to the Prolift, the inflammatory
23   reaction would have been transient or temporary,
24   meaning not permanent and not lifelong; is that
25   fair?

Page 55

1        MR. SMITH:  Object to form.
2    A.   Yes.
3    Q.   And was it your understanding at the time
4   that patients of yours would not have been subject
5   to the lifelong risk of chronic foreign body
6   inflammation at the time of the implantation of the
7   Prolift, that it would have been a transient
8   reaction?
9        MR. SMITH:  Object to form.
10    A.   Correct.
11    Q.   Would you expect Ethicon to have data to
12   support this information that we just went over in
13   the Eth -- in the Prolift IFU?
14        MR. SMITH:  Object to form.
15    A.   Yes.
16    Q.   Would you be surprised to learn Ethicon did
17   not have data supporting those claims?
18        MR. SMITH:  Object to form.
19    A.   I would be surprised, yes.
20    Q.   All right.  Thank you, Doctor.  I'm going to
21   shift gears a little bit and talk about the TVT-O
22   before we get to her care.  Okay?
23    A.   Okay.
24    Q.   I think I asked this earlier and I
25   apologize, but it looks like you were trained on the

Page 56

1   TVT-O in 2004.  Does that sound right, that time
2   frame?
3    A.   That sounds correct, yeah.
4    Q.   All right.  And did you use the TVT
5   retropubic before then?
6    A.   Yes.
7    Q.   Okay.  In your practice, did -- when you
8   started using the TVT-O, was that exclusive or did
9   you use the retropubic and TVT-O?
10    A.   Once the TVT came out, I started using
11   pretty much the TVT.
12    Q.   Retropubic?
13    A.   Retropubic, yeah.
14    Q.   Okay.  And in some patients you used the
15   TVT-O, such as Ms. Geery?
16    A.   Correct.
17    Q.   Did you -- when the TVT-O came out, what
18   would be the indication for you to use the
19   retropubic or classic versus the O?
20    A.   Most of us were using that in patients
21   that have -- in patients that have severe stress
22   incontinence.  You know, they have different levels
23   of incontinence.
24    Q.   Sure.
25    A.   We would use the TVT.  And the ones that had

Page 57

1   the least severe, we use the TVT-O.
2    Q.   And why is that?
3    A.   The TVT -- the TVT, the retropubic one, has
4   a better profile for a stress incontinent patient
5   that have more severe incontinence.
6    Q.   Okay.  What -- strike that.
7        Do you use -- do you still use the TVT?
8    A.   Yes.
9    Q.   Do you still use the TVT-O?
10    A.   No.
11    Q.   Okay.  When did you stop using the TVT-O?
12    A.   About five years ago, four or five years
13   ago.
14    Q.   Why is that?
15    A.   Because we -- the mini sling came out and
16   the mini sling has the same trajectory as the TVT-O
17   and yet it has similar results.
18    Q.   All right.  And which mini sling do you use?
19    A.   I'm using the Solyx, Boston Scientific, but
20   I was using the AMS before that.
21    Q.   Okay.  So the Solyx is -- it's the obturator
22   approach but it doesn't go all the way through the
23   obturator space; is that fair?
24    A.   That is correct.
25    Q.   Much less risk of leg and groin pain with

Virgil Davila, M.D.

Page 58

1   the Solyx than the TVT-O?
2        MR. SMITH: Object to form.
3    A.  That is correct, yes.
4    Q.  Did you ever use the TVT Secur?
5    A.  Never used it.
6    Q.  Good for you.
7    A.  Right.
8    Q.  What other mini sling -- did you use any
9   other mini slings other than the AMS and the Solyx?
10   A.  I tried the one from Bard -- Bard, from
11  Bard.  I forgot the name of it but Bard.
12   Q.  Yeah.  Did you use the Abbrevo?
13   A.  Ajust, the Ajust.
14   Q.  The Ajust, yeah.  Did you ever try the
15  Abbrevo?
16   A.  I tried the Abbrevo also.
17   Q.  What did you think about that?
18   A.  I didn't like it.
19   Q.  If we had more time, we'd get into that a
20  little bit, but I will -- I will move on.
21        When you were trained on the -- strike that.
22        I just want to be sure that my record is
23  clear, that you would have reviewed the TVT-O IFU
24  before starting to use the device?
25        MR. SMITH: Object to form.

Page 59

1    A.  Yes.
2    Q.  Okay.  And you've implanted the TVT-O device
3   consistent with how you were trained, plus the
4   information in the IFU?
5    A.  Correct.
6    Q.  And your risk/benefit informed consent
7   analysis with your patients would be influenced, in
8   part, by the information in the TVT-O IFU?
9        MR. SMITH: Object to form.
10   A.  Correct.
11        (Davila Exhibit 4 was marked for
12  identification.)
13        MR. BRADFORD: I want to mark as Exhibit 4
14  the TVT IFU, maybe.  Here it is.  Here, Counsel.
15        We're done with this one.  We'll stack it up
16  so we don't lose them.
17  BY MR. BRADFORD:
18   Q.  All right.  I want to direct --
19        MR. BRADFORD: Did I give you my copy?
20        MR. SMITH: I don't know.  Is that your --
21        MR. BRADFORD: Did I give you my copy?  Did
22  I mark the wrong one?  Yes.  I'm sorry.
23  BY MR. BRADFORD:
24   Q.  You don't want -- they don't -- I promise
25  they don't want the one I highlighted as the one

Page 60

1   that's attached to this thing.
2        MS. HENRY: Here.
3        MR. BRADFORD: Thank you.  Sorry about that.
4        MS. HENRY: That's okay.  Did they stick
5   together?  Yeah.  There you go.
6   BY MR. BRADFORD:
7    Q.  All right.  Let's try again.
8        Here's Exhibit 4, Doctor.  I want to direct
9   your attention to page -- I'm sorry the print is
10  small.  This is how they produced it.  Do you see
11  that okay?
12   A.  It's okay, yeah.
13   Q.  All right.  I want to direct your attention
14  to page 6.  Okay.  I want to look at the portion
15  of -- under the section Adverse Reactions.  Okay?
16   A.  Uh-huh.  Yeah.
17   Q.  All right.  The second bullet point there
18  says: "Transitory local irritation at the wound
19  site and a transitory foreign body response may
20  occur.  This response could result in extrusion,
21  erosion, fistula formation or inflammation."
22        Do you see that?
23   A.  Yes.
24   Q.  All right.  And transitory, we talked about
25  that earlier, but it's your understanding that means

Page 61

1   temporary, fair?
2    A.  Right.
3    Q.  Meaning not permanent?
4    A.  Yes.
5    Q.  Not lifelong risk?
6    A.  Yes.
7    Q.  And if you look further down under Actions,
8   it reads:  Animal studies show that implantation of
9   the Prolene mesh elicits a minimal reaction --
10  minimal inflammatory reaction in tissues, which is
11  transient and is followed by the deposition of a
12  thin fibrous layer of tissue that can grow through
13  the interstices of the mesh, thus incorporating the
14  mesh into adjacent tissue.  This material is not
15  absorbed, nor is it subject to degradation
16  or weakening by the action of tissue enzymes.
17        Do you see that?
18   A.  Yes, sir.
19   Q.  That's the same language from the Prolift
20  IFU?
21   A.  Yes, sir.
22   Q.  Okay.  And your answers to the same
23  questions, to move along, if I asked the same
24  questions about this, would be the same?
25        MR. SMITH: Object to form.

Virgil Davila, M.D.

Page 62

1    A.  Yes, sir.
2    Q.  Let me ask the questions then.  I don't want
3  to deal with that objection.
4        Doctor, was it your understanding that any
5  inflammatory reaction for the TVT-O would have been
6  temporary?
7        MR. SMITH:  Object to form.
8    A.  Yes.
9    Q.  And any complication therefrom regarding the
10  inflammation would have been temporary as opposed to
11  permanent or lifelong?
12        MR. SMITH:  Object to form.
13    A.  Yes.
14    Q.  All right.  And that was consistent with
15  what you were taught by Ethicon before deciding to
16  use the TVT-O in your practice?
17        MR. SMITH:  Object to form.
18    A.  Yes.
19    Q.  On the last sentence, did anyone from
20  Ethicon ever tell you that they knew the mesh
21  actually degrades?
22        MR. SMITH:  Object to form.
23    A.  No, I don't remember being told that.
24    Q.  Do you know -- are you familiar with Thomas
25  Barbolt, he's an Ethicon scientist?

Page 63

1    A.  No.
2    Q.  Okay.  No one from Ethicon, Dr. Lucente,
3  Dr. --
4    A.  Sepulveda.
5    Q.  -- Dr. Sepulveda, no one ever told you that
6  it was their lead scientist, Dr. Barbolt's opinion
7  that the Prolene mesh degrades?
8    A.  No.
9        MR. SMITH:  Object to form.
10    Q.  All right.  Thank you, Doctor.
11        Did you rely upon Ethicon to give you
12  accurate information about the risks they knew that
13  could be related to the TVT-O?
14    A.  Yes.
15        MR. SMITH:  Object to form.
16    Q.  As a -- as a in-the-trenches practicing
17  physician, it's important for companies to give you
18  thorough and accurate information about the risk of
19  its devices, isn't it?
20    A.  Yes, sir.
21        MR. SMITH:  Object to form.
22    Q.  That way you can make good decisions about
23  what products to use, fair?
24        MR. SMITH:  Object to form.
25    A.  Yes.

Page 64

1    Q.  And that way you can also make good
2  decisions when talking to your patients about
3  whether or not they should use a certain product or
4  medical device; is that fair?
5        MR. SMITH:  Object to form.
6    A.  Yes.
7    Q.  I'm going to have to hurry.  All right.
8  Actually, take that -- take that back out.  I
9  apologize.  Go back to page 6, Doctor, of the -- of
10  Exhibit 4, which is the TVT-O IFU.
11        Do you see the adverse reactions listed
12  there for the TVT-O, do you see that on page 6?
13    A.  Yes, sir.
14    Q.  All right.  I want to show you what I'm
15  going to mark as Plaintiff's Exhibit 5.
16        (Davila Exhibit 5 was marked for
17  identification.)
18  BY MR. BRADFORD:
19    Q.  There it is.  All right.  Okay, Doctor.
20        MR. BRADFORD:  Here you go, Counsel.
21    Q.  Are you familiar with Dr. Marty Weisberg,
22  he's one of the medical directors of Ethicon, have
23  you heard that name before?
24    A.  It sounds familiar.
25    Q.  All right.

Page 65

1        MS. HENRY:  I'm going to see what kind of
2  predicate you're going to lay.
3        MR. BRADFORD:  Sure.
4  BY MR. BRADFORD:
5    Q.  Doctor, take a second --
6        MS. HENRY:  Before he takes a look at this.
7        MR. BRADFORD:  Dr. Weisberg testified that
8  the company knew that those were the actual risks
9  of all TVT devices before they launched the TVT,
10  and they didn't make it in the IFU and the
11  warnings and they didn't teach doctors about it,
12  so that's what I'm going to ask him.
13        MR. SMITH:  Object to form.
14        MS. HENRY:  I mean --
15        MR. BRADFORD:  It's informed consent, the
16  risks.  This is -- this is a very important
17  document for the -- for our failure to warn
18  claim.
19        MS. HENRY:  I mean, does he -- it's improper
20  to ask a treating physician in a deposition to
21  review a document that he's never seen before
22  unless he relied on it for his care and treatment
23  of the patient.
24        MR. BRADFORD:  Well --
25        MS. HENRY:  Who was this created by?

Virgil Davila, M.D.

Page 66

1    MR. BRADFORD: This was created by the
2   lawyer who took Dr. Weisberg's deposition and I
3   -- there is going to be no dispute Dr. Weisberg
4   absolutely agreed those are all the risks, and
5   there was actually an edit made because of his
6   testimony. And look, if I'm wrong about this,
7   this evidence won't come in anyway, I'm wasting
8   my time to give factually incorrect bases for any
9   of this stuff, because I'm wasting my valuable
10  time that's getting spent right now.
11     This is -- I'm talking this is the risk
12  profile the company knew for this device that was
13  put in this woman. They didn't tell him about
14  it, I don't think, I'm about to find out, and
15  they didn't put it in the IFU. It's the -- as
16  foundational as a -- of evidence as we can have
17  for our failure to warn claim.
18     MS. HENRY: Okay. I just -- I mean, if
19  defense counsel has no objection, we can -- I
20  guess we can use it.
21     MR. BRADFORD: I'm certain he's going --
22  certainly he's going to object.
23     MR. SMITH: Yeah. I mean, I object to
24  the --
25     MR. BRADFORD: I want to -- can we go off

Page 67

1   the record?
2      MS. HENRY: Sure.
3      MR. BRADFORD: I'm -- because I'm time
4   limited in this deposition.
5      MS. HENRY: Okay.
6      THE VIDEOGRAPHER: The time is 5:04 p.m.
7   Off the record.
8      (Recess from 5:04 p.m. until 5:13 p.m.)
9      THE VIDEOGRAPHER: The time is 5:13 p.m.
10  On the record.
11  BY MR. BRADFORD:
12    Q. Dr. Davila, I want to show you what's been
13  marked as Plaintiff's Exhibit 5. I understand your
14  counsel has some objection to this -- me using this
15  as an exhibit.
16     MS. HENRY: It's my understanding, Counsel,
17  and correct me --
18     MR. BRADFORD: I'm not counting the time.
19     MS. HENRY: -- if I'm wrong, that this is a
20  document that was not in existence at the time of
21  the doctor's treatment of Ms. Geery, it was
22  created at the time of a deposition of a medical
23  witness many years after Dr. Geery -- or the
24  doctor last treated Ms. Geery. He did not offer
25  it and did not participate in its creation, and

Page 68

1   so I would move to suspend the deposition as to
2   any line of questioning asking the doctor to use
3   this document. However, I would encourage you to
4   ask the rest of your questions and any questions
5   that you may have relative to this information as
6   it relates to the doctor's treatment of your
7   client.
8      MR. BRADFORD: And my response would be that
9   it is a proper exhibit. What I will plan to do
10  is lay the foundation for the document advising
11  that it's the information that the company knew
12  about the risk of all TVT devices, including the
13  TVT-O, as of the time of the launch of the TVT
14  retropubic, which was in the late '90s, and with
15  a failure to warn claim there can be no more
16  relevant information about the risk profile of
17  the product than what the company knew at the
18  time that is not in dispute was never provided to
19  physicians.
20     MS. HENRY: And I would encourage you to ask
21  all of those questions. It's specifically the
22  use of the document that did not exist at the
23  time of his care and treatment. I think it's
24  improper to ask a treating physician to review a
25  document that was created years after his care

Page 69

1   and treatment of the patient to provide
2   testimony, but certainly ask your line of
3   questions. The doctor has not been retained as
4   an expert witness, he's simply a treating
5   physician.
6      MR. BRADFORD: All right. I'm going to go
7   ahead and just proffer and attach Exhibit 5
8   anyway and we'll deal with -- we'll deal with it
9   with the court as we need to.
10     All right. I'm going to turn my time back
11  on and get back to my deposition.
12  BY MR. BRADFORD:
13    Q. All right. Dr. Davila, did anyone from
14  Ethicon, through the IFU or in your training or
15  otherwise, ever advise you that there was risk of
16  the TVT-O of pain with intercourse which in some
17  patients may not resolve?
18     MR. SMITH: Object to form.
19    A. No.
20    Q. Same question for acute and/or chronic pain?
21    A. No.
22    Q. Same question regarding neuromuscular
23  problems, including acute and/or chronic pain in the
24  groin, thigh, leg, pelvic or abdominal area?
25    A. No.

