## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| MICHELLE A. GEERY, | Civil Action No. |
| Plaintiff, | 6:20-cv-01975-RBD-LRH |
| v. | |
| ETHICON INC., | |
| JOHNSON & JOHNSON, | |
| Defendants. | |

## PLAINTIFF'S OMNIBUS DAUBERT MOTION
## AND MEMORANDUM TO EXCLUDE OR LIMIT THE OPINIONS AND
## TESTIMONY OF DEFENSE EXPERTS

Plaintiff Michelle A. Geery respectfully moves this Court to exclude or limit certain opinions and testimony of Defense experts in this case. As the Court is aware, the Multi-District Litigation (MDL) Court for the transvaginal mesh litigation (MDL 2327) previously considered and ruled on many issues raised in earlier *Daubert* motions. This Court adopted relevant MDL 2327 *Daubert* rulings, by Order dated December 14, 2020.[1] However, the MDL Court reserved certain issues and this Court has asked the parties to brief those reserved issues in omnibus *Daubert* motions. By this Motion, Plaintiff seeks to exclude or limit the testimony of Defense experts

---

[1] Doc. No. 100.

1

Stephen M. Factor, M.D., Jaime L. Sepulveda-Toro, M.D., and Christina Pramudji, M.D.

## I.   LEGAL STANDARD

To qualify as an expert witness under Federal Rule of Evidence 702, a witness must be *qualified* as an expert by knowledge, skill, experience, training, and/or education, to provide testimony competently on the issues he intends to address.[2] The methodology used to reach the expert's conclusions must be sufficiently *reliable*, as determined by applying the principles the Supreme Court set forth in its *Daubert* ruling.[3] It must be "ground in sound scientific principles, not speculation or conjecture."[4] The expert's testimony must be relevant and *assist* the trier of fact understand the evidence or determine facts in issue (i.e. the testimony must "fit" the issues in the case.)[5] With regard to helpfulness, generally, experts are permitted to testify when "the proffered expert testimony concerns information that is beyond the understanding of the layperson."[6] In summary, the expert's testimony is admissible if it "rests on a reliable foundation and is

---

[2] See FRE 702; *Adams v. Lab Corp. of America*, 760 F.3d 1322, 1327-28 (11th Cir. 2014); *Rosenfeld v. Oceania Cruises, Inc.*, 654 F. 3d 1190, 1193 (11th Cir. 2011); *Alvarez v. Geovera Specialty Insurance Co.,* 2019 WL 7900073, *2 (S.D.Fl. Sept. 25, 2019).
[3] FRE 702; *Daubert,* 509 U.S. 579*; Adams,* 760 F. 3d at 1327-1328*; Rosenfeld,* 654 F.3d at 1193; *Alvarez,* 2019 WL 7900073, *2.
[4] *Alvarez,* 2019 WL 7900073, *4.
[5] FRE 702; *Adams,* 760 F. 3d at 1327-1328*; Rosenfeld,* 654 F.3d at 1193; *Alvarez,* 2019 WL 7900073, *2.
[6] *Alvarez,* 2019 WL 7900073, * 4.

relevant."[7] The proponent of the expert bears the burden of establishing the expert's qualifications, reliability, and helpfulness, by a preponderance of evidence.[8]

A district court has broad discretion in deciding whether to admit or exclude expert testimony, including "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."[9] The District Court acts as a "gatekeeper," screening out speculative, unreliable expert testimony, with the goal of ensuring that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of the expert in the relevant field."[10]

## II.   ARGUMENTS

**A. <u>Stephen M. Factor, M.D.</u>**:  Defendants have designated Dr. Factor as an expert pathologist in this case. Dr. Factor is board certified in Anatomic and Clinical Pathology.[11] Dr. Factor's subspecialty is cardiovascular pathology and the bulk of his research, writing and teaching relate to cardiovascular pathology.[12] As the MDL Court noted, "Prior to analyzing twenty explanted mesh samples for this litigation, Dr. Factor had never examined vaginal mesh, and as a pathologist,

