# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

MICHELLE A. GEERY,

     Plaintiff,

v.

ETHICON INC.,
JOHNSON & JOHNSON,

     Defendants.

Civil Action No.
6:20-cv-01975-RBD-LRH

## PLAINTIFF'S MEMORANDUM IN OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Michelle Geery submits this response to Defendants' Motion for Partial Summary Judgment. There are genuine issues of material fact as to Plaintiff's failure-to-warn, fraud, and misrepresentation-based claims, [1] and as to the knowledge and conclusions regarding Prolift and TVT-O by implanting surgeon, Dr. Virgil Davila, that render summary judgment inappropriate. The remaining issues raised by Defendants have no legal or factual merit.

---

[1] Ms. Geery will not pursue any causes of action for Negligent Infliction of Emotional Distress (Count X), fraudulent concealment (Count VII), Constructive Fraud (Count VIII), or Consumer Protection (XIII) and has previously stipulated to the dismissal of her claims related to Count I: Negligence (as to Manufacturing Defect); Count II: Strict Liability – Manufacturing Defect; Count IV: Strict Liability – Defective Product (except to the extent the latter encompasses design defect and failure to warn); Count XI: Breach of Implied Warranty; Count XII: Breach of Express Warranty; and Count XV: Unjust Enrichment.  Ms. Geery has thus not responded to Defendants' arguments against these claims.

## PLAINTIFF'S STATEMENT OF DISPUTED
## MATERIAL FACTS ("SDMF")

### A. Plaintiff's Experience with Mesh

1.      On May 16, 2006, Plaintiff was implanted with Defendants' Prolift (anterior and posterior) and TVT-O synthetic mesh devices by Dr. Virgil Davila. Ex. 1, Med. Rec. GEERYM_SOUSH_MDR00036.

2.      Plaintiff initially presented to Dr. Davila with "symptomatic relaxation and stress urinary incontinence."  Ex. 1, Med. Rec. GEERYM_SOUSH_MDR00036; Ex. 1, Med. Rec. GEERYM_SOUSH_MDR00039.

3.      Since being implanted with the Prolift and TVT-O, Plaintiff has undergone three surgeries to remove portions of the mesh, in 2015, 2016, and 2017.  Ex. 1, Med. Rec. GEERYM_ADVAURO_MDR00187-88; Ex. 1, Med. Rec. GEERYM_UFHWCP_MDR00017-19; Ex. 1, GEERYM_ADVAURO_MDR00329.  Plaintiff's injuries caused by the defective meshes include chronic pelvic pain, dyspareunia, neuromuscular pain, vaginal shortening, nerve pain, and pelvic floor spasms, among other injuries.  Plaintiff has additionally undergone pelvic floor therapy and pain management—including both injections and medication management.  *See* Ex. 2, Plaintiff's Fact Sheet.

### B. Dr. Davila's Experience with Defendants' Prolift Device

4.      Prior to implanting Defendants' mesh devices in Plaintiff, Dr. Davila

attended Ethicon training sessions on the Prolift and TVT-O devices.  Ex. 3, deposition of Virgil Davila, M.D., July 18, 2019, at 17:23-18:25; 55:24-56:3.

5.      Prior to implanting Defendants' mesh devices in Plaintiff, Dr. Davila reviewed the package insert—also known as the Instructions for Use ("IFU")—for the Prolift and TVT-O devices.  Dr. Davila testified the IFU was an important document which contained the warnings and contraindications for the mesh devices, and that he relied on the warnings and contraindications in the IFUs when advising his patients of the risks and benefits of the devices and whether to use them.  Ex. 3, Davila Dep. at 22:1-23:23.

6.      Dr. Davila testified that, even as an "early user" of the Prolift device, he did not know that the Prolift device had not been cleared by the FDA.  Ex. 3, Davila Dep. at 26:8-14.  He did not learn that Prolift was not cleared by the FDA until May 2008, and he testified that he would have liked to have known that when he implanted Plaintiff with the Prolift device in 2006.  *Id.* at 25:15-25.

7.      Dr. Davila stopped using the Prolift in his practice in 2007 because it was not in the best interests of his patients. Ex. 3, Davila Dep. at 33:1-7-34:9-16.