Virgil Davila, M.D.

Page 70

1    Q.   Same regarding one or more revision
2  surgeries may be necessary to treat these adverse
3  reactions?
4    A.   No.
5    Q.   Same regarding the risk that in cases in
6  which the Prolene mesh needs to be removed in part
7  or whole, significant dissection may be required?
8    A.   No.
9    Q.   Same regarding the risk of foreign body
10 response?
11   A.   No.
12   Q.   Same regarding the risk of excessive
13 contraction or shrinkage of the tissue surrounding
14 the mesh as defined by Ethicon Medical Director
15 Marty Weisberg?
16     MR. SMITH:  Object to form.
17   A.   No.
18   Q.   Thank you, Doctor.  Had you known, Doctor,
19 that the risk of inflammation regarding the TVT-O
20 was not transient or temporary, but could be chronic
21 and lifelong, is that something that would have
22 played a role in your decision in using the TVT-O
23 device with patients like Ms. Geery?
24     MR. SMITH:  Object to form.
25   A.   Yes.

Page 71

1    Q.   And is that something, had you known that
2  there is a risk of chronic inflammation, that you
3  would have advised Ms. Geery in your risk/benefit
4  analysis with her regarding her TVT-O?
5      MR. SMITH:  Object to form.
6    A.   Yes, sir.
7    Q.   And the information I just went through
8  regarding the additional risk of the TVT-O from
9  Plaintiff's Exhibit 5, and if the exhibit doesn't
10 come in, as I just asked you, are those risks, had
11 you known, that you would have considered in your
12 decision to use the TVT-O device with patients such
13 as Mrs. Geery?
14     MR. SMITH:  Object to form.
15   A.   Yes.
16   Q.   And are those risks that, had you known
17 them, you would have provided to Ms. Geery in your
18 risk/benefit analysis with her in the decision
19 process to use the TVT-O?
20     MR. SMITH:  Object to form.
21   A.   Yes.
22   Q.   All right.  I want to shift gears and talk
23 about your care and treatment of Ms. Geery.  We've
24 mentioned earlier you had a chance to review the
25 medical records before.  I'm just going to go ahead

Page 72

1  and mark all these now so we can get through them.
2      (Davila Exhibit 6 was marked for
3  identification.)
4  BY MR. BRADFORD:
5    Q.   Exhibit 6 will be your office note from
6  September 19, 2005.
7      (Davila Exhibit 7 was marked for
8  identification.)
9  BY MR. BRADFORD:
10   Q.   Exhibit 7 will be your office note of May 9,
11 2006.
12     (Davila Exhibit 8 was marked for
13 identification.)
14 BY MR. BRADFORD:
15   Q.   Exhibit 8 will be your office note of -- or
16 I'm sorry, the consent, the hospital consent from
17 May 16, 2006.
18     MR. BRADFORD:  We are a consent short.
19     (Davila Exhibit 9 was marked for
20 identification.)
21 BY MR. BRADFORD:
22   Q.   Exhibit 9 will be the history and physical
23 from the surgery.
24   A.   Uh-huh.
25     (Davila Exhibit 10 was marked for

Page 73

1  identification.)
2  BY MR. BRADFORD:
3    Q.   Exhibit 10 will be the op report from the
4  implant surgery of the two devices.
5      (Davila Exhibit 11 was marked for
6  identification.)
7  BY MR. BRADFORD:
8    Q.   Exhibit 11 will be the pathology report from
9  the surgery, the implantation surgery.
10     (Davila Exhibit 12 was marked for
11 identification.)
12 BY MR. BRADFORD:
13   Q.   I'm not going to ask about the discharge
14 surgery.  She was doing all right.
15     Exhibit 12 will be the follow-up post
16 surgery of May 22nd, 2006.
17     (Davila Exhibit 13 was marked for
18 identification.)
19 BY MR. BRADFORD:
20   Q.   And then Exhibit 13 will be the last time
21 you saw her, as we talked about earlier, your note
22 from August 21st, 2006.
23     All right.  I'm going to hand all these to
24 you at once, Doctor.  We're going to kind of look
25 through these pretty quickly.  I'm sure defense

Virgil Davila, M.D.

Page 74

1  counsel will have some questions in a little more
2  detail for it.
3      Regarding Exhibit 6, Dr. Davila, that's the
4  first time you saw Ms. Geery, is that correct, on
5  September 19, 2005?
6      A.  That's correct.
7      Q.  All right.  And it looks like she gave you a
8  history of having undergone some type of native
9  tissue or nonmesh anterior and posterior repair in
10  the past?
11      A.  Correct.
12      Q.  And you examined her that day?
13      A.  Yes.
14      Q.  And you found that she had a cystocele that
15  was a grade 3, correct?
16      A.  Yes.
17      Q.  And you found she had some vaginal vault
18  prolapse?
19      A.  Yes.
20      Q.  And that's the apex, correct?
21      A.  Correct.
22      Q.  Okay.  And then she also had a grade 1 to
23  grade 2 rectocele?
24      A.  Yes.
25      Q.  All right.  And you noted that she did not

Page 75

1  appear to have severe urinary incontinence, although
2  she claimed to on occasion leak urine?
3      A.  Yes.
4      Q.  All right.  And you counseled her at that
5  time about the options of surgery and other things
6  regarding the treatment of her prolapse?
7      A.  Yes.
8      Q.  All right.  And then it looks like she
9  didn't come back to see you for eight months or so.
10  She saw you next on May 9, 2006?
11      A.  Correct.
12      Q.  Which is Exhibit 7.  All right.  When she
13  came back to see you, was she doing similar to how
14  she was when you first saw her?
15      A.  Yes.
16      Q.  All right.  One of the issues or things I
17  wanted to ask you about is you had mentioned that
18  you thought she might have had a TVT in the past.
19  Do you see that?
20      A.  Yes.
21      Q.  But when you look -- when you examined her,
22  you didn't see any scars from the TVT?
23      A.  It's difficult to see any scars when you do
24  a TVT.
25      Q.  Right.  And that's kind of -- so as the

Page 76

1  records continue, you kind of wonder if there was a
2  TVT but it looks like you say there is no way to
3  know; is that -- is that fair?
4      A.  That's correct.
5      Q.  All right.  When you opened her -- or strike
6  that.
7      When you did your vaginal incision and
8  removed the -- I'm bounding around a little bit I
9  know, but when you removed that area of tightness,
10  when you, you know, cut her vaginally when you did
11  the surgery, did you see any mesh or any evidence of
12  a TVT?
13      A.  No, just a lot of scar tissue in that area.
14      Q.  Right, but no blue mesh or anything to show
15  that a TVT was there?
16      A.  I couldn't see it, no.
17      Q.  Right.  And then you also took part of that
18  and had pathology look at it as well?
19      A.  Correct.
20      Q.  And in the specimen description, does it --
21  did they see any mesh anywhere when it was looked at
22  by pathology?
23      A.  No.
24      Q.  All right.  I will represent to you that
25  she's given a deposition in this case and she did

Page 77

1  not have a mesh device implanted before you put the
2  TVT-O and Prolift in her.  Okay?  That's her
3  testimony.
4      Based upon what you saw, despite her having
5  the area of tightness, would that surprise you, that
6  she doesn't recall having a TVT retropubic device?
7      A.  That doesn't surprise me, because a lot of
8  patients don't know what they did when they do the
9  surgery.  They think a bladder lift is just -- is
10  just that and they don't know -- they don't know the
11  difference between a bladder lift and a sling, so --
12      Q.  Right.  Is it fair to say with any medical
13  certainty you can't say one way or the other whether
14  or not she had a TVT before you put in the TVT-O?
15      A.  That's correct.
16      Q.  And just so we're clear, you didn't see any
17  evidence when you had her open or otherwise that
18  showed that there was a TVT there, did you?
19      A.  I did not.
20      Q.  Thank you, Doctor.  Now, when you did your
21  surgery -- I'm sorry.  It's the op report.  I've
22  jumped ahead of you.  I think that's beyond that
23  one.  It's beyond 8.  It looks like --
24      MS. HENRY:  10.
25      Q.  -- 10.  All right.  I think I've asked this

Virgil Davila, M.D.

Page 78

1  three times already but you implanted the TVT-O as
2  you were taught by Ethicon, correct?
3      A.  Correct.
4      Q.  No complications with the implantation of
5  the TVT-O with her, did you?
6      A.  No.
7      Q.  Okay.  And you also decided -- you ended up
8  doing a total Prolift on her; is that fair?
9      A.  Correct.
10     Q.  All right.  So meaning you used the Prolift
11 anterior and posteriorly?
12     A.  Yes.
13     Q.  Did anyone from Ethicon ever tell you that
14 the company had concerns about the potential success
15 of the -- of the Prolift regarding posterior
16 repairs?
17         MR. SMITH:  Object to form.
18     A.  No.
19     Q.  In the course of your practice did you ever
20 become aware that there were issues with success
21 regarding the posterior repair with the Prolift?
22     A.  After --
23         MR. SMITH:  Object to form.
24     A.  After the mesh surgeries, studies came out
25 showing that the posterior compartment does not do

Page 79

1  better with or without mesh.
2      Q.  Right.  And no one from Ethicon ever told
3  you they had information about that before those
4  studies, did they?
5      A.  No.
6         MR. SMITH:  Object to form.
7      Q.  All right.  She followed back up with you,
8  Doctor, on -- postsurgically on May 22nd, 2006.
9  That's six days after the surgery; is that fair?
10     A.  Yes.
11     Q.  She was doing well at that time?
12     A.  Yes.
13     Q.  All right.  Doing -- is it fair to say she
14 was doing as you would have hoped she would have
15 been doing at that time?
16     A.  Correct.
17     Q.  And doing as you would have expected?
18     A.  Yes.
19     Q.  All right.  And then the last time you saw
20 her was September 21st, 2006, and what exhibit
21 number is that, Doctor?
22     A.  13.
23     Q.  Thank you.  I appreciate that.  And when you
24 saw her then, she was having some pelvic pain, but
25 based upon your examination, you thought that was

Page 80

1  musculoskeletal versus pelvic nature?
2         MR. SMITH:  Object to form; misstates the
3  document.
4      A.  Correct.
5      Q.  Let me -- that's a valid objection.  I'm not
6  trying to put words in your mouth, Doctor.
7         What was your opinion as to the cause of her
8  pelvic pain when you saw her two months -- three
9  months, give or take, postsurgery?
10        MR. SMITH:  Object to form; misstates the
11 document.
12     A.  I believe it was mostly musculoskeletal
13 pain.
14     Q.  Right.  And you told her you thought she
15 might do well with Celebrex?
16     A.  Correct.
17     Q.  What's Celebrex?
18     A.  It's a nonsteroidal anti-inflammatory.
19     Q.  And you thought she needed to see maybe a
20 chiropractor to help her with her musculoskeletal
21 issues?
22     A.  Yes.
23     Q.  All right.  Since then you haven't seen
24 Ms. Geery, fair?
25     A.  Fair, no.

Page 81

1      Q.  And you, other than me giving you a little
2  bit of information today, had no idea how she's
3  doing after she left your care?
4      A.  No idea.
5      Q.  Those are -- Doctor, are the opinions you've
6  given today been to within a reasonable degree of
7  medical certainty?
8      A.  Yes.
9         MR. BRADFORD:  Thank you, Doctor.  Those are
10 the questions I have.  I'll probably have some
11 follow-up.
12        (Discussion off the record.)
13        THE VIDEOGRAPHER:  The time is 5:29 p.m.
14 Off the record.
15        (Recess from 5:29 p.m. until 5:32 p.m.)
16        THE VIDEOGRAPHER:  The time is 5:32 p.m.
17 On the record.
18        CROSS-EXAMINATION
19 BY MR. SMITH:
20     Q.  Good afternoon, Doctor.  My name is Matt
21 Smith.  I represent Ethicon.  You and I have never
22 met before?
23     A.  No.
24     Q.  Doctor, let me -- let me cut to the chase
25 here.  In your practice did you find TVT-O to be a

Virgil Davila, M.D.

Page 82

1  safe and effective treatment option for stress
2  incontinence in your patients?
3      A.  Yes.
4      Q.  And the TVT-O, you would agree, was a
5  reasonable and appropriate choice to treat
6  Ms. Geery's stress incontinence in 2006?
7          MR. BRADFORD:  Objection.
8      A.  Correct.
9      Q.  Do you stand by your recommendation and
10  decision to use TVT-O to treat Ms. Geery's stress
11  incontinence in 2006?
12          MR. BRADFORD:  Objection.
13      A.  Yes.
14      Q.  And nothing Plaintiff's counsel discussed
15  with you changed that, correct?
16          MR. BRADFORD:  Objection.
17      A.  No.
18      Q.  In other words, yes, correct?
19      A.  Correct.
20      Q.  And likewise, at the time in 2016, it was
21  reasonable and appropriate to use Prolift to treat
22  Ms. Geery's pelvic organ prolapse which involved the
23  collapse of both her bladder and her rectum into her
24  vagina?
25      A.  Yes.