---

[7] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).
[8] *Hendrix Ex. Rel. G.P. v. Evenflo Co., Inc.,* 609 F.3d 1183, 1194 (11th Cir. 2010).
[9] *Adams,* 760 F.3d at 1327  (quoting *Kumho Tire Co.,* 526 U.S. at 152).
[10] *Id.*
[11] Ex. 1, Expert report of Dr. Factor at 1.
[12] Ex. 2, 11/27/2012 Deposition of Dr. Factor at 17:18-18:16.

focuses on cardiovascular disease."[13] Dr. Factor attempts to offer certain opinions that are outside his area of expertise and are, therefore, inadmissible pursuant to Federal Rule of Civil Procedure 702, and *Daubert v. Merrell Dow Pharms. Inc.*[14]

### Dr. Factor's general mesh opinions, including opinions concerning the adequacy of mesh design, physical characteristics of the mesh, and biocompatibility, should be excluded.

As a pathologist specializing in cardiovascular disease, who has no experience with vaginal mesh outside of this litigation, it is Plaintiff's position that Dr. Factor is not qualified to render general mesh opinions, including opinions concerning the adequacy of mesh design, physical characteristics of the mesh or the biocompatibility of the Ethicon products placed in Ms. Geery. The MDL Court reserved ruling on this issue:

> the defendants state that 'Dr. Factor does not seek to opine generally about mesh design or biomaterials,' yet they acknowledge his testimony may touch on these issues tangentially. Given the lack of clarity as to which opinions Dr. Factor actually intends to offer and which specific opinions plaintiffs are seeking to exclude, I RESERVE ruling until the matter may be evaluated first hand at trial.[15]

Outside of his work as an expert in these cases, Dr. Factor has never analyzed a single explanted transvaginal polypropylene mesh device, has never performed any research whatsoever on mesh, has never published any articles or given any

---

[13] Doc. No. 70-12, MDL Court Memorandum Opinion and Order re: Dr. Factor, at 6.
[14] See *Daubert,* 509 U.S. 579 (1993).
[15] Doc. No. 70-12 MDL Court Memorandum Opinion and Order re: Dr. Factor, at 6.

presentations on mesh, does not know what protocols are followed by pathologists who actually specialize in studying explanted surgical mesh devices, and does not hold himself out as expert on bridging fibrosis or scar plate formation and has never been trained by anybody professionally on how to identify these mesh-specific pathological features.[16]

Dr. Factor's lack of experience with surgical meshes could not have been described any better than by Dr. Factor himself who testified as follows:

> Q:   You do not hold yourself out as an expert with regard to surgical mesh in particular, do you?
> A:   No.
> Q:   You do not hold yourself out with regard to the biocompatibility of surgical mesh, correct?
> A:   No.
> Q:   Meaning I am correct?
> A:   Yes, you are correct.[17]

These issues go to the very heart of the claims and defenses in this litigation, and, as such, experience in these areas is critical in order to provide any meaningful or reliable testimony at trial. Unfortunately, however, Dr. Factor offers numerous general opinions in his expert report that are beyond his expertise. For

---

[16] Ex. 2, 11/27/2012 Deposition of Dr. Factor, at 10:13-18 (never performed a pathological analysis of explanted transvaginal mesh outside of this litigation); 22:9-13 (never published any articles related to polypropylene mesh); 23:8-11 (never performed any research on surgical mesh); 22:14-17 (never given any professional presentations concerning mesh); Ex. 3, 3/5/2014 Deposition of Dr. Factor, at 49:6-11 (Dr. Factor does not know what protocols are followed by pathologists who specialize in studying explanted surgical mesh devices); 66:3-6 and 16-24 (does not hold himself out as an expert in bridging fibrosis or scar plate formation and has never been trained professionally in how to identify these pathologically).