## C. Dr. Davila's Knowledge of the Prolift and TVT-O Devices

8.      The warnings provided in the Prolift IFU, which were consistent with information provided during Defendants' training, described the inflammatory response to the device as "transient," which Dr. Davila knew to mean short-lived.

During the time he was using the Prolift, Dr. Davila believed, based on the IFU, that his patients' body's inflammatory reaction to the device would be temporary and not permanent, chronic, and/or lifelong.   Ex. 3, Davila Dep. at 53:2-55:10; 151:10-151:22.

9.      Dr. Davila testified he did not know of the following risks of Prolift at the time he implanted Ms. Geery, and that had he known of these risks, he would have advised Ms. Geery of them during his risk/benefit discussions with her:

a. The original study on Prolift failed its primary endpoint.  (Ex. 3 at 37:13-38-10.)
b. Ethicon's chief medical director believed a reasonable argument could be made that the risks of Prolift outweighed the benefits at the time of launch. (Ex. 3 at 38:11-39:10.)
c. Ethicon never investigated mesh contraction prior to launching Prolift. (Ex. 3 at 39:11-40:6.)
d. Ethicon knew the contraction rate of Prolift was 20-40%. (Ex. 3 at 40:7-41:24.)
e. Ethicon never investigated the risk of chronic pain with the Prolift. (Ex. 3 at 40:25-41-21.)
f. The inventors of Prolift's main concern with the device was contraction and they wanted to create a new material before the Prolift was ever launched. (Ex. 3 at 42:9-43:1.)
g. Ethicon medical director Axel Arnaud believed if exposure and shrinkage were due to the mesh, the material should have been changed and never put in the Prolift. (Ex. 3 at 43:2-43:24.)
h. Ethicon launched Prolift without studying whether the Prolift mesh could be removed if complications arose with the mesh. (Ex. 3 at 43:25-44:14.)
i. Ethicon medical director Axel Arnaud wanted to change the Prolift package insert (IFU) to include a warning that use of mesh could lead to complications such as vaginal erosion and retraction which could interfere with sexual intercourse, but Ethicon never made the change. (Ex. 3 at 50:7-51:23.)
j. Ethicon knew there was a risk of pelvic pain in patients which may

4

not resolve regarding the mesh. (Ex. 3 at 152:14-154:6.)

    k.  Ethicon knew there was a risk of pain with intercourse which in some patients may never resolve. (Ex. 3 at 152:14-154:6.)

    l.  Ethicon knew there was a risk of excessive shrinking or contraction around the mesh that could cause vaginal scarring, vaginal tightening and potentially vaginal shortening. (Ex. 3 at 152:14-154:6.)

10.    The warnings provided in the TVT-O IFU were consistent with what Ethicon taught Dr. Davila at his Ethicon training about the risks of the device. The TVT-O warnings also described the inflammatory response to the device as "transient." It was Dr. Davila's understanding at the time he implanted the TVT-O that his patients' inflammatory reactions to the device would be temporary and not permanent, chronic, and/or lifelong. Ex. 3, Davila Dep. at 53:2-55:10 (generally); 60:13-62:18; 151:10-22).

11.    Dr. Davila testified he did not know of the following risks of TVT-O at the time he implanted Ms. Geery and had he known of the following risks, he would have advised Ms. Geery of them during his risk/benefit analysis with her:

    a.  Ethicon knew there was a risk of pain with intercourse which in some patients may never resolve. (Ex. 3 at 69:13-19; 71:7-21.)

    b.  Ethicon knew there was a risk of acute and/or chronic pain. (Ex. 3 at 69:20-21; 71:7-21.)

    c.  Ethicon knew there was a risk of neuromuscular problems, including acute and/or chronic pain in the groin, leg, pelvic and abdominal area. (Ex. 3 at 69:22-25; 71:7-21.)

    d.  Ethicon knew there was a risk of one or more revision surgeries may be necessary because of these adverse reactions. (Ex. 3 at 70:1-4; 71:7-21.)

    e.  Ethicon knew there was a risk in some cases in which the mesh needs to be removed in part or whole, significant dissection may be

required.  (Ex. 3 at 70:5-8; 71:7-21.)

f.  Ethicon knew there was a risk of excessive contraction or shrinkage of the tissue surrounding the mesh.  (Ex. 3 at 70:12-17; 71:7-21.)

g.  Dr. Davila was taught by Ethicon (through training and the IFU) that any inflammatory reaction from the TVT-O would be temporary and any complication regarding the inflammation would be temporary as opposed to permanent and lifelong.  (Ex. 3 at 62:4-13.)