Page 83

1          MR. BRADFORD:  Objection.
2      Q.  And was that decision by you to use Prolift
3  to treat her prolapse in 2006 supported by both the
4  medical literature at the time and by your own
5  clinical experience with Prolift?
6          MR. BRADFORD:  Objection.
7      A.  Yes.
8      Q.  And do you stand by your decision to use
9  Prolift to treat Ms. Geery's pelvic organ prolapse
10  in 2006?
11          MR. BRADFORD:  Objection.
12      A.  Yes.
13      Q.  And nothing Plaintiff's counsel said to you
14  today changes that, right?
15          MR. BRADFORD:  Objection.
16      A.  No.
17      Q.  In other words, it does not, correct?
18      A.  It does not.
19      Q.  Now, Doctor, you talked a little bit about
20  this when you were being questioned by Plaintiff's
21  counsel, but by 2006 you had a lot of experience
22  treating both stress incontinence and pelvic organ
23  prolapse?
24      A.  Correct.
25      Q.  You'd been doing that for over 10 years?

Page 84

1      A.  Yes.
2      Q.  And you mentioned that there are both mesh
3  and nonmesh procedures to treat stress incontinence?
4      A.  Correct.
5      Q.  And you were trained on both types of
6  procedures, nonmesh and mesh?
7      A.  Correct.
8      Q.  And the nonmesh procedures you were trained
9  on included both the Burch procedure and the MMK?
10      A.  And the pubovaginal slings.
11      Q.  And pubovaginal slings, by that you mean,
12  basically, biologic slings, not synthetic?
13      A.  By that I mean using the patient's fascia to
14  do the procedure for incontinence.  It's a different
15  procedure altogether.
16      Q.  With the nonmesh, the urethropexy
17  procedures, what percent recurrence rate or failure
18  rate have you found in your patients?
19      A.  Similar to the TVT, if that answers your
20  question.
21      Q.  Well, let's just start with what percent, if
22  you're able to do it, what percent -- let's break
23  them down.
24          With the Burch procedure, what percent
25  recurrence rate have you found in your patients?

Page 85

1      A.  Maybe 10 to 20 percent.
2      Q.  And how about with the MMK?
3      A.  About the same.
4      Q.  Now, you first used TVT-O in 2004?
5      A.  TVT-O in 2004?  Yes, that is correct.
6      Q.  And then you told us that you used it until
7  about four years ago, when you started using the
8  mini sling?
9      A.  Approximately four years.
10      Q.  Approximately?
11      A.  Yes, sir.
12      Q.  But would it be fair to say that you didn't
13  stop using TVT-O due to any safety concerns, it was
14  more the different type of approach that you were
15  going to be using with the mini sling?
16          MR. BRADFORD:  Objection.
17      A.  It was a less invasive procedure, possible
18  less postop pain.
19      Q.  Okay.  How many TVT-O procedures do you
20  think you've performed in your practice?
21      A.  It's got to be close to a thousand.
22      Q.  And by 2006, would it be fair to say that
23  you had quite a bit of experience with TVT-O by that
24  point?
25      A.  Yes.

Virgil Davila, M.D.

**Page 86**

1   Q.   In terms of pelvic organ prolapse, like
2   stress incontinence, there is both mesh and nonmesh
3   procedures to surgically treat it?
4       A.   Correct.
5       Q.   And I think you testified that in terms of
6   the nonmesh surgeries, that you were trained and
7   you've used anterior and posterior repair surgeries?
8       A.   Correct.
9       Q.   And that includes colporrhaphies?
10      A.   Correct.
11      Q.   In terms of colporrhaphies, what recurrence
12  rate have you seen in your patients?
13      A.   The recurrence is higher, I would say 30
14  percent.
15      Q.   And would that be for both a posterior
16  repair and an anterior repair?
17      A.   I would just say with the anterior repair.
18      Q.   How about with the posterior?
19      A.   The posterior repair, the recurrence is low,
20  I would say 10 percent.
21      Q.   And with the anterior repair using
22  polypropylene mesh, like a Prolift, what type of
23  recurrence rate were you seeing?
24      A.   It was lower.  I cannot give you a specific
25  number but, you know, I felt like I had better

**Page 87**

1   results with the propylene mesh.
2       Q.   In other words, you were finding that you
3   were having a higher cure rate for the anterior
4   prolapse in your patients using Prolift versus the
5   anterior colporrhaphy?
6       A.   Correct.
7       Q.   You testified that you first began using
8   Prolift in your practice around 2005?
9       A.   Correct.
10      Q.   And then used it through 2007, at which
11  point you started using a different type of
12  procedure?
13      A.   Yes, correct.
14      Q.   Approximately?
15      A.   Approximately, yes.
16      Q.   And do you know how many Prolift procedures
17  you had done, approximately, prior to May 2006, when
18  you put the Prolift in Ms. Geery?
19      A.   I believe about 20 or 30 maybe.  I don't
20  remember exactly.
21      Q.   And then if we added up all of the Prolift
22  procedures you did at the time that you were using
23  it, from 2005 to approximately 2007, about how many
24  do you think you had done?
25      A.   I think I did about 50 of the Apogee and

**Page 88**

1   Perigee, so I would say probably close to 100, I
2   would think.
3       Q.   You were asked by Plaintiff's counsel about
4   what complications you saw in your patients with
5   Prolift.  Do you remember being asked that?
6       A.   Yes.
7       Q.   And the only one that you saw in your
8   patients was extrusion?
9       A.   That I know of, extrusion.
10          MR. BRADFORD:  Objection.  Objection.
11      Q.   Okay.  Are you aware that Ms. Geery has
12  never been diagnosed with extrusion of her mesh at
13  any point up through today?
14      A.   I'm not aware either way.
15      Q.   Plaintiff's counsel told you that she had
16  had three revision surgeries but he didn't mention
17  that there was never any extrusion?
18      A.   I didn't know that.
19      Q.   Okay.
20          MR. BRADFORD:  I don't have any issue with
21      that.  That's accurate.  Her surgeries were for
22      mesh complications, not an erosion, just so you
23      know.
24      Q.   Doctor, up through May 2006 had you achieved
25  good clinical outcomes using TVT-O in your patients?

**Page 89**

1          MR. BRADFORD:  Objection.
2       A.   Yes.
3       Q.   And had you found that in your hands the
4   benefits of TVT-O outweighed their risks?
5          MR. BRADFORD:  Objection.
6       A.   Yes.
7       Q.   And had you found that TVT-O was an
8   effective treatment at -- for stress incontinence?
9       A.   Yes.
10          MR. BRADFORD:  Objection.
11      Q.   And had you found TVT-O to be safe for the
12  treatment of stress incontinence?
13          MR. BRADFORD:  Objection.
14      A.   Yes.
15      Q.   Prior to May 2016, did you have an
16  opportunity to review medical literature looking at
17  the safety and efficacy of polypropylene meshes in
18  the treatment of stress incontinence?
19          MR. BRADFORD:  Objection.
20      A.   Yes, I believe I did.
21      Q.   And did that literature support the use of
22  polypropylene mesh for the treatment of stress
23  incontinence?
24          MR. BRADFORD:  Objection.
25      A.   As I recall, yes.

Virgil Davila, M.D.

Page 90

1    Q.   In terms of Prolift, you followed patients
2   for a number of years who had Prolift implanted?
3    A.   Yes.
4        MR. BRADFORD:  Objection.
5    Q.   And in terms of your patients, would it be
6   fair to say that the vast majority of them didn't
7   experience any complications from the Prolift?
8        MR. BRADFORD:  Objection.
9    A.   That would be correct.
10   Q.   And that in your experience, you achieved
11  good clinical outcomes with the use of Prolift in
12  fixing pelvic organ prolapse?
13       MR. BRADFORD:  Objection.
14   A.   Yes.
15   Q.   In 2006, in your view, did Prolift have an
16  acceptable profile -- risk profile for the benefits
17  you were hoping to achieve in your patients?
18       MR. BRADFORD:  Objection.
19   A.   Yes, based on the literature that I had or
20  what I'd been told, yes.
21   Q.   And based on your own clinical experience?
22   A.   Correct.
23   Q.   And so touching on what you just said, prior
24  to May 2006, you'd had an opportunity to review
25  medical literature on the use of polypropylene mesh

Page 91

1   like Prolift to treat pelvic organ prolapse?
2        MR. BRADFORD:  Objection.
3    A.   Yes.
4    Q.   And that literature supported the use of
5   polypropylene mesh like Prolift to treat pelvic
6   organ prolapse?
7    A.   Yes, it seemed an acceptable treatment for
8   prolapse, correct.
9    Q.   Doctor, do all surgical procedures,
10  including those with mesh and those without, that
11  are used to treat stress incontinence and pelvic
12  organ prolapse carry potential risks of
13  complications?
14   A.   Can you repeat that again?  I'm sorry.
15   Q.   Sure.  Let me just break it into two
16  questions.
17       Do all surgical procedures to treat stress
18  incontinence, including procedures with mesh and
19  including procedures without mesh, carry possible
20  risks of complications?
21   A.   Yes.
22   Q.   And do all surgical procedures to treat
23  pelvic organ prolapse, including those with mesh and
24  those without mesh, carry the possibility of risks
25  of complications?

Page 92

1    A.   Yes.
2    Q.   And in terms of the risks and safety of
3   polypropylene slings, like TVT-O, and pelvic organ
4   prolapse mesh, like Prolift, did you gain your
5   knowledge about the risks and safety from various
6   sources?
7        MR. BRADFORD:  Objection.
8    A.   Can you be more specific?
9    Q.   Sure.  There -- would it be fair to say that
10  there were various sources from which you drew your
11  knowledge about the possible risks of slings, like
12  TVT-O, and pelvic organ prolapse like -- mesh, like
13  Prolift?
14       MR. BRADFORD:  Objection.
15   A.   Meaning from colleagues and --
16   Q.   Right.
17   A.   And --
18   Q.   Right.
19   A.   Yes.
20   Q.   So as you mentioned, one of them would be
21  talking to surgeon colleagues of yours about their
22  clinical experience with the meshes?
23   A.   Correct.
24   Q.   And obviously, your own clinical experience
25  with both TVT-O and with Prolift?

Page 93

1    A.   Yes.
2    Q.   And from reviewing and staying on top of
3   medical literature and studies evaluating those
4   products?
5        MR. BRADFORD:  Objection.
6    A.   Yes.
7    Q.   And from your education and training and
8   continuing medical education?
9    A.   Yes.
10   Q.   Just generally, Doctor, what is a
11  colporrhaphy surgery?
12   A.   Colporrhaphy is a surgery that we basically
13  use to repair either the anterior or the posterior
14  compartment.
15   Q.   Does it involve the use of sutures?
16   A.   It does.
17   Q.   And are those sutures permanent sutures?
18   A.   No, although some patients will -- some
19  doctors will use permanent sutures.  Most doctors
20  don't.
21   Q.   And in your practice you do not use
22  permanent?
23   A.   I do not.
24   Q.   Did you perform an anterior and posterior
25  colporrhaphy on Ms. Geery as part of the procedure

Virgil Davila, M.D.

Page 94

1  in which you performed on her?
2     A.  I'd have to review my records exactly to
3  answer that.
4     Q.  Sure.
5     A.  Yes.
6     Q.  And again, Doctor, nonmesh surgeries for
7  pelvic organ prolapse, such as colporrhaphies, carry
8  a number of potential risks for the patient, right?
9     A.  Yes.
10    Q.  Would one of those be infection?
11    A.  Yes.
12    Q.  Organ or nerve damage?
13    A.  Yes.
14    Q.  Chronic dyspareunia or pain with
15  intercourse?
16    A.  Yes.
17       MR. BRADFORD:  Objection.
18    Q.  Chronic pain, including pelvic pain and
19  vaginal pain?
20       MR. BRADFORD:  Objection.
21    A.  Yes.
22    Q.  And the chronic pain, pelvic pain, and pain
23  with intercourse, that can be mild, moderate or
24  severe; fair to say?
25       MR. BRADFORD:  Objection.

Page 95

1     A.  Yes.
2     Q.  Another risk of colporrhaphy surgeries and
3  other nonmesh surgeries for pelvic organ prolapse is
4  fistula formation?
5     A.  Yes.
6     Q.  And in colporrhaphy surgeries where doctors
7  use permanent sutures, there is a risk of erosion or
8  exposure of the sutures?
9     A.  Yes.
10    Q.  A risk of neuromuscular problems?
11       MR. BRADFORD:  Objection.
12    A.  Yes.
13    Q.  Scarring?
14    A.  Yes.
15    Q.  Inflammation?
16    A.  Yes.
17    Q.  And in surgeries where permanent sutures are
18  used, foreign body reaction around the sutures?
19    A.  Yes.
20    Q.  Another risk would be new or worsened
21  urinary problems, such as urgency, urge incontinence
22  or voiding problems?
23    A.  Yes.
24    Q.  And another risk would be failure of the
25  surgery and need for additional corrective

Page 96

1  surgeries?
2     A.  That's correct.
3     Q.  Now, Doctor, through your ongoing training
4  and education and review of the medical literature
5  up to May 2006, were you aware that these risks that
6  we just went over for the nonmesh surgeries were
7  also potential risks with Prolift?
8       MR. BRADFORD:  Objection.
9     A.  Yes.
10    Q.  By May of 2006, Doctor, you were aware that
11  infection was a potential risk of a Prolift surgery?
12    A.  Of any surgery, correct.
13    Q.  Including Prolift?
14    A.  Yes.
15    Q.  And organ or nerve damage was a potential
16  risk with Prolift?
17    A.  Yes.
18    Q.  And chronic dyspareunia?
19       MR. BRADFORD:  Objection.
20    A.  Yes.
21    Q.  Which is pain with intercourse, right?
22    A.  Correct.
23    Q.  And chronic pain including pelvic pain and
24  vaginal pain?
25       MR. BRADFORD:  Objection.