[17] Ex. 3, 3/5/2014 Dep. of Dr. Factor at 19:8-13.

example, Dr. Factor renders opinions throughout his report concerning the adequacy of the Prolene and Prolene Mesh design, including the physical properties and tendencies of the mesh such as pore size, mesh degradation, and mesh shrinkage, and its propensity to cause bridging fibrosis, scar platting, and/or inflammation in the human body[18]-- opinions that Dr. Factor has admitted are beyond the scope of his expertise.[19] Tellingly, Dr. Factor has refused to render these types of opinions in prior cases:

> Q:   Doctor, are you going to be rendering any opinions on the size of the mesh pores?
> A:   No.[20]
>
> ****
>
> Q:   Do you have an opinion as to whether or not the mesh itself migrates within the female body?
> A:   I do not, no. I have no opinion.[21]
>
> ****
>
> Q:   Doctor, are you rendering an opinion in this case as to how the mesh works within the female body?
> A:   No.
> Q:   Do you have an understanding of how the mesh is intended to work within the female body?
> A:   Only in very broad senses. I mean, I'm not a bioengineer or mechanical engineer. I understand the general concept of support of tissues, but I'm not here as an expert in that area.[22]

---

[18] See Ex. 1, Expert Report of Dr. Factor at 8, 9, 14, 15, 17, 18, 19, 20, 21. See also Ex. 2, 11/27/2012 Dep. of Dr. Factor at 44:18-45:1.

[19] Ex. 2, 11/27/2012 Dep. of Dr. Factor at 44:18-45:1 (Dr. Factor admitted that he is not a bioengineer or mechanical engineer and is not an expert in these areas); 53:5-11 (Dr. Factor testified that he has no opinions concerning what happens to the mesh once it is placed in the female body; 44:14-17 (Dr. Factor testified that he has no opinions concerning how mesh is intended to work within the female body); Ex. 3, 3/5/2014 Deposition of Dr. Factor at 19:8-13 (Dr. Factor testified that he does not hold himself out as an expert on mesh or mesh biocompatibility).

[20] Ex. 2, 11/27/2012 Dep. of Dr. Factor at 50:8-11; 126:5-10.

[21] Ex. 2, 11/27/2012 Dep. of Dr. Factor at 75:12-16.

[22] Ex. 2, 11/27/2012 Dep. of Dr. Factor at 44:18-45:1.

What little experience Dr. Factor does have in analyzing explanted polypropylene mesh specimens is limited to only eight to ten hernia mesh devices throughout his entire career—no transvaginal mesh devices.[23] And moreover, Dr. Factor testified that this limited experience cannot be extrapolated to other mesh devices globally, which would include Ethicon's transvaginally placed Prolene and Prolene Soft mesh products.[24] Dr. Factor's experience in the field of anatomical and clinical pathology and vague notions of experience analyzing a handful of hernia mesh device does not automatically qualify him as an expert in pelvic mesh pathology and, without more, is insufficient to pass *Daubert* muster.

As one Court has noted,

> both *Daubert* and *Kumho* make it clear that the day of the expert, who merely opines, and does so on basis of vague notions of experience, is over. Experts are now held to a level of accountability that requires factual predicates, in historical fact, or in competent evidence, which allows a factfinder to independently verify the accuracy of the expert's results. Absent such reliable verification, the expert's opinion is not admissible.[25]

Opinions like Dr. Factor's, that flow neither from training, experience, nor research, that have never been presented to and reviewed by his peers, and which are formed only for purposes of litigation should be excluded.[26]

---

[23] Ex. 2, 11/27/2012 Dep. of Dr. Factor at 19:19-20:21.

[24] Ex. 2, 11/27/2012 Dep. of Dr. Factor at 63:23-65:8.

[25] *Solheim Farms, Inc. v. CHN America, LLC,* 503 F.Supp.2d 1146, 1150 (D. Minn. 2007).

[26] *Daubert*, 43 F.3d at 1317 ("*Daubert II*"); *see also* Lauzon v. Senco Prods., Inc. 270 F.3d 681, 687 (8th Cir. 2001) (citing *Daubert II*, noting impetus for opinion as a factor in considering the admissibility of expert testimony); *see also Wagner v. Hesston Corp.*, 2005 WL 1540135 (D. Minn. June 30, 2005), at *6 (attached as Ex. 4) (citing *Daubert II*, noting that expert testing

Even if this Court determines that Dr. Factor is qualified to offer general opinions concerning the design, biocompatibility, or physical properties of the mesh, his deposition testimony demonstrates that the methods he uses to render these opinions are flawed:

> Q:   Is it fair to say that the materials that are significant to you in forming your opinion are the photomicrographs of the pathology specimens?
> A:   And the pathology slides.
> Q:   And the pathology slides?
> A:   Yes.
> Q:   You didn't base your opinions on the materials listed –
> A:   No.
> Q:   -- in this report, correct?
> Q:   There's some writings by Klinge and Klosterhalfen in this list of literature, this vast list of literature. Are those articles that you were familiar with?
> A:   I have not reviewed them from the time that I originally received them and read them. So I know their names. I don't know the content of what they said.
> Q:   Whatever they said was not of significance to you one way or the other in forming your opinions; correct?
> A:   Correct.[27]

As the MDL Court has noted, "[j]ust because an expert may be 'qualified . . . by knowledge, skill, experience, training or education' does not necessarily mean that the opinion that the expert offers is 'the product of reliable principles and methods' or that the expert 'has reliably applied the principles and methods to the facts of this case.'"[28]

---

conducted almost entirely within the context of litigation "increase[d] the unreliability of [the expert's] opinions").

[27] Ex. 3, 3/5/2014 Dep. of Dr. Factor at 48:8-49:5.

[28] *Cisson v. C. R. Bard, Inc. (In re C. R. Bard, Inc.)*, 948 F. Supp. 2d 589, 612 (S.D. W. Va. 2013).

The admissibility of Dr. Factor's unreliable and unfounded opinions, outside of his expertise, regarding the adequacy of vaginal mesh design, the physical characteristics of mesh, and the biocompatibility of the products used in Ms. Geery, presents a serious risk of confusing the issues and misleading the jury in this case and should be excluded.[29]

**B. <u>Jaime L. Sepulveda-Toro, M.D.</u>**: Jaime L. Sepulveda-Toro, M.D. is board certified in obstetrics and gynecology and licensed in the State of Florida.[30] Dr. Sepulveda-Toro has proffered two expert reports, one report addressing Gynemesh PS, Prolift, and Prosima and a second report addressing TVT and TVT-O. The MDL Court considered and ruled upon the majority of Plaintiff's objections to the admissibility of Dr. Sepulveda-Toro's expert opinions, but reserved rulings regarding on certain issues.

With regard to Dr. Sepulveda-Toro's opinions on the adequacy of the safety warnings in Ethicon's brochures, the MDL Court indicated that it "was doubtful of the relevance of such testimony given the usual application of the learned intermediary doctrine to cases in these MDLs, [but] as the relevance of this testimony will best be determined on a case-by-case basis applying the applicable

---

[29] *See U.S. v. Frazier,* 387 F.3d 1244, 1263 (11th Cir. 2004); *Hull v. Merck & Co., Inc.,* 758 f.2d 1474, 1477 (11th Cir. 1985).

[30] *See Expert Opinion of Jaime L. Sepulveda-Toro MD FACOG FACS PRPC Gynemesh PS, Prolift and Prosima Devices* at 1 *and Expert Opinion of Jaime L. Sepulveda-Toro MD FACOG FACS PRPC TVT and TVTO Devices* at 1, attached hereto as Ex. 5 and Ex. 6, respectively; *see also Curriculum Vitae of Jaime L. Sepulveda-Toro, M.D.*, attached hereto as Ex. 7.

state law, I reserve ruling on this point."[31] Similarly it reserved ruling on other issues, such as the reliability of Dr. Sepulveda-Toro's review of the relevant medical literature, his opinions on Ethicon's design processes and control standards, his opinions on the adequacy of Ethicon's clinical testing, physician outreach, etc., stating that the reliability, relevance, and potential prejudicial impact of such opinions needed to be determined consistent with state law.[32] The MDL Court did not rule on Plaintiff's objections to Dr. Sepulveda-Toro's opinions on the FDA's Public Health Notices.