12.     Dr. Davila testified that the frequency, severity, treatability, and potential permanency of risks from medical devices is important, and he (and through him his patients) deserved to know what Ethicon knew about each of those topics. These risks were not warned of by Ethicon.  Ex. 3, Davila Dep. at 146:5-147:24.

13.     Michelle Geery would not have agreed to have the Prolift or TVT-O implanted in her, and thus would never have been injured by the products, had Dr. Davila advised her of the risks listed in Paragraphs 10 and 12.  Ex. 4, Affidavit of Michelle Geery, dated August 28, 2019.  However, Dr. Davila could not have warned Plaintiff of these risks because he was not informed of them at the time of Plaintiff's implant.

## SUMMARY JUDGMENT STANDARD

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is

"'genuine' only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *In re Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.*, 748 F. App'x 212, 215 (11th Cir. 2018) (quoting *Atheists of Fla., Inc. v. City of Lakeland*, 713 F.3d 577, 589 (11th Cir. 2013)).  When the Court evaluates a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Libby Lobby*, 477 U.S. 242, 255 (1986).

## ARGUMENT

### I.   Florida Substantive Law Applies to Plaintiff's Substantive Claims, But New Jersey Law Applies to Plaintiff's Punitive Damages Claim.

Here, Plaintiff agrees with Defendants that Florida has the most significant relationship to Plaintiff's substantive claims.  However, Plaintiff believes that New Jersey law should apply to Plaintiff's request for punitive damages.  It is uncontroverted that both Defendants are incorporated and headquartered in New Jersey, and that is where the decisions concerning the design, marketing, distribution, and labeling (*i.e.*, the tortious conduct) occurred.  In *Smith v. Ethicon, Inc. et al.*, Case No. 4:20cv394-MW/MAF (N.D. Fla. Dec. 28, 2020), a case involving the TVT-O and similar allegations of tortious conduct, a Florida district court held that New Jersey law applied to plaintiff's claim for punitive damages, reasoning that "Florida courts apply the 'most significant relationship' test, not to a

collectively sum of issues in dispute, but to each individual issue which arises in [a] case." *Id.* (quoting *Judge v. Am. Motors Corp.*, 908 F.2d 1565, 1578 (11th Cir. 1990) and citing *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999 (Fla. 1980)). Moreover, "[c]ourts applying Florida choice-of-law principles have repeatedly emphasized the deterrence rationale underlying punitive damages and concluded that the place of tortious conduct is more important than the place of injury when deciding which state's law should govern punitive damages." *Id.* (citing *Salinero v. Johnson & Johnson*, 408 F. Supp. 3d 1357 (S.D. Fla. 2019; *Krause v. Novartis Pharm. Corps.*, 926 F. Supp. 2d 1306, 1310-12 (N.D. Fla. 2013)).

Here, the place of injury—Florida—is "simply fortuitous." *Id.* (citation omitted). New Jersey's interest in deterring Defendants' tortious conduct outweighs any interest Florida may have. As such, New Jersey law should apply to Plaintiff's request for punitive damages.

## II.      Plaintiff is Not Pursuing her Manufacturing Defect Claim.

In light of the Court's consistent rulings across these pelvic mesh MDLs as to manufacturing defect, Plaintiff does not intend to pursue a separate claim for "manufacturing defect," as such claim has been construed by the Court (not manufactured in accordance with design, or departure from manufacturer's design specifications). Ex. 5, *Cisson*, C.A. No. 2:11-cv-00195, Dkt. No. 272 (Memorandum Opinion and Order, Bard Motion for Partial Summary Judgment),

p. 8; *see also* Ex. 6, *Tyree v. Boston Scientific Corp.*, Case 2:12-cv-08633, Dkt. No. 446, pp. 5-6.