Page 97

1     A.  Yes.
2     Q.  And like it is with nonmesh surgeries, you
3  were aware that the chronic pelvic pain and vaginal
4  pain and dyspareunia can be mild, moderate or
5  severe?
6       MR. BRADFORD:  One second.  What time frame
7     are you asking?
8       MR. SMITH:  Up through May of 2000 -- by the
9     time of May 2006.
10      MR. BRADFORD:  You're asking what he knew
11    about Prolift by May of 2006?
12      MR. SMITH:  That's correct.
13      MR. BRADFORD:  Okay.
14  BY MR. SMITH:
15    A.  Yes, any type of surgery can cause that,
16  yes.
17    Q.  And you were aware by May 2006 that erosion
18  and exposure were potential complications with
19  Prolift?
20    A.  Yes.
21    Q.  And you were aware fistula formation was a
22  potential complication with Prolift?
23    A.  Yes.
24    Q.  And neuromuscular problems?
25    A.  Yes.

Virgil Davila, M.D.

Page 98

1    Q.   Scarring?

2    A.   Yes.

3    Q.   Inflammation and foreign body reaction

4 around the mesh?

5        MR. BRADFORD:  Objection.

6    A.   Yes.

7    Q.   New or worsened urinary problems, such as

8 urgency, urge incontinence and voiding problems?

9        MR. BRADFORD:  Objection.

10   A.   Yes.

11   Q.   And failure of the surgery and recurrence of

12 the prolapse?

13       MR. BRADFORD:  Objection.

14   A.   Yes.

15   Q.   And through your education and training and

16 review of medical literature, by May 2006 were you

17 aware that most of those same risks with Prolift

18 were risks of TVT-O?

19       MR. BRADFORD:  Objection.

20   A.   I'm not sure about that in particular.

21   Q.   Let's go one by one.  Were you aware by May

22 of 2006 that infection was a potential risk of

23 TVT-O?

24   A.   Oh, yes, yes, yes.

25   Q.   And scarring?

Page 99

1    A.   Yes.

2    Q.   Erosion of the mesh into the vagina, bladder

3 or urethra?

4    A.   Yes.

5    Q.   Organ or nerve damage?

6    A.   Yes.

7    Q.   Chronic pain, including pelvic and vaginal

8 pain?

9    A.   Yes.

10   Q.   Chronic dyspareunia, again, pain with

11 intercourse?

12       MR. BRADFORD:  Objection.

13   A.   Yes.

14   Q.   And again, you were aware that this chronic

15 pelvic pain or pain with intercourse could be mild,

16 moderate or severe?

17   A.   Yes.

18       MR. BRADFORD:  Objection.

19   Q.   Inflammation?

20   A.   Yes.

21   Q.   Foreign body reaction around the mesh?

22       MR. BRADFORD:  Objection.

23   A.   Yes.

24   Q.   New or worsened urinary problems, the ones

25 we talked about, urgency, voiding problems, urge

Page 100

1 incontinence?

2        MR. BRADFORD:  Objection.

3    A.   Yes.

4    Q.   And failure of the surgery and recurrence of

5 the stress incontinence?

6    A.   Yes.

7    Q.   Do urethropexy procedures, Burch procedures,

8 MMKs, do those carry potential risks as well?

9    A.   Yes.

10   Q.   And did those also include the risk of organ

11 and nerve damage?

12   A.   Yes.

13   Q.   And chronic pain, including pelvic pain and

14 vaginal pain?

15       MR. BRADFORD:  Objection.

16   A.   Yes.

17   Q.   And dyspareunia?

18       MR. BRADFORD:  Objection.

19   A.   Yes.

20   Q.   And that pelvic and vaginal pain and

21 dyspareunia can be severe?

22       MR. BRADFORD:  Objection.

23   A.   Yes, it can, yes.

24   Q.   And where a pubovaginal sling is used, you

25 have a risk of erosion of the biological sling, or

Page 101

1 exposure?

2    A.   It's not really biological mesh.  You're

3 using the patient's own tissue.

4    Q.   Okay.

5    A.   So you don't get any erosion.

6    Q.   All right.  When sutures are used, there's a

7 potential risk of exposure or erosion of the

8 sutures?

9    A.   Yes.

10   Q.   And then there is a risk of the -- a failure

11 of the surgery and recurrence of stress

12 incontinence?

13   A.   Right.

14   Q.   Doctor, you were asked some questions about

15 what Plaintiff's counsel called the IFU or the

16 package insert that came in the box of both the

17 TVT-O and the Prolift.  Do you recall that?

18   A.   Yes.

19   Q.   And at any time prior to May 2006, when you

20 were performing surgeries either for stress

21 incontinence or for Prolift, did you do so by taking

22 out that piece of paper and, you know, following it

23 step by step?

24   A.   No.

25   Q.   In other words, you performed both stress

Virgil Davila, M.D.

Page 102

1  incontinence surgeries using TVT-O and pelvic organ
2  prolapse surgeries using Prolift by doing it the way
3  you had learned and the way you had been doing it in
4  your practice based on your prior experience with
5  it?
6      A.  Correct, yes.
7          MR. BRADFORD:  Objection.
8      Q.  And fair to say that you weren't relying on
9  the written information in the box of Prolift or
10  TVT-O to tell you how to do your surgeries; is that
11  fair?
12          MR. BRADFORD:  Objection.
13      A.  That's fair.
14      Q.  In nonmesh procedures to treat stress
15  incontinence, like a Burch or MMK, and nonmesh
16  procedures to treat pelvic organ prolapse, like
17  colporrhaphies, those don't come with package
18  inserts or IFUs, obviously, do they?
19      A.  No.
20      Q.  And you learn about the risks of those
21  procedures through your education and your review of
22  literature and talking to colleagues, the various
23  sources we already talked about, right?
24      A.  Correct.
25      Q.  And would it be fair to say the same thing

Page 103

1  with respect to TVT-O and Prolift, that you gained
2  your knowledge about the risks of both of those
3  devices through your education and training, through
4  your review of literature and talking to colleagues
5  and your own clinical experience with it?
6          MR. BRADFORD:  Objection.
7      A.  Yes, a combination of all those, yes.
8      Q.  And you weren't relying on the piece of
9  paper that was in the box of Prolift or the piece of
10  paper that was in the box with TVT-O to tell you the
11  risks of those products?
12          MR. BRADFORD:  Objection.
13      Q.  Fair?
14      A.  Fair.
15      Q.  Every time, Doctor, you perform a pelvic
16  floor surgery on a patient, that patient undergoes
17  some risks of complications regardless of what the
18  procedure is, right?
19      A.  That's correct.
20      Q.  So, for example, as we talked about with a
21  native tissue anterior/posterior colporrhaphy repair
22  to fix a cystocele or rectocele like Ms. Geery had,
23  two potential risks when a patient undergoes that
24  operation are chronic pelvic pain and dyspareunia,
25  right?

Page 104

1          MR. BRADFORD:  Objection.
2      A.  Right.
3      Q.  And there is no type of surgery in modern
4  medicine to treat rectoceles and cystoceles for
5  which there is no risk of chronic pelvic pain and no
6  risk of dyspareunia, right?
7          MR. BRADFORD:  Objection.
8      A.  There are risks, right.
9      Q.  And so, in other words, for every type of
10  surgical procedure to fix a rectocele and a
11  cystocele, some subset of women will develop chronic
12  pelvic pain or chronic dyspareunia, correct?
13          MR. BRADFORD:  Objection.
14      A.  Correct.
15      Q.  And when a woman does experience a
16  complication like pelvic pain or dyspareunia, that
17  does not necessarily mean that the -- that there was
18  something wrong with the surgery, correct?
19          MR. BRADFORD:  Objection.
20      A.  Correct.
21      Q.  And when Prolift is used, that doesn't
22  necessarily mean that there was something wrong with
23  the Prolift; is that fair?
24          MR. BRADFORD:  Objection.
25      A.  Fair, yeah.

Page 105

1      Q.  And likewise, for all stress incontinence
2  procedures, including mesh slings, including native
3  tissue or nonmesh procedures, chronic pelvic pain
4  and dyspareunia are known risks?
5          MR. BRADFORD:  Objection.
6      A.  Correct.
7      Q.  And there is no surgical procedure to treat
8  stress incontinence for which there is no risk of
9  pelvic pain and no risk of dyspareunia?
10          MR. BRADFORD:  Objection.
11      A.  Correct.
12      Q.  And again, so with every surgical procedure
13  to treat stress incontinence, including nonmesh
14  procedures and including mesh procedures, like the
15  TVT-O, some subset of women will develop chronic
16  pelvic pain or chronic dyspareunia?
17          THE VIDEOGRAPHER:  Sorry for interrupting.
18  We just got unplugged here.  I need to restart
19  everything.
20          MR. SMITH:  Okay.  Let's go off the record.
21          (Recess from 5:58 p.m. until 6:05 p.m.)
22          THE VIDEOGRAPHER:  The time is 6:05 p.m.
23  On the record.
24  BY MR. SMITH:
25      Q.  Doctor, before we went off the record we

Virgil Davila, M.D.

Page 106

1  were talking about the fact that for all surgical
2  procedures to treat stress incontinence there is a
3  risk of chronic pelvic pain and dyspareunia, right?
4      A.  Right.
5      Q.  And so, in other words, for every time of
6  surgical procedure to treat stress incontinence,
7  including nonmesh procedures, including mesh slings,
8  like the TVT-O, it's known that some subset of women
9  will develop chronic pelvic pain or chronic
10  dyspareunia?
11      MR. BRADFORD:  Objection.
12      A.  That is correct.
13      Q.  But if a woman does develop chronic pelvic
14  pain or dyspareunia from an operation, that doesn't
15  mean necessarily that there was something wrong with
16  the operation, right?
17      MR. BRADFORD:  Objection.
18      A.  That is correct.
19      Q.  And if a woman develops chronic pelvic pain
20  or dyspareunia after the use of TVT-O, that doesn't
21  necessarily mean that the TVT-O, that there is
22  something wrong with it or defective with it, right?
23      MR. BRADFORD:  Objection.
24      A.  Right.
25      Q.  Doctor, let's now turn to your specific care

Page 107

1  and treatment of Ms. Geery, and if you will pull out
2  with me your initial consult, which I believe was
3  marked as Exhibit 6.
4      A.  Yes.
5      Q.  Your initial consult was September 19th,
6  2005?
7      A.  Correct.
8      Q.  And this is the first time you saw her?
9      A.  Right.
10      Q.  And at this visit you met with her and took
11  a history?
12      A.  That is correct.
13      Q.  And looking at the first paragraph, she
14  reported numerous previous pelvic-related
15  procedures?
16      A.  Right.
17      Q.  She'd had two vaginal deliveries as well as
18  two C-section deliveries?
19      A.  Correct.
20      Q.  She'd had a total abdominal hysterectomy?
21      A.  Yes.
22      Q.  And that's the removal of her uterus and
23  this one was done through her abdomen?
24      A.  Correct.
25      Q.  She also told you she had undergone an

Page 108

1  abdominoplasty, which is a tummy tuck?
2      A.  Correct.
3      Q.  And is that procedure done with an incision
4  that's at the top of the pubic area?
5      MR. BRADFORD:  Objection.
6      A.  Yes.
7      Q.  And that incision is hip to hip, right, and
8  then sutures are used to tighten the fascia and the
9  muscles?
10      A.  That is correct, yes.
11      Q.  And does that tummy tuck surgery carry with
12  it risks, including nerve damage?
13      A.  Yes.
14      Q.  And chronic pain?
15      MR. BRADFORD:  Objection.
16      A.  Yes.
17      Q.  Now, Ms. Geery also told you that she had
18  had a previous anterior repair surgery to fix
19  a collapse -- her bladder which was collapsing into
20  her vagina?
21      A.  Yes.
22      Q.  And this is an anterior repair surgery.  Is
23  that a colporrhaphy?
24      A.  Correct.
25      Q.  Is that an invasive pelvic surgery?

Page 109

1      MR. BRADFORD:  Objection.
2      A.  Yes.
3      Q.  And she also told you she had a prior
4  posterior repair surgery to fix her rectum which was
5  collapsing into her vagina?
6      A.  Yes.
7      Q.  And again, that's a colporrhaphy surgery?
8      A.  Correct.
9      Q.  Is that posterior colporrhaphy surgery also
10  an invasive pelvic surgery?
11      MR. BRADFORD:  Objection.
12      A.  Yes.
13      Q.  And in both those repair surgeries, the
14  anterior repair of her collapsing bladder and the
15  posterior repair of her collapsing rectum, as we've
16  talked about, carry a risk of dyspareunia and
17  chronic pelvic pain?
18      MR. BRADFORD:  Objection.
19      A.  Yes.
20      Q.  Did the fact that Ms. Geery had had a failed
21  anterior repair surgery and a failed posterior
22  repair surgery, as well as numerous prior abdominal
23  surgeries, the C-sections, the abdominal
24  hysterectomy and the tummy tuck, did all of that
25  together make her a good candidate for transvaginal

Virgil Davila, M.D.

Page 110

1  mesh?
2      MR. BRADFORD:  Objection.
3      A.  Yes.
4      Q.  And if we look down near the end of that
5  first paragraph, Ms. Geery was seeing you at this
6  time because she was feeling pressure in her vaginal
7  area and her gynecologist had observed both a
8  uterovaginal prolapse and a cystocele?
9      A.  Correct.
10     Q.  What's a utero --
11     A.  Just so you know -- excuse me.  I'm sorry.
12     Q.  Sure.
13     A.  I think this was a mistype.
14     Q.  Okay.
15     A.  It should have been a vaginal prolapse, not
16  a uterovaginal prolapse, because she had no uterus.
17     Q.  So, in other words, like a vaginal vault
18  prolapse?
19     A.  Correct.
20     Q.  And at this visit you performed a physical
21  examination of Ms. Geery?
22     A.  I did, yes.
23     Q.  And you observed that she had a significant
24  cystocele?
25     A.  Yes.