### Dr. Sepulveda-Toro's opinions on the FDA's Public Health Notices should be excluded

Dr. Sepulveda-Toro's opinions on whether surgeons knew or should know about the FDA's 2008 and 2013 Public Health Notices regarding mesh should be excluded as speculative and pure conjecture. In both of his reports, Dr. Sepulveda-Toro opines: "Pelvic floor surgeons using mesh to treat [POP or SUI] would be aware of and expected to know of the [FDA Public Health] Notice, the potential complications, as well as their severity and need for reoperation discussed therein, and recommendations made."[33] His opinion is not supported and constitutes pure conjecture. There is no way for Dr. Sepulveda-Toro to know, nor did he offer a

---

[31] Doc. No. 70-15 at 8-9.
[32] *Id.* at 9-10, 12, 13.
[33] Ex. 5, Dr. Sepulveda-Toro Prolift Expert Report at 15-16; Ex. 6, Dr. Sepulveda-Toro TVT Expert Report at 21.

basis for such knowledge, whether "all" pelvic floor surgeons "would be aware" of the existence of particular FDA Public Health Notices or the contents thereof (including the potential complications, severity of complications, need for reoperation, etc.) Nor did he opine as to the basis of any opinion that surgeons should be aware of such information. As such, Dr. Sepulveda-Toro's opinion on this issue should be excluded as pure conjecture, and he should not be permitted to testify that pelvic floor surgeons knew or should have known of the existence and/or contents of the 2008 FDA Public Health Notice.[34]  These *ipse dixit* opinions lack a proper basis for admissible expert testimony.

### Dr. Sepulveda-Toro's opinions on the adequacy of Ethicon's brochures should be excluded.

Dr. Sepulveda-Toro's opinions on the adequacy of Ethicon's brochures should also be excluded as speculative and based upon pure conjecture. He opines: "I have used the [POP and SUI] brochures in my practice. Both allow a patient to construct a base to be used in the conversation about the procedure."[35] However, he indicates no experience in drafting or reviewing product brochure, nor any knowledge of what information is required in product brochures. Nor does he offer

---

[34] *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) (Holding "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").
[35] Ex. 5, Dr. Sepulveda-Toro Prolift Expert Report at 18; Ex. 6, Dr. Sepulveda-Toro TVT Expert Report at 22.

any objective criteria or methodology for determining whether patient brochures provide adequate information to patients. As such, he lacks the expertise to offer such an opinion, and furthermore offers an opinion not rooted in any reliable methodology. His opinions regarding Ethicon's patient brochures should be excluded.

### Dr. Sepulveda-Toro misrepresents the robustness of the medical and scientific literature supporting his opinions, and his opinions are therefore unreliable and should be excluded.

Dr. Sepulveda-Toro's opinions on the safety of Ethicon's products (including factors such as cytotoxicity, mesh degradation, and inflammation) purport to be based upon findings in the medical and scientific literature, but he misrepresents the robustness of the literature, fails to appropriately cite to the literature so that his claims about the findings can be verified, and therefore draws unsupported and unreliable conclusions. Therefore, his opinions on cytotoxicity, mesh degradation, inflammation, and also mesh pore size (as will be addressed below) should be excluded as unreliable.

For example, Dr. Sepulveda-Toro opines: "The medical literature including over 100 Gynemesh PS studies, meta-analyses and systematic reviews do not support that mesh is cytotoxic, that it degrades or leads to a harmful inflammatory response in humans."[36]  With regard to TVT, he indicates that over 1,000 studies

---

[36] Ex. 5, Dr. Sepulveda-Toro Prolift Expert Report at 20.

are consistent with his opinions.[37] These statements are not supported by actual citations to the 100 (Gynemesh) or 1,000 (TVT) purportedly relevant studies. Thus, the accuracy of his summation of the evidence, including the number of studies on point and the purported results of those studies, cannot be evaluated and verified. This renders his report unreliable, and any opinions relying upon this cursory "summation" of the medical and scientific literature must be excluded.

Dr. Sepulvada-Toro's deposition testimony further belies his opinions regarding and reliance on the medical literature, as he admits that the number of studies he indicates in his reports, and the conclusions he draws, purportedly from them, is greatly overstated. For example, he indicated in his report that he was relying on over 1,000 TVT studies. In stark contrast, this is what he said in his deposition:

> Q:   And, so, am I correct, you cannot sit here today, Dr. Sepulveda, and tell me how many randomized control studies have been done looking at Ethicon's TVT-O? Can you agree that you can't tell me that number?
> A:   I can, I can say for certain, without looking into the long version, this is the short version of the Cochrane data review [referring to a deposition exhibit], I can say with accuracy the TOMUS trial.
> Q:   One?
> A:   Yes.[38]

He provides absolutely no basis for his opinion that over 100 POP-related studies and over 1,000 TVT-related studies exist and support his opinions.