However, in support of Plaintiff's negligence, failure to warn, and punitive damages claims, Plaintiff intends to present evidence that Ethicon's manufacturing process and the raw materials used in the manufacture of the Gynemesh PS, Prolift, TVT-O, and TVT products resulted in defects in the product.  This is consistent with the Court's prior rulings.  *See e.g.*, Ex. 5, *Cisson*, C.A. No. 2:11-cv-00195, Dkt. No. 272 (Memorandum Opinion and Order, Bard Motion for Partial Summary Judgment), p. 8.  Although not contesting Ethicon's motion as to "manufacturing defect," Plaintiff does not forego, waive, or in any way agree that any evidence relating to Ethicon's manufacturing process and raw materials should be excluded or restricted in advance of trial.

## III.  The Court Should Deny Defendants' Motion for Partial Summary Judgment on Plaintiff's Negligence and Strict Liability Failure-to-Warn Claims.

The record evidence is replete with facts showing that Defendants are not entitled to partial summary judgment on Plaintiff's failure-to-warn claims.  To establish a failure-to-warn claim, a plaintiff must prove that the "defendant (a) is a manufacturer or distributor of the product at issue, and (b) did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of the

manufacture and distribution." *Thomas v. Bombardier Recreational Prods., Inc*., 682 F. Supp. 2d 1297, 1300 (M.D. Fla. 2010) (citation omitted).

The "sufficiency and reasonableness of a manufacturer's warnings are questions of fact which are best left to the jury to decide unless the warnings are accurate, clear and unambiguous." *Scheman-Gonzalez v. Saber Mfg. Co.,* 816 So. 2d 1133, 1139-40 (Fla. Dist Ct. App. 2002). For example, in *Union Carbide Corp. v. Kavanaugh*, 879 So. 2d 42, 45-46 (Fla. Dist. Ct. App. 2004), the manufacturer gave "some warning," but "did not fully disclose the magnitude of the hazards then known to exist." The Florida appellate court affirmed the order denying directed verdict because the manufacturer supplied only "limited information." *Id.* at 46. As in *Kavanaugh*, the adequacy of the warning was for the jury to decide. *Zanzuri v. G.D. Searle & Co.*, 748 F.Supp 1511, 1516 (S.D. Fla. 1990)(holding a fact question existed on the adequacy of warnings for an intrauterine device that provided "a qualified warning, the adequacy of which must be resolved through a highly intensive factual inquiry).

When the device at issue is a prescription drug or medical device, Florida law provides that the manufacturer's duty to warn is extended to the patient's physician rather than the patient (the Learned Intermediary Doctrine). *Zanzuri* at 1517; *Ocasio v. C.R. Bard, Inc*., 2015 WL 3496062, at \*4 (M.D. Fla. June 3, 2015). In essence:

> [t]he manufacturer's duty to warn of drug hazards runs to the physician, not directly to the patient. The learned intermediary rule provides that the failure of the manufacturer to provide the physician with an adequate warning of the risks associated with a prescription product is not the proximate cause of a patient's injury if the prescribing physician had independent knowledge of the risk that the adequate warning should have communicated.

*Christopher v. Cutter Labs.*, 53 F.3d 1184, 1192 (11th Cir. 1995) (citing *Felix v. Hoffmann–LaRoche, Inc.*, 540 So. 2d 102, 104 (Fla. 1989)) (internal citations omitted).

Here, the prescribing physician, Dr. Davila, has testified that, in 2006, he did not have independent knowledge of the omitted risk information he believes Ethicon should have communicated to him, and that he would have given Plaintiff different warnings if he had had more information. SDMF ¶¶ 9-14. Plaintiff verified that she would have made a different treatment decision had she been offered more complete information. SDMF ¶14.