Page 111

1      Q.  And you wrote a +3.  What does that mean?
2      A.  It's a grading system.  The different ways
3  of doing the staging, there is grading, and the
4  grading system just means there's +1, +2, +3, +4.
5  So that means it was fairly severe.
6      Q.  And as far as that grading system goes, does
7  a stage 3 cystocele mean that the bladder was
8  protruding from her vagina?
9      A.  Beyond the hymenal ring, correct.
10     Q.  You confirmed what her gynecologist had
11  observed, that she also had some vaginal vault
12  prolapse?
13     A.  This almost always goes hand in hand, yes.
14     Q.  And then you also found that she had a
15  rectocele, which was a -- the bladder -- I mean the
16  rectum collapsing into the vagina?
17     A.  Correct.
18     Q.  Fair to say that by this point, in September
19  2005, her prior anterior and posterior repair
20  surgeries had failed and her cystocele and her
21  rectocele had returned?
22     MR. BRADFORD:  Objection.
23     A.  That's correct.
24     Q.  Now, in terms of her urinary problems, at
25  this visit you noted that she did not appear to have

Page 112

1  severe stress incontinence?
2      A.  Correct.
3      Q.  But she was telling you that she was
4  occasionally leaking urine?
5      A.  Yes.
6      Q.  At this visit her main complaints in terms
7  of urinary problems was that she was having
8  difficulty urinating and that it took her a long
9  time to urinate?
10     A.  Correct.
11     Q.  You, at this visit, counseled her on options
12  for treating her prolapse?
13     A.  Yes.
14     Q.  And the first thing that you discuss with
15  her is that she could do nothing because,
16  essentially, a prolapse isn't a life-threatening
17  condition?
18     A.  That is correct.
19     Q.  And in fact, that's what you wrote here, you
20  said:  We discussed the fact that the option #1
21  would be to do absolutely nothing for this
22  particular problem.  I explained to her that there
23  is absolutely no reason why we should be concerned
24  about doing anything for this particular problem
25  since this is not a life-threatening condition.

Page 113

1      Right?
2      A.  Correct.
3      Q.  And that's the discussion you had with her?
4      A.  Yes.
5      Q.  Now, fair to say that while a pelvic organ
6  prolapse may not be life-threatening, they can have
7  a significant impact on a woman's life or lifestyle?
8      A.  On the quality of life, yes.
9      MR. BRADFORD:  Objection.
10     Q.  And that's why many women choose surgical
11  correction of pelvic organ prolapse despite it not
12  being a life-threatening condition?
13     A.  That is correct.
14     Q.  And in this particular instance, despite you
15  telling Ms. Geery that her first option was to do
16  nothing at all, she elected to proceed with a
17  surgical procedure because it was impacting her
18  life?
19     A.  Correct.
20     MR. BRADFORD:  Objection.
21     Q.  So then you discussed surgical options with
22  Ms. Geery?
23     A.  Correct.
24     Q.  What surgical options did you discuss with
25  her?

Virgil Davila, M.D.

Page 114

1    A.  Well, you know, I discussed all the options
2  with patients, so I didn't list it here, but I'm
3  sure that I discussed using nothing, just
4  anterior/posterior repair, we discussed also using
5  an abdominal approach, like a sacrocolpopexy, you
6  know, and we also discussed me doing a Prolift.  She
7  was very aware of Prolift as being an option.
8    Q.  In terms of the anterior and posterior
9  colporrhaphy surgeries, what would you have
10  discussed with her in terms of the pros and cons of
11  that option?
12       MR. BRADFORD:  Objection.
13    A.  I would have told her that because of the
14  fact that she had a previous failure, that the
15  anterior and posterior repair would more than likely
16  fail again.
17    Q.  So in your view, the anterior and posterior
18  colporrhaphy surgery wasn't really an option for
19  her?
20    A.  Not a good option.
21    Q.  What would you have discussed with Ms. Geery
22  about the pros and cons of doing an abdominal
23  approach?
24    A.  Much more risky, more adhesions, more
25  difficult, possible more complications.

Page 115

1    Q.  And would that be, in part, because she'd
2  had a number of previous abdominal surgeries?
3       MR. BRADFORD:  Objection.
4    A.  That is correct.
5    Q.  All right.  Now, you mentioned that at the
6  time you discussed Prolift with Ms. Geery as an
7  option, she told you that she was, quote, very well
8  aware of Prolift?
9    A.  Yes, she did tell me her daughter was aware
10  of it.  I'm not sure whether she worked for Gynecare
11  or whether she interviewed for Gynecare or there was
12  some connection.  I don't remember all the details.
13    Q.  But in any event, Ms. Geery told you that
14  she was very well aware of Prolift and had found out
15  some information about it?
16    A.  Correct.
17    Q.  You then discussed the potential
18  complications from Prolift with Ms. Geery, correct?
19    A.  Correct.
20    Q.  And in your record from this visit you
21  listed some of the risks you went over with her,
22  correct?
23       MR. BRADFORD:  Objection.
24    A.  Correct.
25    Q.  But not all of them, and what you wrote here

Page 116

1  is:  "I explained to the patient that with any type
2  of procedure the risks associated including but not
3  limited to..."
4       And does that indicate that you list some of
5  the risks that you specifically mentioned but didn't
6  list them all?
7    A.  Correct.
8       MR. BRADFORD:  Objection.
9    Q.  You told her that one of the risks of using
10  Prolift to treat her prolapse was that she could
11  experience bleeding?
12    A.  Correct.
13    Q.  That she could develop infection?
14    A.  Correct.
15    Q.  You told her that there could be damage to
16  her bladder and/or her bowel?
17    A.  Correct.
18    Q.  And you specifically told her there could be
19  an erosion of the mesh into her vagina or other
20  organs?
21    A.  That is correct.
22    Q.  Did you discuss with her that pelvic pain
23  was a potential risk of Prolift surgery?
24    A.  All my patients, I tell them that pain can
25  happen with any type of surgery.

Page 117

1    Q.  And in that discussion, would that include
2  chronic pelvic pain?
3       MR. BRADFORD:  Objection.
4    A.  I don't particularly recall if I said
5  chronic.
6    Q.  I'm talking about just in general.  Your --
7       MR. BRADFORD:  Let the doctor -- no, let the
8  doctor answer the question.  Don't step on his
9  answer because you don't like it.
10       MR. SMITH:  I'm not stepping on anything.
11       MR. BRADFORD:  Don't step on -- hang on.
12  Don't step on his answer because you don't like
13  it.
14       MR. SMITH:  It's not because I don't like
15  it.
16       MR. BRADFORD:  Go ahead and finish your
17  answer, Doctor.
18  BY MR. SMITH:
19    A.  I don't specifically recall whether I
20  mentioned chronic pain, but I did mention pain.
21    Q.  So let me ask it a little bit differently.
22       You treated Ms. Geery back in 2005/2006.
23  Obviously, you don't have specific recollections of
24  conversations with her, right?
25    A.  Correct.

Virgil Davila, M.D.

Page 118

1    Q.   And what you can do, though, is testify
2  based on what your custom and practice was with all
3  of your patients?
4       MR. BRADFORD:  Objection.
5    A.   Correct.
6    Q.   And do you have any reason to believe that
7  the discussion you had with Ms. Geery about the
8  potential risks of Prolift differed from what you
9  did typically with all of your patients?
10      MR. BRADFORD:  Objection.
11   A.   No.
12   Q.   And so you told us that one of the things
13  that it was your custom and practice back in 2005 to
14  discuss with patients for whom you were considering
15  using Prolift was pelvic pain?
16   A.   Correct.
17   Q.   And was it your custom and practice back in
18  2005, when discussing pelvic pain, to indicate that
19  the pelvic pain could be long-term?
20   A.   Back in 2005, you know, maybe.  I don't
21  particularly recall the particular event that I --
22  whether I told her chronic or not.
23   Q.   Okay.
24   A.   So --
25   Q.   But regardless of -- strike that.

Page 119

1       Regardless of what you can recall about what
2  you did or didn't say to patients back then, as we
3  already talked about, you were aware by 2005 and in
4  2006 that pelvic pain could be chronic with Prolift?
5       MR. BRADFORD:  Objection.
6    A.   That is correct.
7    Q.   And did you also discuss with Ms. Geery that
8  a potential risk of Prolift could be dyspareunia or
9  pain with intercourse?
10      MR. BRADFORD:  Objection.
11   A.   I'm sure, yes.
12   Q.   Now, looking at your record, you also
13  discussed with Ms. Geery that she was at increased
14  risk over just the normal patient for bowel and
15  bladder damage due to having a fair amount of scar
16  tissue from her previous anterior and posterior
17  repair surgeries?
18   A.   I'm sorry.  Can you repeat the question?
19   Q.   Sure.  Did you also discuss with Ms. Geery
20  that she was at increased risk beyond just the
21  typical patient to experience bladder and bowel
22  damage with Prolift due to the fact that she had a
23  fair amount of scar tissue from her previous
24  anterior repair and posterior repair surgeries?
25      MR. BRADFORD:  Objection.

Page 120

1    A.   Yes.
2    Q.   And that's -- you documented that in the
3  sentence where you wrote:  "The patient understands
4  that since she has had an anterior and posterior
5  repair in the past that surgery will be more
6  difficult since she will have a fair amount of scar
7  tissue and there is an increased risk of bladder and
8  bowel damage with this type of procedure."
9    A.   Yes.  The second surgery is always more
10  difficult.
11   Q.   Doctor, do you believe you had a robust and
12  comprehensive risk/benefit discussion with Ms. Geery
13  about Prolift at this visit on September 19th, 2005?
14      MR. BRADFORD:  Objection.
15   A.   Yes.
16   Q.   Did you afford her the opportunity to ask
17  any questions and answer them the best you could?
18   A.   Absolutely.
19   Q.   Let's turn to the record from your preop
20  visit.  I believe it is Exhibit 7.  So after the
21  initial consult she came back approximately eight
22  months later for her preop visit to proceed with
23  surgery?
24   A.   Yes.
25   Q.   And you performed another physical

Page 121

1  examination?
2    A.   Yes.
3    Q.   And we talked about this a little bit
4  earlier with Plaintiff's counsel, but you wrote here
5  that you found a really tight area in the urethral
6  area?
7    A.   Yes.
8    Q.   And you thought that it could be a previous
9  TVT?
10   A.   Correct.
11   Q.   But after actually going through with the
12  surgery and getting back the pathology, it turned
13  out that she didn't have a TVT tape either, correct?
14   A.   More than likely not, but, you know, it
15  could have been that it was not in the right place
16  and I couldn't find it.
17   Q.   Certainly if the evidence in this case is
18  that she had an autologous tissue repair and didn't
19  have a TVT, that would be consistent with your
20  findings on examination?
21   A.   Can you repeat that again?  I'm sorry.
22   Q.   Sure.  If the evidence in this case is that
23  Ms. Geery did not have a previous TVT placed, but
24  instead she had an autologous -- am I saying that
25  right?

Virgil Davila, M.D.

Page 122

1    A.   Autologous.
2    Q.   Autologous.  Okay.  So let me ask it again.
3        If evidence in this case is that Ms. Geery
4   had a previous autologous surgery to correct her
5   incontinence and didn't have a TVT, would your
6   findings in May of 2006 be consistent with that type
7   of surgery?
8    A.   Yes, it could have been, yes.
9    Q.   In other words, you can develop banding or
10   tightness around the urethra from other types of
11   stress incontinence surgeries, it's not just limited
12   to synthetic slings, correct?
13       MR. BRADFORD:  Objection.
14   A.   Correct.
15   Q.   Now, due to this tightness that you observed
16   and her complaints about difficulty with urinating,
17   you recommended potentially doing a urethrolysis
18   surgery?
19   A.   Correct.
20   Q.   Is that an operation which essentially
21   treats obstruction or blockage of the urethra?
22   A.   Correct.
23   Q.   And getting down near the bottom of this
24   record, you noted Ms. Geery would have the Prolift
25   surgery in the near future, correct?

Page 123

1    A.   Correct.
2    Q.   And then wrote:  "The risks of procedure
3   including bleeding, infection, bladder and bowel
4   damage, urethrovaginal fistula, all of these have
5   been discussed with the patient at great length."
6    A.   Correct.
7    Q.   So at this point, at this preop visit, did
8   you have another discussion with Ms. Geery about the
9   potential risks of Prolift?
10       MR. BRADFORD:  Objection.
11   A.   Correct.
12   Q.   And that included the risks of bleeding?
13   A.   Correct.
14   Q.   Infection?
15   A.   Yes.
16   Q.   Bladder and bowel damage?
17   A.   Correct.
18   Q.   Fistula?  And can you tell us what a fistula
19   is?
20   A.   Fistula is a communication between two
21   cavities, so whether it might be the urethra and the
22   vagina, the bladder and the vagina, the rectum and
23   the vagina, or any other part of the body,
24   basically.
25   Q.   When you say communication, it's essentially

Page 124

1   an opening between the two, correct?
2    A.   Correct.
3    Q.   And if you have, for example, a rectovaginal
4   fistula, you can have an opening between the rectum
5   and the vagina?
6    A.   Correct.
7    Q.   And that can become a real problem because
8   you can have feces going into the vagina?
9    A.   That is correct.
10   Q.   And that's a risk of Prolift with which you
11   discussed with Ms. Geery?
12   A.   Correct.
13   Q.   And then you indicated that Ms. Geery
14   understood these risks and she agreed to proceed
15   with the surgery?
16   A.   Yes.
17   Q.   And that was based on the communication you
18   had with her, that she told you she understood and
19   she wanted to proceed?
20   A.   Right.
21   Q.   Can you pull out Exhibit 9, which is the
22   history and physical you performed on May 16th,
23   2006?
24   A.   Yes.
25   Q.   And so --

Page 125

1        MR. BRADFORD:  It's this one, right?
2        MR. SMITH:  Yeah.  No, no.  This is the
3   operative report.  The history and physical.
4        MR. BRADFORD:  All right.  I'm sorry.  I've
5   got them misnumbered.
6        MR. SMITH:  Yeah.  Yeah.
7   BY MR. SMITH:
8    Q.   So before you actually performed --
9        MR. BRADFORD:  I think I have -- either my
10   number is wrong --
11       THE COURT REPORTER:  9.
12       MR. BRADFORD:  It's 9?  I'm sorry.  Go
13   ahead.  Sorry.
14       MR. SMITH:  Okay.
15   BY MR. SMITH:
16   Q.   Doctor, before you actually performed the
17   surgery, you then performed another history and
18   physical?
19   A.   Correct.
20   Q.   And by -- you performed this history and
21   physical --
22   A.   Wait, wait, wait.  Correction.  I'm sorry.
23   Q.   Sure.
24   A.   I'm sorry.  So this history and physical is
25   based on my last visit that I had with Mrs. Geery.