---

[37] Ex. 6, Dr. Sepulveda-Toro TVT Expert Report at 27.
[38] Ex. 8, 4/8/2016, Deposition of Dr. Sepulveda-Toro at 82: 11-21.

13

Without the medical literature he purports to rely upon but often fails to cite, Dr. Sepulveda-Toro has no basis for many of his opinions. For example, he admitted that he has no personal experience from which he could determine whether or not polypropylene mesh degrades in the human body:

> Q:     And there are others that are more qualified than you to testify about whether or not polypropylene degrades?
> A:     I think that as a surgeon, there is a very limited information that we can give about degradation.
> Q:     And that would be including yourself?
> A:     Yes, we don't have that information one way or the other.[39]

He admits he is not qualified to opine on the subject of mesh degradation, and admits that he would not have sufficient information to opine on this subject "one way or the other."  Yet, he offers an opinion in this litigation that mesh does not degrade. This opinion should be excluded.

Finally, Dr. Sepulveda-Toro opines in his TVT report that: "The monofilament knitted Prolene TVT sling has pores which are macroporous (over 75 microns)."[40] He takes this position based solely on the fact that "AMI," an Australian based medical device company, classifies polypropylene mesh in such a way that Dr. Sepulveda-Toro believes qualifies the mesh as "macroporous" even though he admits that the AMI method of making such a determination "has its own limitations."[41] Ethicon itself takes the position that its mesh is NOT macroporous.

---

[39] *Id.* at 316:7-15.
[40] Ex. 6, Dr. Sepulveda-Toro TVT Report at 23.
[41] Ex. 8, 4/8/2016, Deposition of Dr. Sepulveda-Toro at 106:7-10.

Dr. Sepulveda-Toro fails to take into account data compiled by Ethicon's own engineers when forming his opinions.

Dr. Sepulveda-Toro's opinions on these important issues must be excluded as beyond his expertise and unreliable, because he lacks expertise and experience on these topics, and also fails to demonstrate that the relevant medical and scientific literature supports his claims. His opinions are just the sort of "conclusory statements without further explanation" that the MDL Court found "insufficient to survive *Daubert* scrutiny."[42]

### Dr. Sepulveda-Toro's opinions on the adequacy of design of Ethicon's products should be excluded.

Dr. Sepulveda-Toro opines, with regard to the POP products: "They are not defective and instead these well-studied devices have significant usefulness and utility."[43] And he opines with regard to the TVT products: "They are not defective and instead these well studied slings have significant usefulness to surgeons in our field."[44] These opinions that the products are not defective are inappropriate in that he is not a biomedical engineer, played no role in the design of these or any other medical devices, and does not have any specialized knowledge qualifying him to render such opinions.

Q:      . . . Would you consider yourself a biomedical engineer?

---

[42] *Sanchez v. Boston Sci. Corp.,* 2014 U.S. Dist. LEXIS 137189, * 29-35 (S.D.W.Va. Sept. 29, 2014).
[43] Ex. 5, Dr. Sepulveda-Toro Prolift and Prosima Report at 21.
[44] Ex. 6, Dr. Sepulveda-Toro TVT Report at 28.

A:    I do not get compensated for doing biomedical engineering.

Q:    Okay.

A:    And I did not graduate from – with a degree of biomedical engineering. I do—I do understand biomedical engineering well.

***

Q:    Have you ever, personally, designed a medical device?

A:    I—not—not a medical device, but I have my own set of needles that I actually made.

***

Q:    Were those used in connection with implanting mesh at all?

A:    No, I use them for sutures.

***

Q:    Were . . . you ever involved in the design of any transvaginal mesh devices?

A:    Not in the devices of the ones that I use.

Q:    Do you have any patents on medical devices?