Where there is even the "slightest doubt" that the physician would have altered his treatment of the patient based on different or additional warnings— either in deciding not to use the product <u>or just passing along a more detailed warning to the patient</u>—Defendants' Motion must be denied. *Scheibe v. Bank of Am., N.A.*, 822 So. 2d 575, 575 (Fla. 5th DCA 2002). *See e.g.*, *Guenther v. Novartis Pharms. Corp.*, 2014 WL 657919, at *2–3, (M.D. Fla. Feb.20, 2014) (denying motion on proximate cause issue under Florida law where there was

sufficient evidence that a different warning could have prevented the plaintiff's injury by "prompting the physician to pass along a more detailed warning"); *Kirchman v. Novartis Pharm. Corp.*, 2014 WL 2158519, at *19 (M.D. Fla. May 23, 2014) (denying summary judgment on the issue of proximate cause because there was evidence from which "a reasonable juror could find that [the prescribing physician], had he been adequately warned, would have changed his prescribing practices by giving different warnings or instructions to [the plaintiff]" and that the plaintiff, "had he been given different warnings or instructions, would have declined [the drug]"); *Toole v. McClintock*, 999 F.2d 1430, 1433 (11th Cir. 1993) (holding that, under Alabama's learned intermediary doctrine, "[t]he jury . . . could reasonably conclude that a different warning would have caused [the physician] to warn [the plaintiff of possible rupture] before her augmentation surgery.").

Dr. Davila was not alone in thinking that the warnings in the IFU and physician training were insufficient. With respect to the Prolift, Plaintiff's general expert, Dr. Dan Elliot—a urogynecologist at Mayo Clinic—unequivocally opined that the IFU warnings of the Prolift were inadequate:

> Each of the risks, adverse reactions, contraindications, [] warnings, and the clinical consequences, should have been clearly placed and stated in the IFU so that the patients' implanting surgeon would be fully informed and so the patient could have been informed. The following lists inadequacies in the development of the Prolift and the information provided to physicians and patients: [Deficiencies enumerated]. . .

> It is my opinion to a reasonable degree of medical probability that Ethicon did not fully disclose the above risks and those discussed in this report, in its IFU and to surgeons and thereby denied the patient the right to full information about her surgery. This is true despite the information being readily available and known to Ethicon about these risks, which predate the launch of the device.

Ex. 7, Elliott Prolift General Report at pgs. 53-57.

Defendants failed to inform Dr. Davila, through the IFU or physician training, of many of the risks Dr. Elliot indicated in his report were known to Defendants. The myriad of specific risks regarding the Prolift device, known to Defendant, that Dr. Davila testified he would have advised Ms. Geery of during his risk/benefit analysis with her if he had known them at the time of her implant are contained within paragraphs 9-10, 13, & 14 of the SDMF above.

Similarly, with respect to the TVT-O, the IFU and Dr. Davila's device training failed to describe certain risks associated with using the TVT-O device. Again, Dr. Elliot has unequivocally opined that the IFU warnings of the TVT-O were inadequate. Among other deficiencies, Defendants failed to disclose the risks of: chronic pelvic pain, permanent dyspareunia, permanent sexual dysfunction, injury and pain to partner during sexual intercourse, negative impact on sexual function, vagina anatomic distortion, inability to remove the device, permanent risks for erosions, surgical interventions, development of worsening incontinence and urinary dysfunction. Defendant failed to advise that the TVT-O mesh could rope, curl, fray, degrade, contract, or cause a chronic inflammatory or foreign body

reaction. "Ethicon also failed to include warnings in its IFU related to the increased risk of mesh extrusion in women with prior vaginal surgeries, vaginal atrophy, vaginal injury, pre-existing pelvic pain disorders, immune-compromised and post-operative infection." Ex. 8, Elliott TVT-O General Report Exhibit 5 at 37-40.

Dr. Elliott noted that his review of internal documents and the depositions of Ethicon employees revealed that Ethicon was aware of these risks before or at the time the TVT-O was first marketed and sold. For example:

> Ethicon states in its IFU that the mesh is not subject to degradation, which is also inconsistent with Ethicon internal studies and documents and scientific studies examining mesh degradation. In short, Ethicon not only failed to disclose certain risks associated with the product, it downplayed or inaccurately portrayed issues related to the mesh in the IFU. Ethicon prevented physicians from being able to have an appropriate and accurate informed consent discussion with their patients by concealing and misrepresenting this type of information. As a result, numerous patients have suffered injuries from the TVT-O device that were not disclosed to them as potential adverse risks related to the TVT-O.

Ex. 8, Elliott TVT-O General Report Exhibit 5 at 37-40.