Virgil Davila, M.D.

Page 126

1   Q.   The one on May 9th, 2006?
2   A.   The last one, correct.
3   Q.   All right.
4   A.   I didn't see her one more time and perform a
5   history and physical, if that's what you're asking.
6   It was based on the records.
7   Q.   So, in other words, you created this record
8   based off of your previous records, not from seeing
9   her again?
10   A.   Correct.
11   Q.   And would it be fair to say that you may
12   have also created this record based on additional
13   records that you had received at that time?
14   A.   That -- that is correct, yes.
15   Q.   What I'm driving at here is you wrote that
16   by the time you were getting ready to perform the
17   surgery, she had undergone some urodynamic testing
18   which revealed that she did indeed have stress
19   urinary incontinence?
20   A.   That is correct.
21        MR. BRADFORD:  Objection.
22   Q.   And so at this point your plan was
23   to possibly place the TVT-O sling for the stress
24   incontinence along with the Prolift for her
25   rectocele and cystocele?

Page 127

1   A.   That is correct.
2   Q.   You had a discussion with Ms. Geery about
3   the potential risks of the TVT-O sling?
4   A.   Yes.
5   Q.   And you discussed with her that one such
6   risk is bleeding?
7   A.   Correct.
8   Q.   And infection?
9   A.   Correct.
10   Q.   Bladder damage?
11   A.   Correct.
12   Q.   Fistula formation?
13   A.   Correct.
14   Q.   Nerve damage?
15   A.   Correct.
16   Q.   Pelvic pain?
17        MR. BRADFORD:  Objection.
18   A.   I'm sure that I did.  I mean, it's not
19   listed on here but I'm sure I told her about that.
20   Q.   And dyspareunia, pain with intercourse?
21        MR. BRADFORD:  Objection.
22   A.   Yes, I told her that.
23   Q.   What were your instructions to Ms. Geery in
24   terms of how long she should abstain from sex after
25   the surgeries you were to perform?

Page 128

1   A.   Usually two months.
2   Q.   Two months?
3   A.   (Nodding head.)
4   Q.   Let's turn to your operative note, which is
5   Exhibit 10.  You performed your surgery on Ms. Geery
6   on May 16th, 2006?
7   A.   Yes.
8   Q.   You performed a number of surgical
9   procedures, correct?
10   A.   Correct.
11   Q.   One was the urethrolysis?
12   A.   Correct.
13   Q.   And that, again, was to address the tight
14   band under her -- or around her urethra that was
15   leading to her difficulty with urination?
16   A.   Correct.
17   Q.   You also performed an anterior and posterior
18   colporrhaphy along with Prolift?
19   A.   Correct.
20   Q.   You also performed an enterocele repair?
21   A.   Correct.
22   Q.   And that's for the vaginal vault prolapse?
23   A.   Yes, and it also says a formation of small
24   bowel protruding through her vagina.
25   Q.   And then you also did the TVT-O?

Page 129

1   A.   Correct.
2   Q.   And a cystoscopy?
3   A.   Correct.
4   Q.   In terms of -- one of the first things you
5   did is you wrote that after putting her in the
6   correct position for surgery, the anterior
7   compartment was examined and an incision was made
8   from right below the urethra all the way down to the
9   vaginal cuff.
10        Do you see that?
11   A.   Correct.
12   Q.   Can you describe where that is?  When you
13   say below the urethra, is that below the urethra at
14   the opening of the urethra?
15   A.   That's right under the opening of the
16   urethra, correct.
17   Q.   And all the way to the vaginal cuff, is that
18   where the vagina reaches the cervix?
19   A.   If you had a cervix.
20   Q.   If she had one?
21   A.   Right.
22   Q.   Basically, the whole length of the vagina?
23   A.   Yes.
24   Q.   All right.  You then performed your
25   cystoscopy.  You were looking at the urethra?

Virgil Davila, M.D.

Page 130

1   A.   Right.
2   Q.   And after that you wrote:  The dissection of
3 the bladder from the pubocervical fascia was taken
4 all the way down to the level of the -- is that --
5 I'll let you pronounce that word.
6   A.   Ischial spine.
7   Q.   Ischial spine.  Bilaterally?
8   A.   Correct.
9   Q.   And then you wrote:  "...after which the
10 bladder was reduced using 2-0 Vicryl."
11   A.   2-0 Vicryl.
12   Q.   Okay.  What does that mean, that the bladder
13 was reduced?
14   A.   That's part of the anterior colporrhaphy, so
15 we kind of plicate it with 2-0 Vicryl, so --
16   Q.   And then following that you said you turned
17 to the -- her enterocele?
18   A.   Yes.
19   Q.   And did you reduce that using some excision
20 and then purse-stringing it?
21   A.   Right.
22   Q.   And you were purse-stringing it to try to
23 make sure that it would not recur again?
24   A.   Right.
25   Q.   What's does purse-stringing mean?

Page 131

1   A.   That's a suture that would go all the way
2 around and it would kind of close it up.
3   Q.   And then following that, you placed her
4 TVT-O?
5   A.   No.  That was the Prolift.
6   Q.   Okay.
7   A.   The TVT-O was later.
8   Q.   So then after the enterocele, you did the
9 Prolift and then the TVT-O?
10   A.   Yeah.  The TVT-O was after I did the
11 Prolift.
12   Q.   And I think you went over this, but did you
13 implant the TVT-O in the same manner in which you
14 were taught to do it?
15   A.   Yes.
16   Q.   Did you experience any difficulty tensioning
17 it?
18   A.   Not at all.
19   Q.   Did you experience any difficulty at all
20 placing it?
21   A.   Not at all.
22   Q.   Same with the Prolift, any difficulty
23 placing it?
24   A.   None whatsoever.
25   Q.   Did you then observe, after placing the

Page 132

1 TVT-O, that she had another enterocele?  It's a
2 little unclear to me from the record.  It's in about
3 the middle of the page.  You wrote:  The patient was
4 noted to have --
5   A.   Yes.
6   Q.   And was that -- so that was a different
7 enterocele?
8   A.   Yes.
9   Q.   So she had two?
10   A.   Yes.
11   Q.   Okay.  And so you then fixed that one as
12 well?
13   A.   Yes.  Correct.
14   Q.   And then following that you turned your
15 attention to her rectocele?
16   A.   That's correct.
17   Q.   And the incision for the rectocele was from
18 the opening of the vagina to one centimeter from the
19 vaginal cuff?
20   A.   Right.
21   Q.   So, essentially, along the entire length of
22 the posterior compartment of the vagina?
23   A.   Correct.
24       THE COURT REPORTER:  14.
25       (Davila Exhibit 14 was marked for

Page 133

1 identification.)
2 BY MR. SMITH:
3   Q.   Doctor, I'm going to mark as Exhibit 14 and
4 hand you a record from Orlando Regional Healthcare
5 System.  It's the coding summary.
6       Can you tell us generally, Doctor, what this
7 type of document is, what the coding summary is from
8 Orlando Regional Healthcare System?
9   A.   It's a way that they used to -- for billing
10 purposes.
11   Q.   And one of the things it includes would be
12 diagnoses given to the patient?
13   A.   That is correct.
14   Q.   And if we look at this coding summary for
15 Ms. Geery, which is dated May 25th, 2006, under
16 secondary diagnosis, the first one listed there is
17 chronic cystitis?
18   A.   Yes.
19   Q.   And is that the same thing as interstitial
20 cystitis?
21   A.   Not necessarily.
22   Q.   Do you know whether she had chronic
23 interstitial cystitis?
24   A.   I don't know why that diagnosis is there, to
25 be honest with you.

Virgil Davila, M.D.

Page 134

1    Q.  You don't know where that came from?
2    A.  No.
3    Q.  Do you know whether or not she had
4  interstitial cystitis at this point?
5    A.  Not to my -- not to my knowledge.  I don't
6  recall her having that problem.
7    Q.  All right.  Let's now turn to your first
8  postop visit, which is Exhibit 12.
9    A.  Okay.
10   Q.  Actually, we can skip that.  Let's actually
11 flip to the last time -- well, let me just -- you
12 saw her the first time after the surgery on --
13   A.  The 22nd of May.
14   Q.  2006, right?
15   A.  Correct.
16   Q.  And then you saw her again for the last time
17 on August 21st, 2006?
18   A.  Correct.
19   Q.  You wrote:  "The patient presents today
20 complaining of pelvic pain, on Yaz for it."
21   A.  I don't -- I don't know what that is, but,
22 yeah, she came in complaining of pelvic pain.  I
23 don't know why the "on Yaz for it."
24   Q.  Yaz isn't a pain medication, is it?
25   A.  No.

Page 135

1    Q.  It's a birth control medication?
2    A.  It's a birth control.  Obviously, I missed
3  that typo.
4    Q.  In fact, what you actually wrote is her pain
5  is not in her pelvis, right?
6    A.  Yes.
7    Q.  And you said mostly in the low back and
8  the -- and, basically, in her tailbone area?
9    A.  Correct.
10   Q.  So, in other words, at this visit Ms. Geery
11 initially told you she was experiencing some pelvic
12 pain or she thought she was experiencing some pelvic
13 pain?
14   A.  Correct.
15   Q.  But in discussing with her this complaint
16 further, it turned out the pain was really not in
17 her pelvis but more in her lower back and her
18 tailbone area?
19   A.  That is correct.
20   Q.  You wrote:  "The patient claims she has had
21 this pain for quite sometime."
22       Right?
23   A.  Correct.
24   Q.  And that pain you're referring there to is
25 the pain in her low back and her tailbone area?

Page 136

1    A.  Correct.
2       MR. BRADFORD:  Objection.
3    Q.  And based on what you wrote there, that she
4  was having it for quite some time, was she -- was it
5  your understanding that she was telling you that
6  existed before the surgery?
7       MR. BRADFORD:  Objection.
8    A.  Correct.
9    Q.  And in fact, she told you that the pain had
10 been improving and getting better in the three
11 months since her surgery?
12      MR. BRADFORD:  Objection.
13   A.  Correct.
14   Q.  You then performed a physical examination of
15 Ms. Geery, correct?
16   A.  Yes.
17   Q.  And on your physical examination did you
18 make any finding that she was experiencing
19 tenderness or pain in her pelvic area or vagina?
20   A.  Not to my examination, no.
21   Q.  And you did find that the mesh was in place
22 and supporting her vagina well?
23   A.  Yes, she had a good repair, yeah.
24   Q.  In other words, the mesh was doing what it
25 was supposed to be doing at this point?

Page 137

1       MR. BRADFORD:  Objection.
2    A.  Yes.
3    Q.  And if -- well, strike that.
4       Following your discussion and physical
5  examination of Ms. Geery, what was your assessment?
6    A.  That her pain was more musculoskeletal and
7  back pain.
8    Q.  And as a result you referred her to see a
9  chiropractor?
10   A.  Correct.
11   Q.  Were you aware that she ultimately saw not
12 only a chiropractor, but multiple orthopaedic
13 surgeons?
14   A.  No, I was not aware of that.
15   Q.  Were you aware she was diagnosed with
16 advanced lumbar degenerative disc disease with
17 discogenic pain syndrome?
18      MR. BRADFORD:  Objection.
19   A.  No, I was not aware of that.
20   Q.  Would those diagnoses be compatible with the
21 pain that Ms. Geery was reporting to you on
22 August 21st, 2006?
23      MR. BRADFORD:  Objection.
24   A.  Yes.
25   Q.  Doctor, I want to ask you a few questions

Virgil Davila, M.D.

Page 138

1  about the Prolene mesh that was in TVT-O and Prolift
2  back in 2006. And first, you were asked some
3  questions about foreign body reaction earlier. Do
4  you remember that?
5      A.  Yes.
6      Q.  And can you tell, just generally, the jury
7  what foreign body reaction is or what it means?
8      A.  It's a reaction associated with the immune
9  system of a patient where they actually develop a
10  formation of a lesion or something that is trying to
11  reject the particular irritant or antigen.
12      Q.  Let me ask you this then. Is it your
13  understanding that foreign body reaction is
14  essentially the body's reaction in which macrophages
15  and foreign body giant cells are created and exist
16  around the foreign body?
17      A.  Right. They are basically trying to reject
18  the sling.
19      Q.  And is that -- strike that.
20          Is a foreign body reaction a risk of any
21  foreign body that's placed in the body?
22          MR. BRADFORD: Objection.
23      A.  It could be, yes.
24      Q.  After implanting Ms. Geery with TVT-O and
25  Prolift, did you find any evidence that she had been

Page 139

1  harmed by a foreign body reaction to the mesh?
2          MR. BRADFORD: Objection.
3      A.  Not through my examination, no.
4      Q.  Have you ever found that any of your
5  patients were harmed by foreign body reactions to
6  TVT-O or Prolift?
7          MR. BRADFORD: Objection.
8      A.  What exactly do you mean by that? Do you
9  mean did they had a rejection secondary to that or
10  they had a --
11      Q.  That a foreign body reaction somehow led to
12  an adverse reaction or clinical outcome.
13          MR. BRADFORD: Objection.
14      A.  Not to my knowledge, aside from erosion or
15  extrusion.
16      Q.  Plaintiffs claim in this litigation that the
17  Prolene mesh is cytotoxic. Have you found any
18  evidence that Prolift mesh or TVT-O mesh has been
19  cytotoxic in any of your patients, including
20  Ms. Geery?
21          MR. BRADFORD: Objection.
22      A.  No.
23      Q.  You were asked some questions by Plaintiff's
24  counsel about Prolene mesh and degradation. Have
25  you, in your experience, ever seen Prolift mesh or

Page 140

1  TVT mesh fall apart or leach chemicals or otherwise
2  degrade in the body?
3      A.  No.
4          MR. BRADFORD: Objection.
5      Q.  Did you ever find any evidence that
6  Ms. Geery's TVT-O or Prolift mesh degraded?
7      A.  No.
8          MR. BRADFORD: Objection.
9      Q.  Have you ever documented an injury in any of
10  your patients, including Ms. Geery, that you
11  attributed to be caused from mesh degradation?
12          MR. BRADFORD: Objection.
13      A.  No.
14      Q.  After implanting Ms. Geery with the TVT-O
15  and Prolift, did you find any evidence that her mesh
16  had roped or curled?
17          MR. BRADFORD: Objection.
18      A.  No.
19          MR. BRADFORD: He never opened her back up.
20  How is he going to know any of these things? How
21  could -- how is that possible?
22          MR. SMITH: He performed --
23      Q.  In terms of your own clinical experience
24  with all of your patients, including with Ms. Geery,
25  have you ever documented an injury that you

Page 141

1  attributed to roping or curling of TVT-O mesh or
2  Prolift mesh?
3          MR. BRADFORD: Objection.
4      A.  Not to my knowledge, no.
5      Q.  Do you recall being asked some questions
6  about -- strike that.
7          Do you recall being asked earlier some
8  questions by Plaintiff's counsel about internal
9  company communications indicating that there could
10  be contraction of mesh in the range of 20 to 40
11  percent?
12      A.  Yes.
13      Q.  In any of your patients for whom you have
14  implanted Prolift or TVT-O, including Ms. Geery,
15  have you found the mesh to have contracted in the
16  range of 20 to 40 percent?
17          MR. BRADFORD: Objection.
18      A.  Not to my knowledge.
19      Q.  And you told us that as part of your
20  practice as a medical doctor you've followed medical
21  literature on Prolift and TVT-O and other synthetic
22  slings.
23      A.  Yes.
24      Q.  Have you come across any medical literature
25  reporting that Prolift or TVT-O mesh contracts in

Virgil Davila, M.D.