A:    No.[45]

As such, Dr. Sepulveda-Toro is not qualified by training, education, or skill to opine on whether or not Ethicon's products contain design defects. His opinions on this question are speculation and conjecture and should be excluded.

In addition, Dr. Sepulveda-Toro opines: "anatomical considerations were well documented during the description and design of TVT-O."[46] This opinion is not supported by citations to any records or literature, and should be excluded as mere speculation and conjecture. Dr. Sepulveda-Toro was not involved in the design or "description" (it is unclear what he means by this) of the Ethicon products, so without citation to the evidence supporting his opinion, it is impossible to evaluate whether the basis for his opinion is reliable.

---

[45] Ex. 8, 4/8/2016, Deposition of Dr. Sepulveda-Toro at 98:2-9; 99:5-8, 12-14; 100:1-6.

[46] Ex. 6, Dr. Sepulveda-Toro TVT Report at 8.

C. **Christina Pramudji, M.D.**:  Dr. Pramudji is a urologist with a subspecialty in pelvic floor medicine. The MDL Court previously reviewed Dr. Pramudji's expert report and ruled on several challenges to her opinions. The MDL Court reserved ruling on Plaintiff's challenge to the reliability of Dr. Pramudji's opinions regarding mesh degradation. The MDL Court found that Dr. Pramudji is qualified to offer opinions regarding whether mesh degrades and whether degradation would have a clinical effect, but reserved ruling as to whether Dr. Pramudji employed a reliable methodology in reaching her opinions regarding mesh degradation.[47] The MDL Court wrote:

> Dr. Pramudji claims to have based her opinion on her personal experience and her review of the scientific literature, which, in the abstract, are reliable bases on which to form an expert opinion. . . But the Court is unable to judge the reliability of Dr. Pramudji's observations without more information about her methodology . . . I am without sufficient information at this time to draw the fine line between reliable and unreliable testimony based on a doctor's experience *not* observing something, either in her clinical practice or in the scientific literature. Accordingly, I reserve ruling until further testimony may be offered and evaluated firsthand at trial.[48]

**Dr. Pramudji's opinions regarding mesh degradation, beyond what she has observed in her clinical practice, should be excluded as unreliable.**

Dr. Pramudji's expert report expresses the opinion that "the data in women does not support that the Prolene mesh degrades, or that if it did, it would have a

---

[47] Doc. No. 70-13, MDL Court Memorandum Opinion and Order re: Dr. Pramudji, at 8-9.
[48] *Id.*

clinically significant effect."[49] However, Dr. Pramudji has not utilized a reliable method (or indeed any method) to reach this conclusion. Dr. Pramudji's opinions amount to nothing more than baseless assumptions, and the law is clear that such "unsupported speculation" is not only insufficient, but precisely what *Daubert* is aimed to prevent.[50] The MDL Court previously ruled that Dr. Pramudji could testify as to what she has observed regarding degradation in her clinical practice, but it is not scientifically reliable to draw broad conclusions from personal observations, as Dr. Pramudji does in her expert reports.

Dr. Pramudji readily admits that she does not know much about the scientific properties of the polypropylene mesh used in Ethicon products.[51] She also does not know the chemical processes involved with mesh degradation:

> Q:    … you know that it's made of polypropylene, but you're not intending to offer opinions here concerning the chemical processes that are involved with polypropylene?
>
> A:    I don't know about the chemical process.[52]

Moreover, Dr. Pramudji concedes she has never done any of the following:

- Tested polypropylene mesh to see if it degrades;
- Looked at polypropylene under a microscope;
- Looked at explanted polypropylene sutures and analyzed them for degradation;
- Asked a pathologist about polypropylene degradation;
- Sought out and/or reviewed any additional information from Ethicon regarding the chemical makeup of polypropylene mesh;

---

[49] Ex. 9, Pramudji TVT Expert Report at 2; Ex. 10, Pramudji Prolift Expert Report at 3.
[50]  *Daubert,* 509 U.S. 579, 590.
[51] See, e.g. Ex. 11, 4/11/2014 Dr. Pramudji Deposition at 133:19-134:2.
[52] Ex. 11, 4/11/2014 Dr. Pramudji Deposition at 134:7-13.