As with the Prolift, Defendants failed to inform Dr. Davila of many of the risks associated with use of the TVT-O that Dr. Elliot described. These risks were not described within the TVT-O IFU or Dr. Davila's training with Ethicon. The myriad of specific risks of the TVT-O Dr. Davila testified he

would have advised Ms. Geery of during his risk/benefit analysis with her if he had known them at the time of her implant are contained in SDMF, ¶¶ 11-14 above. Because of Defendants' failure to include these identified risks in the TVT-O IFU and training materials, Dr. Davila was unable to adequately inform Plaintiff of the true risks associated with use of the TVT-O. Plaintiff has indicated that she would have made different treatment decisions had she been aware of all the risks known to Defendants.

Had Dr. Davila known of the aforementioned risks of Prolift and TVT-O, he would have included them in his risk/benefit discussion with Ms. Geery, thus informing her of all the possible risks associated with these products, and Ms. Geery would never have agreed to have the Prolift or TVT-O implanted in her and thus would never have been injured by the products.[2] Ex. 4, Affidavit of Michelle Geery. This testimony is sufficient under Florida law to at the very least create a genuine issue for trial to be resolved by a jury. *See e.g.*, *Toole* at 1433; *Guenther* at 1304; and *Kirchman* at *19.

This case is squarely on point with another recently-decided case involving transvaginal mesh products decided under Florida law. *Eghnayem v. Boston Scientific Corp.*, 873 F.3d 1304 (11th Cir. 2017). In *Eghnayem*, the Plaintiff was implanted with Boston Scientific Corp.'s mesh device, the

---

[2] And to reiterate, at least with respect to the Prolift, Dr. Davila stopped using the Prolift in his practice in 2007 because it was not in the best interests of his patients. Ex. 3, Davila Dep. at 33:1-7-34:9-16.

Pinnacle.  *Id*. at 1311.  Boston Scientific Corp. argued its warnings were adequate and sufficiently clear so they merited judgment as a matter of law. However, the court held that the Pinnacle warnings (which are similar to the warnings for the Prolift and TVT-O) did not meet that standard and affirmed the Plaintiffs' verdict.  Boston Scientific Corp additionally argued, as Ethicon does here, that Plaintiff fails to show the inadequate warnings caused her injuries. Boston Scientific Corp "argues that she (Eghnayem) failed to show that the inadequate warnings affected her doctor's decision to use the Pinnacle, but her doctor testified that he would have liked to know the risk of mesh contracture, acute and permanent inflammation, and chronic pain, and that had he known he would have had 'concerns about [ ] using [the Pinnacle] in a patient' and would have discussed those concerns with Eghnayem. This testimony does not 'point so overwhelmingly in favor of' BSC that no reasonable jury could find that the failure to warn proximately caused Eghnayem's injuries. *Slicker v. Jackson*, 215 F.3d 1225, 1229 (11th Cir. 2000) (quotation omitted)."  *Id*. at 1323.

The evidence in this case is strikingly similar to the evidence from *Eghnayem*.  With Rule 56 motions, the Court's function is not "to weigh the evidence and determine the truth of the matter;" rather, the Court's function is to "determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).  Plaintiff has sufficiently established genuine issues that are properly reserved for resolution by a jury. Thus, Defendants' Motion for

Partial Summary Judgment on Plaintiff's Negligence and Strict Liability Failure to Warn claims is due to be denied.

### IV.   Plaintiff's Fraud and Misrepresentation-Based Claims Are Cognizable Under Florida Law and Are Sufficiently Supported by Record Evidence (Counts XI and XII).

Defendants attempt to lean on the learned intermediary doctrine in arguing that Plaintiff's fraud and misrepresentation claims fail.  But, this argument misses the mark.  Defendants failed to provide Dr. Davila with adequate and necessary information about the *true* risks associated with its Prolift and TVT-O devices. This failure precludes Defendants from relying on the learned intermediary doctrine to bar Plaintiff's claims.  At the very least, Plaintiff has sufficiently established that there are disputed issues of fact surrounding Defendants' misrepresentations of the safety and efficacy of their products to both physicians and consumers, and whether they knew such representations to be false.