Page 142

1  the range of 20 to 40 percent?
2      MR. BRADFORD:  Objection.
3      A.  There is some evidence suggesting that there
4  is a contracture.  Whether it's 20 to 40 percent,
5  I'm not really exact on the exact numbers.
6      Q.  It's understood and known in the
7  urogynecologic community that there is going to be
8  some contraction with any synthetic mesh, correct?
9      A.  Correct.
10     Q.  And that's a result of the scarring and
11 that's a well-known risk, right?
12     MR. BRADFORD:  Objection.
13     A.  Correct.
14     Q.  But again, as you sit here today you're not
15 aware and can't cite to me any medical literature
16 out there that says it contracts in the range of 20
17 to 40 percent?
18     MR. BRADFORD:  Objection.
19     A.  Not in that range, no.
20     Q.  Did Plaintiff's counsel show you any medical
21 literature or study that found contraction in the
22 range of 20 to 40 percent?
23     A.  No.
24     MR. BRADFORD:  Objection.
25     MS. HENRY:  Can we go off the record for one

Page 143

1  second?
2      MR. SMITH:  Sure.  Let's go off the record.
3      THE VIDEOGRAPHER:  The time is 6:47 p.m.
4  Off the record.
5      (Recess from 6:47 p.m. until 6:49 p.m.)
6      THE VIDEOGRAPHER:  The time is 6:49 p.m.
7  On the record.
8  BY MR. SMITH:
9      Q.  Doctor, I want to just wrap up here and
10 quickly summarize what we talked about today.
11     You had detailed discussions with Ms. Geery
12 about the risks of Prolift and TVT-O before you
13 performed those procedures?
14     MR. BRADFORD:  Asked and answered.
15     A.  Correct.
16     Q.  Do you believe you adequately informed
17 Ms. Geery of the risks associated with both Prolift
18 and TVT-O?
19     MR. BRADFORD:  Objection.
20     A.  Yes.
21     Q.  If Ms. Geery complains in this lawsuit that
22 she experienced mesh erosion or exposure, is that a
23 complication that you specifically discussed with
24 her before surgery?
25     A.  Yes.

Page 144

1      Q.  If Ms. Geery complains in this lawsuit that
2  she experienced infection, is that a complication
3  you discussed with her before surgery?
4      MR. BRADFORD:  Objection.
5      A.  Yes.
6      Q.  If Ms. Geery complains in this lawsuit that
7  she experienced pelvic pain, is that a complication
8  that you discussed with her before surgery?
9      MR. BRADFORD:  Objection.
10     A.  Yes.
11     Q.  If Ms. Geery complains in this lawsuit that
12 she experienced dyspareunia or pain with
13 intercourse, is that a potential complication that
14 you discussed with her before the surgery?
15     MR. BRADFORD:  Objection.
16     A.  Yes.
17     Q.  If Ms. Geery complains in this lawsuit that
18 she experienced urinary issues following these
19 surgeries, is that a potential complication that you
20 discussed with her before you performed your
21 surgery?
22     MR. BRADFORD:  Objection.
23     A.  Yes.
24     Q.  Based on what both Plaintiff's counsel and I
25 have discussed with you today, do you continue to

Page 145

1  believe that a TVT-O was a reasonable and
2  appropriate treatment option for Ms. Geery in 2006?
3      MR. BRADFORD:  Objection.
4      A.  Yes.
5      Q.  Do you continue to believe that Prolift was
6  a reasonable and appropriate treatment for
7  Ms. Geery's pelvic organ prolapse in 2006?
8      MR. BRADFORD:  Objection.
9      A.  Yes.
10     Q.  And do you stand by your decision to
11 recommend and treat Ms. Geery's pelvic organ
12 prolapse with Prolift in 2006?
13     A.  Yes.
14     MR. BRADFORD:  Objection.
15     Q.  Do you stand by your decision to recommend
16 and treat Ms. Geery's stress incontinence with TVT-O
17 in 2006?
18     MR. BRADFORD:  Objection.
19     A.  Yes.
20     MR. SMITH:  Thank you, Doctor.  At this
21 point I don't have any further questions.  I know
22 Plaintiff's counsel has got some more and I may
23 have a few additional after he's done.
24         REDIRECT EXAMINATION
25 BY MR. BRADFORD:

Virgil Davila, M.D.

Page 146

1    Q.   Are you ready to keep going?
2    A.   Yes.
3    Q.   All right. Let's do it. Give me one
4  second.
5        Doctor, you would agree that the frequency
6  of the risks of a medical device or surgery is
7  important?
8        MR. SMITH: Object to form.
9    A.   Yes.
10   Q.   And would you agree that the severity of the
11 risk of a surgery or medical device is important?
12       MR. SMITH: Object to form.
13   A.   Yes.
14   Q.   Would you agree that the potential
15 treatability of the risks of a surgical or medical
16 device is important?
17       MR. SMITH: Object to form.
18   A.   Yes.
19   Q.   Would you agree that the potential
20 permanency of the risks of a surgery or medical
21 device is important?
22       MR. SMITH: Object to form.
23   A.   Yes.
24   Q.   Would you agree that you deserve to know all
25 that Ethicon knew about the risks of the

Page 147

1  frequency -- strike that.
2        Would you agree that you deserve to know the
3  information that Ethicon knew about the frequency of
4  the risks from the Prolift?
5        MR. SMITH: Object to form.
6    A.   Yes.
7    Q.   And would you agree that you deserve to know
8  the information Ethicon knew about the risk of the
9  frequency of the TVT-O?
10   A.   Yes.
11   Q.   And would you agree that you deserve to know
12 about the potential severity of the risks that
13 Ethicon knew about for the TVT-O and Prolift?
14       MR. SMITH: Object to form.
15   A.   Yes.
16   Q.   Would you agree that you deserve to know
17 about the potential treatability of the risks of the
18 Prolift and the TVT-O that Ethicon knew?
19   A.   Yes.
20   Q.   And would you agree that you deserve to know
21 about the potential permanency of the risks of the
22 Prolift and the TVT-O that Ethicon knew about?
23       MR. SMITH: Object to form.
24   A.   Yes.
25   Q.   You had mentioned earlier you spend a

Page 148

1  portion of your practice treating mesh-related
2  complications. Do you recall that?
3    A.   Yes.
4    Q.   I don't want to get the number wrong. My
5  memory says 10 percent. I checked my notes. I
6  didn't write it down. Does that sound right?
7        MR. SMITH: He said five percent.
8    A.   That sounds about right, five to 10 percent,
9  yeah.
10   Q.   Okay. And I'm not trying to -- or what --
11 okay.
12       What percentage of your practice do you
13 spend treating mesh-related complications?
14   A.   Probably about five percent.
15   Q.   Okay.
16   A.   That's probably more accurate.
17   Q.   And what percent of your practice do you
18 spend treating complications, not recurrence but I'm
19 talking about chronic pain, erosion, those type of
20 complications from the other treatments that are out
21 there for -- the nonmesh treatments out there for
22 prolapse or stress urinary incontinence?
23       MR. SMITH: Object to form.
24   A.   It's hard to put a number on that, but not
25 as many.

Page 149

1    Q.   You would agree that the -- strike that.
2        Doctor, you would agree that between the
3  nonmesh options and the mesh options for pelvic
4  organ prolapse, there is a difference between the
5  severity and the frequency of the complications?
6        MR. SMITH: Object to form.
7    A.   Yes.
8    Q.   And you would agree that the mesh surgeries,
9  there is a higher frequency of complications for the
10 mesh surgeries used for pelvic organ prolapse
11 compared to the nonmesh surgeries, wouldn't you?
12       MR. SMITH: Object to form.
13   A.   Yes.
14   Q.   And you would agree that there is a
15 increased frequency for the mesh surgical options
16 for stress urinary incontinence compared to the
17 nonmesh as well, wouldn't you?
18       MR. SMITH: Object to form.
19   A.   I'm sorry. Can you repeat that again?
20   Q.   Yeah. That was a bad question. I think I
21 jumbled that one. Sorry about that.
22       Doctor, you would agree that between the
23 nonmesh options and the mesh options, there is a
24 difference between the frequency of complications
25 for treatment of stress urinary incontinence?

Virgil Davila, M.D.

Page 150

1    A.   There is a difference, yes.
2    Q.   Right.  And it's the -- it's more frequent
3  to have complications with the mesh options?
4    A.   You are talking about the sling or the mesh?
5  I'm sorry.
6       MR. SMITH:  Object to form.
7    Q.   The sling?
8    A.   The sling.  I think there is more
9  complications with the nonsling, to be honest with
10  you.
11    Q.   Okay.  For the -- as far as stress urinary
12  incontinence?
13    A.   It's a greater surgery, it's more risky.
14  There is more -- you know, it's a more difficult
15  surgery to do, so I think there is more risk from
16  that than there is from the sling.
17    Q.   Sure.  And are those more short-term risks,
18  meaning there is infection risk and there's -- it's
19  a bigger procedure --
20    A.   Sorry.
21    Q.   Go ahead.  -- as opposed to long-term risks?
22    A.   Both, actually, because a patient that have
23  the Burch procedures and the MMK, they tend to have
24  more problems with voiding dysfunction in the
25  long-term, so naturally they have more problems with

Page 151

1  urinary tension, and the surgery itself is a more
2  difficult surgery to do.
3    Q.   Sure.  Regarding chronic pain, is it more
4  likely to have chronic pain from a mesh treatment
5  for stress urinary incontinence as opposed to a
6  Burch or MMK?
7       MR. SMITH:  Object to form.
8    A.   That's difficult to say, to be honest with
9  you.
10    Q.   Okay.  You were asked some questions about
11  the risks that were present.  Just so we're clear,
12  it was your understanding at the time you implanted
13  the Prolift in Ms. Geery that the risk was transient
14  as discussed earlier; is that fair?
15       MR. SMITH:  Object to form.
16    A.   Correct.
17    Q.   Yeah.  Meaning it's a temporary -- the risk
18  of inflammation and problems therefrom is temporary
19  and not lifelong; is that fair?
20    A.   That is fair, yes.
21    Q.   And is the same true for the TVT-O as well?
22    A.   That is correct.
23    Q.   I'm going to mark -- what -- Exhibit 15.
24       (Davila Exhibit 15 was marked for
25  identification.)

Page 152

1       MR. BRADFORD:  There you go, Counsel.  I'm
2  sure you will have -- it's the -- it's the list
3  of the adverse reactions for the Gynemesh, which
4  is the Prolift.  I'm sure your same objection
5  stands and I can save you from giving it.
6       MS. HENRY:  Yes, same objection.
7       MR. BRADFORD:  Okay.
8  BY MR. BRADFORD:
9    Q.   Doctor, based upon your training and what
10  you were taught by Ethicon and your review of the
11  IFU for the Gynemesh -- which is the mesh that forms
12  the Prolift --
13    A.   Okay.
14    Q.   Okay?  The Gynemesh PS.  Were you ever told
15  or warned that there was the risk of pelvic pain in
16  patients which may not resolve regarding the mesh
17  used in the Prolift by Ethicon?
18    A.   I don't recall being told that.
19    Q.   And you never gave your patients the warning
20  that there is a lifelong risk from the Prolift, did
21  you?
22    A.   No.
23    Q.   And you didn't give the warning to your
24  patients that there is a lifelong risk from the
25  TVT-O, did you?

Page 153

1    A.   No.
2    Q.   And regarding pain with intercourse, which
3  in some patients may not resolve, that's, again,
4  that's not the lifelong warning you gave regarding
5  the Prolift to your patients, is it?
6    A.   No.
7    Q.   And if the company knew that from before the
8  Prolift was launched, that's something you would
9  want to know?
10    A.   Yes.
11    Q.   And that's something you would share with
12  your patients?
13    A.   Yes.
14    Q.   The company -- if the company knew there was
15  a risk of excessive contraction or shrinking around
16  the -- surrounding the mesh that would cause vaginal
17  scarring, vaginal tightening and potentially vaginal
18  shortening, were you ever told that by Ethicon?
19       MR. SMITH:  Object to form.
20    A.   No.
21    Q.   Regarding the Prolift?
22    A.   No.
23    Q.   And you didn't learn that via any other
24  source either, did you?
25    A.   No.

Virgil Davila, M.D.