    • Performed independent studies related to polypropylene degradation.[53]

When asked directly how, in fact, she knows whether or not polypropylene mesh deteriorates, Dr. Pramudji testified: "Because it doesn't."[54] This is merely the expert's own "hypothesis and speculation" and not the basis for a reliable opinion.[55]

Dr. Pramudji attempts to further support her opinions by stating that she has not heard of degradation in her review of literature.[56] However, Dr. Pramudji confirms that she reviewed literature and documents provided by Ethicon, but did not ask Ethicon to provide her with *all of the information* that they have concerning degradation.[57] Though Dr. Pramudji has primarily reviewed a cherry-picked selection of studies on this topic, a clearly unreliable method, she does concedes that she has seen what she characterizes as "remote studies" that do, in fact, demonstrate polypropylene degradation.[58] She does not sufficiently account for studies inconsistent with her opinion, as one must in reaching a reliable opinion under *Daubert*, and points to studies which do not look specifically at degradation to support her critique of the one study showing degradation that she does

---

[53] Ex. 11, 4/11/2014 Dr. Pramudji Deposition at 132:1-134:10
[54] Ex. 11, 4/11/2014 Dr. Pramudji Deposition at 1134:16-19.
[55] *Doe v. Ortho-Clinical Diagnostics, Inc.,* 440 F. Supp. 2d 465, 473-74 (M.D.N.C. 2006) (excluding expert testimony based on a literature review, stating that it must be based on more than "hypothesis and speculation," that the review was "disconnected" and not derived by the scientific method.)
[56] Ex. 11, 4/11/2014 Dr. Pramudji Deposition at 136:21-138:15.
[57] Ex. 11, 4/11/2014 Dr. Pramudji Deposition at 132:6-11.
[58] Ex. 11, 4/11/2014 Dr. Pramudji Deposition at 136:21-138:15.

address.[59] Of particular concern is Dr. Pramudji's assertion that there is *nothing* she could learn about the material used in the Ethicon products, or that she could see in the medical literature about polypropylene degradation, that would change her opinion, which is based upon her personal opinion and a cherry-picked selection of studies.[60] Reliable science requires one to consider the full spectrum of relevant data, and one's conclusions cannot be reliable if one simply dismisses any findings that do not support one's preconceived expectations.

## III.    CONCLUSION

For the reasons set forth herein, Plaintiff respectfully asks that the Court limit the testimony of Ethicon's experts Dr. Factor, Dr. Sepulveda-Toro, and Dr. Pramudji to testimony that is based on reliable methodology, is within their respective areas of expertise, and will assist the trier of fact.

---

[59] Ex. 10, Dr. Pramudji's Prosima Expert Report at 35-36.
[60] Ex. 11, 4/11/2014 Dr. Pramudji Deposition at 141:7-142:3.

## RULE 3.01(g) CERTIFICATION

Pursuant to United States District Court, Middle District of Florida Local

Rule 3.01(g), the parties conferred by telephone and email regarding this motion on

February 10, 2021, February 11, 2021 and February 15, 2021. The Parties agreed

that the Court adopted the MDL court's general *Daubert* rulings and, therefore,

have narrowed the scope of the *Daubert* challenges to only those issues reserved by

the MDL court.  Defendant opposes Plaintiffs' motion.

Dated: February 16, 2021          */s/ Daniel J. Thornburgh*
                                  Daniel J. Thornburgh
                                  Bobby J. Bradford
                                  AYLSTOCK, WITKIN, KREIS &
                                  OVERHOLTZ, PLLC
                                  17 E. Main Street, Suite 200
                                  Pensacola, Florida 32502
                                  Tel: (850) 202-1010
                                  Fax: (850) 916-7449
                                  bbradford@awkolaw.com
                                  dthornburgh@awkolaw.com

                                  *Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 16, 2021, I electronically filed the forgoing document with the Clerk of Court using CM/ECF, which will send notification of such filing to the CM/ECF participants registered to receive service in this case.

/s/ Daniel J. Thornburgh
Daniel J. Thornburgh