As to Plaintiff's fraud- and misrepresentation-based claims, the evidence overwhelming shows that Defendants failed to fully inform physicians and consumers of the dangers associated with the Prolift and TVT-O devices, that they knew the information they provided to physicians in both the IFUs and training sessions was false, that Dr. Davila relied on their false claims, and Plaintiff was harmed as a result thereof.  As such, Defendants cannot persuasively argue that the learned intermediary doctrine bars Plaintiff's claims when Dr. Davila was unaware

17

of the serious and prevalent risks that accompany the Prolift and TVT-O devices.

Another court in this Circuit has found such misrepresentations to be sufficient to

withstand summary judgment, even in light of the learned intermediary doctrine.

*See Aldridge v. Ethicon, Inc.*, 2020 WL 1308335, at *5 (S.D. Ala. March 19, 2020)

(holding, with respect to the plaintiff's fraud and misrepresentation claims, the

"[the] plaintiff's evidence is that Ethicon fraudulently misrepresented or

suppressed known risks about the Prolift and Abbrevo products in the warnings

given to [the plaintiff's physician], the learned intermediary.  The record in the

light most favorable to plaintiff supports a reasonable inference that [the plaintiff's

physician] reasonably relied on the accuracy and completeness of those warnings,

and that [the plaintiff] reasonably relied on her prescribing health-care professional

. . . . Accordingly, summary judgment is not appropriate on the fraud /

misrepresentation claims.").

Moreover, Defendants seemingly attempt to argue a lack of causation as to

Plaintiff's fraud and misrepresentation-based claims.  Not only is it difficult to

decipher what Defendants are arguing, as there is a complete lack of record

evidence cited to support this contention, but the record evidence clearly shows

that, had Dr. Davila been fully aware of all the risks associated with Defendants'

Prolift and TVT-O devices, he would have adequately informed Plaintiff of the

true risks associated with the Prolift and TVT-O, she would not have been

implanted with the devices, and she would not have suffered her injuries.

Consequently, Defendants' Motion for Partial Summary Judgment as to Plaintiff's claims for fraud (Count VI), negligent misrepresentation (Count IX), and consumer fraud (Count XIII) should be denied.

## V.    Plaintiff Concedes that Her Claim for Gross Negligence Cannot Survive as a Standalone Cause of Action Under Florida Law

Plaintiff believes that New Jersey Law applies to her request for punitive damages. However, should the Court determine that Florida law, rather than New Jersey law applies to the issue of punitive damages in this case, Plaintiff has pled gross negligence as a mechanism for acknowledging the requisite burden of proof for punitive damages under Florida law.[3]  Until such a determination is made by this Court, Plaintiff reserves the right to assert and establish an independent cause of action for gross negligence on the part of Defendants.

## CONCLUSION

In light of the foregoing, Plaintiff respectfully requests that the Court enter an Order denying Defendants' Motion for Partial Judgment with regard to her claims for failure to warn (Count I – negligence and Count III – strict liability); design defect (Count I – negligence and Count V – strict liability); fraud- and

---

[3] "Under Florida law, '[a] defendant may be held liable for punitive damages only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence.'" *Taylor v. Mentor Worldwide LLC*, 940 F.3d 582, 596 (11th Cir. 2019) (quoting Fla. Stat. § 768.72(2)).  Plaintiff has more than enough factual evidence in this case to show gross negligence on the part of Defendants.

misrepresentation-based claims (Counts VI – fraud and Count IX – negligent

misrepresentation); and Punitive Damages (Count XVII).


Dated: March 17, 2021                  */s/ Daniel J. Thornburgh*
                                       Daniel J. Thornburgh
                                       Bobby J. Bradford
                                       AYLSTOCK, WITKIN, KREIS &
                                       OVERHOLTZ, PLLC
                                       17 E. Main Street, Suite 200
                                       Pensacola, Florida 32502
                                       Tel: (850) 202-1010
                                       Fax: (850) 916-7449
                                       bbradford@awkolaw.com
                                       dthornburgh@awkolaw.com

                                       *Counsel for Plaintiff*




## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2021, I electronically filed the forgoing

document with the Clerk of Court using CM/ECF, which will send notification of

such filing to the CM/ECF participants registered to receive service in this case.


                                       */s/ Daniel J. Thornburgh*
                                       Daniel J. Thornburgh