Page 154

1    Q.   Is that something you would have liked to
2  have known?
3    A.   Yes.
4    Q.   Is that something that you would have shared
5  with your parents had you known?
6    A.   Yes.
7    Q.   You got asked some questions about the
8  medical literature that was available when you were
9  using the Prolift and the TVT-O.  You know, Prolift
10  came on the market in March of 2005.  She was
11  implanted in May of 2006.  What literature was out
12  there on the Prolift in that -- in that little
13  window for you to review?
14    A.   Not much literature at all.
15    Q.   You were essentially beholden to what the
16  company told you, weren't you?
17      MR. SMITH:  Object to the form.
18    A.   Correct.
19    Q.   Same for the TVT-O, it was on the market in
20  2004 and she was implanted in May of 2006.  What
21  literature -- do you remember any literature that
22  was out there at that time supporting the TVT-O?
23      MR. SMITH:  Object to form.
24    A.   No.
25    Q.   And same deal, you were beholden to what the

Page 155

1  company was telling you about the product at that
2  point, weren't you?
3    A.   Correct.
4      MR. SMITH:  Object to form.
5    Q.   You got asked about whether you had seen
6  degradation or contraction or roping and curling in
7  Ms. Geery specifically.  Do you recall those
8  questions?
9    A.   Yes.
10    Q.   You never -- I mean, you did a physical
11  examination of her but you've never surgically
12  opened her up to see what's going on with that mesh
13  in her body after you implanted it, did you?
14    A.   I did not.
15    Q.   And you certainly never looked under a
16  microscope to -- at a pathological level to see
17  what's going on with that?
18    A.   No, I did not.
19    Q.   And the same for your other patients.  You
20  got asked about degradation and leaching and those
21  kind of things.  Have you ever done a
22  pathological -- you personally looked under a
23  microscope to see what's going on with the mesh
24  that's been removed from your patients?
25    A.   Not personally, no.

Page 156

1    Q.   Right.  And can you see degradation with the
2  naked eye, or is that something you would need to do
3  a pathological look under an electron microscope to
4  see?
5    A.   You would have to look, yes.
6    Q.   You got asked a lot of questions about the
7  risks of your informed consent discussion with
8  Ms. Geery.  Just so the jury is clear in this case,
9  is it fair that you informed her of the risks you
10  knew about at the time you implanted the Prolift in
11  her?
12    A.   Yes.
13    Q.   And is it fair to say that you informed her
14  of the risks that you knew about of the TVT-O at the
15  time she was implanted with that device?
16    A.   Yes.
17    Q.   Let me look through.  I may be finished.
18      Doctor, would you agree that you can't have
19  mesh-related complications if there is no mesh used?
20    A.   You cannot have mesh complications if no
21  mesh is used.
22    Q.   And would you agree that the foreign body
23  reaction with a suture is much different than a big
24  piece of woven mesh, such as a Prolift?
25      MR. SMITH:  Object to form.

Page 157

1    A.   Yes.
2    Q.   Do you know how much -- if the Prolift were
3  unwoven, do you know how much -- how much -- how
4  long the piece of polypropylene fishing line would
5  be?
6      MR. SMITH:  Object to form.
7    A.   I don't have the answer to that.
8    Q.   Would you be surprised if it was more than
9  300 meters?
10      MR. SMITH:  Object to the form.
11    A.   No.
12    Q.   Would you agree that the foreign body
13  reaction from a suture is much different than a
14  woven piece of mesh, such as the TVT-O or the
15  Prolift?
16      MR. SMITH:  Object to form.
17    A.   Yes.
18    Q.   And the foreign body reaction would be
19  greater with the larger pieces of mesh?
20    A.   Yes.
21    Q.   Do you know the difference -- strike that.
22      Did anyone from Ethicon ever tell you there
23  was a different way of cutting of the mesh for the
24  TVT-O?
25      MR. SMITH:  Object to form.

Virgil Davila, M.D.

Page 158

1    A.   No.
2    Q.   Did you know that there was laser cut mesh
3  and mechanically cut mesh?
4    A.   I had no idea, no.
5    Q.   Did anyone from Ethicon ever give you the
6  difference in the risk profile between laser cut
7  mesh and mechanically cut mesh?
8        MR. SMITH:  Object to form.
9    A.   No.
10   Q.   If there is a difference in the risk profile
11  between those two, is that something you would have
12  liked to have known?
13   A.   Yes.
14   Q.   Is that something that could have played a
15  role in whether or not you used the TVT-O in your
16  patients, depending upon what it shows?
17   A.   Yes.
18       MR. SMITH:  Object to form.
19   Q.   Based upon your examination and history you
20  took from Ms. Geery, did she have any issues or
21  complications from her tummy tuck?
22       MR. SMITH:  Object to form.
23   A.   Not to my knowledge.
24   Q.   Other than the prolapse recurring, did she
25  have any complications or issues from the prior

Page 159

1  anterior and posterior suture repair?
2        MR. SMITH:  Object to form.
3    A.   Not to my knowledge.
4    Q.   In your risk/benefit analysis with Ms. Geery
5  regarding the Prolift, did you discuss the frequency
6  of the risks that you mentioned to her?
7    A.   The frequency of the risks in regards to?
8    Q.   Of -- the potential risk of the Prolift
9  surgery.  Did you -- did you discuss with -- strike
10  that.  I don't need -- I'm not going to go through
11  that.  It's going to take 10 minutes and I don't
12  want to do it.
13       MR. BRADFORD:  Actually, that's all the
14   questions I have for now.  I have a little bit of
15   time if I need to follow up, but I don't have to.
16       THE WITNESS:  Okay.
17           RECROSS-EXAMINATION
18  BY MR. SMITH:
19   Q.   Doctor, you were asked again some questions
20  about your practice in treating potential mesh
21  complications and you told us previously that that's
22  about five percent of your practice.
23   A.   Correct.
24   Q.   Is that today that you were talking about,
25  or what time period?

Page 160

1    A.   Today, I'm seeing less of it now, really.
2  Yeah.
3    Q.   And when you're talking about potential mesh
4  complications, you're not talking about just
5  specifically Prolift or TVT-O, are you?  You're
6  talking about all meshes?
7    A.   Correct.  All meshes, yeah.
8    Q.   So all different types of mesh used for
9  pelvic organ prolapse, not just Prolift and not just
10  mesh from Ethicon?
11   A.   That is correct.
12   Q.   And all types of mesh for stress urinary
13  incontinence, not just TVT-O and not just mesh from
14  Ethicon?
15   A.   Correct.
16   Q.   And in your own clinical practice and in
17  your own experience with your patients using Prolift
18  and TVT-O, the vast majority of your patients
19  haven't experienced any complications from those
20  meshes, correct?
21       MR. BRADFORD:  Objection.
22   A.   That's correct.
23   Q.   Doctor, you were asked -- strike that.
24       You testified that in your view there is an
25  increase in frequency and severity of complications

Page 161

1  with mesh options versus nonmesh options to treat
2  pelvic organ prolapse, was that your testimony?
3    A.   For prolapse?
4    Q.   For prolapse?
5    A.   Yes.
6    Q.   And that was something you knew in May 2006,
7  when you put the Prolift in Ms. Geery?
8        MR. BRADFORD:  Objection.
9    A.   Not necessarily, no.
10   Q.   Well, do you know as you sit here today
11  whether that was something you were aware of in May
12  2006?
13   A.   Not -- not at that point.  I don't think at
14  that point we were aware of that.
15   Q.   All right.  You were asked about -- strike
16  that.
17       Before Prolift came to the US, it was being
18  used in Europe?
19   A.   Correct.
20   Q.   For how long?
21   A.   A few years.  I don't know exactly how many
22  years.
23   Q.   Was there literature coming out of Europe
24  related to Prolift?
25   A.   I believe there was limited literature

Virgil Davila, M.D.

Page 162

1 coming at that point from Europe.
2 Q. Okay. You were asked whether you had ever
3 personally performed a pathological examination of
4 mesh to determine whether there was degradation.
5 A. Correct.
6 Q. And, obviously, you haven't done that
7 because you're not a pathologist, right?
8 A. No.
9 Q. But when you take out mesh specimens --
10 strike that.
11 But when you take out mesh, do you send
12 specimens to pathology to look at?
13 A. I do. They don't always look at it but I
14 do.
15 Q. And when they do look at it, have you ever
16 had a pathologist tell you that they found the mesh
17 had degraded?
18 MR. BRADFORD: Objection.
19 A. Not to my knowledge, not that I can recall.
20 Most of the time they just say mesh.
21 Q. Right.
22 A. They don't look at it under the microscope.
23 Q. Sometimes they do?
24 A. Sometimes they do, yes.
25 Q. And in the times that they've done that, no

Page 163

1 one has ever told you I found mesh degradation?
2 MR. BRADFORD: Objection.
3 A. I -- I don't remember seeing that, no.
4 Q. Doctor, you were asked some questions about
5 adverse reactions related to Prolift which Counsel
6 questioned you from a document marked as Exhibit 15,
7 but again, I just want to make clear that these
8 reactions that he went over or these potential
9 adverse reactions were risks, as we already
10 discussed, that you were aware of in 2006.
11 Mesh extrusion and exposure or erosion into
12 the vagina or other structures or organs, you were
13 aware of that in May 2006, correct?
14 A. Yes.
15 Q. In fact, you specifically warned Ms. Geery
16 about it?
17 A. Yes.
18 Q. And pelvic pain, you were aware of that and
19 warned her about that?
20 A. For any type of surgery, yes.
21 MR. BRADFORD: Objection.
22 Q. And pain with intercourse?
23 A. Yes.
24 Q. You were aware in May 2006 that there could
25 be contraction or shrinkage of the tissue

Page 164

1 surrounding the mesh, as all scars do?
2 MR. BRADFORD: Objection.
3 A. From scarring, yes.
4 Q. And you were aware that there could be a
5 foreign body response to mesh?
6 A. Yes.
7 Q. You were aware that there could be fistula
8 formation?
9 A. Yes.
10 Q. Can you remind me, Doctor, how many TVT-O
11 devices you think you could approximate you've put
12 in in your career?
13 MR. BRADFORD: Asked -- asked and answered.
14 MR. SMITH: I just can't remember what he
15 said.
16 A. Yeah, I don't remember exactly. It's been a
17 lot. It's got to be close to a thousand just
18 because I've been doing it for a long time.
19 Q. And I think you said around 100 Prolifts?
20 MR. BRADFORD: Same objection.
21 A. Yes, a hundred, maybe more. I don't
22 remember exactly when you asked me.
23 Q. Now, you were asked some questions from
24 Plaintiff's counsel about frequency and severity and
25 permanency of risks. Do you recall that?

Page 165

1 A. Yes.
2 Q. In your experience with the approximately
3 100 Prolifts you've done and the approximately 1,000
4 TVT-Os you've done, have you found any complications
5 to be frequent?
6 MR. BRADFORD: Objection.
7 A. Very infrequent.
8 Q. Have you found any complications to be more
9 frequent than what you learned during your training
10 and education on the -- on the devices?
11 MR. BRADFORD: Objection.
12 A. No.
13 Q. In your experience with the 100 Prolifts and
14 the 1,000 TVT-Os, have you found any of the
15 potential complications to be more severe than you
16 were trained on or learned about?
17 MR. BRADFORD: Objection.
18 A. No.
19 Q. Have you found any of the complications to
20 be more permanent than you were trained on or
21 learned about?
22 MR. BRADFORD: Objection.
23 A. No.
24 Q. When you're performing surgery to remove
25 mesh and evaluating a patient for complications that

Virgil Davila, M.D.

Page 166

1  could be potentially related to mesh, do you rely on
2  pathology and the pathologist's report to help you
3  determine whether mesh caused a patient's given
4  clinical complications?
5        MR. BRADFORD:  I'm going to object.  That's
6  beyond the scope and calls for an expert opinion
7  beyond Ms. Geery.
8     A.  Can you rephrase that?  I'm sorry.
9     Q.  Sure.  Do you rely on pathology to help you
10  in determining whether a patient's clinical symptom
11  was or was not related to a mesh product?
12        MR. BRADFORD:  Objection.
13     A.  No.
14        MR. SMITH:  Thank you, Doctor.
15             REDIRECT EXAMINATION
16  BY MR. BRADFORD:
17     Q.  One last question for you, Doctor:  As an
18  in-the-trenches practicing doctor, do you agree that
19  you should be able to rely on what the company tells
20  you about the risk profiles of its devices,
21  specifically you should be able to rely on what
22  Ethicon told you about the risk profile for the
23  Prolift and the TVT-O?
24     A.  Yes.
25     Q.  And the company should tell you what it

Page 167

1  knows about those products?
2     A.  Yes.
3        MR. BRADFORD:  Thank you.
4           RECROSS-EXAMINATION
5  BY MR. SMITH:
6     Q.  Doctor, have you, in your experience with
7  your 100 Prolift operations and 1,000 TVT-O
8  operations, found any complications or potential
9  risks had Ethicon had never told you about?
10        MR. BRADFORD:  Objection.
11     Q.  In your own experience?
12     A.  Not in my own patients.
13        MR. SMITH:  Thank you, Doctor.  We're done.
14        THE VIDEOGRAPHER:  The time is 7:15 p.m.
15  Off the record.
16        (Whereupon, the deposition concluded at
17  7:15 p.m.)
18
19
20
21
22
23
24
25

Page 168

1             C E R T I F I C A T E
2        I, SUSAN D. WASILEWSKI, Registered
3  Professional Reporter, Certified Realtime Reporter,
4  and Certified Realtime Captioner, do hereby certify
5  that, pursuant to notice, the deposition of VIRGIL
6  DAVILA, M.D., was duly taken on Thursday,
7  July 18, 2019 at, 4:02 p.m. before me.
8        The said VIRGIL DAVILA, M.D., was duly sworn
9  by me according to law to tell the truth, the whole
10  truth and nothing but the truth, and thereupon did
11  testify as set forth in the above transcript of
12  testimony.  The testimony was taken down
13  stenographically by me.  I do further certify that
14  the above deposition is full, complete, and a true
15  record of all the testimony given by the said
16  witness, and that a review of the transcript was not
17  requested.
18
19
20  _____
21  Susan D. Wasilewski, RPR, CRR, CRC
22  (The foregoing certification of this transcript does
23  not apply to any reproduction of the same by any
24  means, unless under the direct control and/or
25  supervision of the certifying reporter.)

Page 169

1             LAWYER'S NOTES
2  PAGE  LINE
3  _____  _____  _____
4  _____  _____  _____
5  _____  _____  _____
6  _____  _____  _____
7  _____  _____  _____
8  _____  _____  _____
9  _____  _____  _____
10  _____  _____  _____
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21  _____  _____  _____
22  _____  _____  _____
23  _____  _____  _____
24  _____  _____  _____
25